**Peter J. LIMONE, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. Action No. 02cv10890–NG.**

United States District Court, D. Massachusetts.

July 26, 2007.

148

Edwin Durham, Michael Rachlis, Rachlis, Durham, Duff, Adler, Chicago, IL, Howard Friedman, Jennifer L. Bills, Myong J. Joun, Law Offices of Howard Friedman, P.C., Christine Marie Griffin, Juliane Balliro, John C. Foskett, Wolf, Block, Schorr & Solis–Cohen LLP, Michael Avery, Suffolk University Law School, William T. Koski, Koski & Kearns LLP, Richard D. Bickelman, Posternak Blankstein & Lund LLP, Daniel R. Deutsch, Deutsch Williams Brooks Derensis & Holland, P.C., Boston, MA, Bridget Ciarlo, Glenn E. Coe, Austin J. McGuigan, Rome McGuigan Sabanosh, P.C., Joseph B. Burns, Hoberman, McGuigan, Freidman, McNamara & Ruberto, P.C., Hartford, CT, Victor J. Garo, Law Offices of Victor J. Garo, Medford, MA, John Cavicchi, Boston, Ma, for Plaintiffs.

Keith H. Liddle, Mary McElroy Leach, Bridget Bailey Lipscomb, U.S. Department of Justice, Washington, DC, John M. Connolly, Michael B. Meyer, Meyer, Connolly, Sloman & MacDonald, LLP, James M. Chernetsky, City of Boston Law Department, Thomas R. Donohue, Brody, Hardoon, Perkins & Kesten, Edward J.

Lonergan, Boston, MA, E. Peter Mullane, Mullane, Michel & McInnes, Cambridge, MA, Katherine A. Carey, Civ. Div., Dept. of Justice, Washington, DC, for Defendant.

Dennis Condon, Waltham, MA, pro se.

John Morris, Niceville, FL, pro se.

*MEMORANDUM AND ORDER*
*RE: BENCH TRIAL*

GERTNER, District Judge.

TABLE OF CONTENTS

I. *INTRODUCTION* ..................................................... 151

II. *PROCEDURAL BACKGROUND* .......................................... 155

III. *FACT FINDINGS* ................................................... 157
 A. *The FBI Program to "Get" La Cosa Nostra* ........................... 159
 1. *Patriarca Wire* ...................................................... 160
 2. *"Top Echelon Criminal Informant Program"* ....................... 160
 3. *Significance of (1) and (2)* ....................................... 161
 B. *The Boston FBI, the Flemmi Brothers and Barboza* ................... 161
 1. *Agents Rico and Condon* ......................................... 161
 2. *The Flemmi Brothers* .............................................. 163
 a. *Jimmy Flemmi* ................................................ 163
 b. *Stephen Flemmi* ............................................. 164
 3. *Using the Flemmi Brothers to Turn Barboza into a Witness* .......... 166
 4. *Rico and Condon Meet with Barboza* .............................. 167
 a. *Meetings Before September 1967* ............................... 167
 (1) *March 8, 1967* .......................................... 167
 (2) *March 21, 1967* ......................................... 168
 (3) *April 11, 1967* ......................................... 169
 (4) *April 27, 1967* ......................................... 169
 (5) *May 22, 1967* ......................................... 169
 (6) *Summer of 1967* ....................................... 170
 b. *Barboza Mentions the Plaintiffs for the First Time on September 8, 1967* ........................................ 171
 (1) *What the FBI Knew about the Deegan Murder Before The Murder* ............................................. 172
 (2) *What the FBI Knew after the Murder* .................... 173
 (3) *What the Local Authorities Knew about the Deegan Murder* ............................................ 177
 c. *The September 8 Interview and the Indictment* ................ 178
 C. *The Deegan Trial* .................................................. 181
 1. *Trial Preparation: An Allegedly "Independent Investigation"* ....... 181
 2. *The Trial* ......................................................... 184
 3. *The Verdict* ...................................................... 189
 D. *Between the Deegan Murder Trial and the Nolle Prosequi* ............ 189
 1. *Praises for Rico and Condon* ..................................... 189
 2. *The Involvement of the FBI Hierarchy* ............................ 190
 3. *Protecting and Providing for Barboza* ............................ 191
 4. *1970 Rico Admission* ............................................. 191
 5. *Barboza Attempts to Recant* ...................................... 192
 6. *Barboza Murders Clay Wilson and Brags about His False Testimony in the Deegan Trial* ............................... 194
 7. *Rico's Methods Are Exposed—Still Nothing is Done* ................ 197
 8. *The FBI and Stephen Flemmi in the 1980s* ........................ 198
 9. *Deegan Defendants' Efforts Post–Conviction* ...................... 199
 a. *Salvati Commutation Petitions* ................................ 199
 b. *Limone Commutation Petitions* ............................... 200
 c. *Tameleo Commutation Petitions* .............................. 201

 d. *Greco Commutation Petitions* ................................. 201
 10. *The Conspiracy of Silence* ......................................... 202

IV. *CONCLUSIONS OF LAW* ................................................ 202
 A. *Prior Issues* ...................................................... 203
 1. *Discretionary Function Exception* .............................. 203
 2. *The FTCA's Exception for Malicious Prosecution Claims* ........... 204
 B. *Malicious Prosecution* ............................................. 205
 1. *Initiation* .................................................... 207
 a. *The FBI's Role in Bringing about the Prosecution of the Plaintiffs: More than a Host* ............................... 209
 b. *The Information Provided by Barboza Was False or Misleading—and the FBI Knew it* ........................... 211
 c. *There Was No Independent Investigation: There Could Not Be* ...................................................... 211
 d. *The FBI's Efforts Continued over Thirty Years* ................ 212
 2. *Lack of Probable Cause* ........................................ 213
 a. *Information Available to the FBI at the Time* ................. 214
 (1) *Barboza's Credibility* 214
 (2) *Limone and Tameleo* ..................................... 214
 (3) *Greco* .................................................. 214
 (4) *Salvati* ................................................ 215
 b. *Conviction is Not Conclusive Proof of Probable Cause on these Facts* .................................................. 215
 (1) *Subornation* ............................................ 216
 (2) *Due Process* ............................................ 218
 (3) *FBI's Misconduct/Barboza's Testimony—The Sole Foundation* ............................................. 219
 (a) *The Fitzgerald Bribe Testimony* ....................... 219
 (b) *The Stathopolous Identification* ...................... 219
 c. *No Other Evidence* .......................................... 219
 3. *Malice and Termination* ....................................... 220
 4. *Not a "Failure to Disclose" Claim* .............................. 221
 5. *Massachusetts Survival Statute* ................................ 222
 C. *Civil Conspiracy* .................................................. 223
 D. *Intentional Infliction of Emotional Distress* ......................... 226
 1. *Deegan Defendants' Claims* .................................... 226
 2. *Family Members' Claims* ....................................... 228
 a. *Substantially Contemporaneous Knowledge* .................. 228
 b. *Severe Emotional Response* ................................. 229
 E. *Negligence* ....................................................... 229
 1. *The Government Was Directly Negligent* ......................... 230
 2. *Negligent Supervision* ......................................... 232

V. *DAMAGES* ........................................................... 234
 A. *Facts* ............................................................ 235
 1. *Limone Plaintiffs* ............................................. 235
 a. *Peter Limone Sr.* .......................................... 235
 b. *The Family* ................................................ 236
 2. *Salvati Plaintiffs* ............................................. 237
 a. *Joseph Salvati* ............................................. 237
 b. *The Family* ................................................ 238
 3. *Tameleo Plaintiffs* ............................................ 239
 a. *Henry Tameleo* ............................................ 239
 b. *The Family* ................................................ 239
 4. *Greco and Werner Plaintiffs* ................................... 240
 a. *Louis Greco Sr.* ........................................... 240
 b. *The Family* ................................................ 241
 (1) *The Children* ........................................... 241

(2) *The Marriage* .........................................242
B. *Law* ..........................................................243
1. *Damages for the Deegan Defendants: Limone, Tameleo, Greco and Salvati* ...............................................243
2. *Damages for Family Members* ...............................245
a. *Loss of Consortium* ..................................245
(1) *Spouses* ........................................246
(2) *Children* .......................................248
b. *Bystander Intentional Infliction of Emotional Distress* ...........249
(1) *The General Case* ..............................249
(2) *Young Children* ................................249

VI. *CONCLUSION* .............................................250

## I. INTRODUCTION

Peter Limone ("Limone"), Enrico "Henry" Tameleo ("Tameleo"), Louis Greco ("Greco"),[1] and Joseph Salvati ("Salvati"), made extraordinary and troubling accusations in this case. They claimed that thirty-nine years ago, virtually to the date of this decision, on July 31, 1968, they were convicted of a crime which they did not commit—the murder of Edward "Teddy" Deegan ("Deegan"). Limone, Tameleo, and Greco were sentenced to die in the electric chair, a sentence reduced to life imprisonment when the death penalty was vacated. They accused the United States, specifically, the Federal Bureau of Investigation ("FBI") of framing them for Deegan's murder, and then, by covering up FBI misconduct, ensuring their imprisonment over the next three decades.

This trial, however, was not about securing the plaintiffs' release. Salvati was freed in 1997; Limone in 2001. Tameleo and Greco died tragically as prisoners—Tameleo in 1985, Greco in 1995.

Rather, the plaintiffs sought a different form of redress, which the law allows—damages for their loss of liberty, for their pain, and the pain of their loved ones. They brought this lawsuit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., on a number of grounds, including malicious prosecution.

The bench trial was lengthy. It took twenty-two days and involved hundreds of exhibits, thousands of pages. There were comparatively few live witnesses; this story had to be painstakingly pieced together through documents, many of them heavily redacted, particularly at the outset of the proceedings.

Despite the complexity of the record, this decision is far, far, longer than I would have wished. It has taken much more time to complete than I had predicted. But there was no other alternative. The conclusions that the plaintiffs have asked me to draw—that government agents suborned perjury, framed four innocent men, conspired to keep them in jail for three decades—are so shocking that I felt obliged to analyze this complex record with special care in order that the public, and especially the parties, could be fully confident of my conclusions.

I have concluded that the plaintiffs' accusations that the United States government violated the law are proved. In the pages that follow, I will describe why in detail. This introduction summarizes some of those findings.

---

1. In many of the early documents, including the Deegan trial transcripts themselves, Louis Greco's name is spelled "Lewis Grieco." I use that alternate spelling only when quoting from those documents.

The plaintiffs were convicted of Deegan's murder based on the perjured testimony of Joseph "The Animal" Barboza ("Barboza").[2] The FBI agents "handling" Barboza, Dennis Condon ("Condon") and H. Paul Rico ("Rico"), and their superiors—all the way up to the FBI Director—knew that Barboza would perjure himself. They knew this because Barboza, a killer many times over, had told them so—directly and indirectly. Barboza's testimony about the plaintiffs contradicted every shred of evidence in the FBI's possession at the time—and the FBI had extraordinary information. Barboza's testimony contradicted evidence from an illegal wiretap that had intercepted stunning plans for the Deegan murder before it had taken place, plans that never included the plaintiffs. It contradicted multiple reports from informants, including the very killers who were the FBI's "Top Echelon" informants.

And even though the FBI knew Barboza's story was false, they encouraged him to testify in the Deegan murder trial. They never bothered to tell the truth to the Suffolk County District Attorney's Office. Worse yet, they assured the District Attorney that Barboza's story "checked out."

The FBI knew Barboza's testimony was perjured because they suborned that perjury. They met with Barboza long before the state authorities ever did. They coddled him, nurtured him, debriefed him, protected him, and rewarded him—no matter how much he lied. When Barboza told them he *would not* accuse the man they knew to be one of Deegan's killers, his friend and FBI informant, Jimmy Flemmi, they urged Barboza to testify nonetheless. And when he announced that

he *would accuse* four men who had never been linked to this murder, they were undaunted. They continued to press for his testimony. Indeed, they took steps to make certain that Barboza's false story would withstand cross-examination, and even be corroborated by other witnesses.

In word and in deed, the FBI condoned Barboza's lies. FBI agent Dennis Condon even told the Deegan jury that he was "always concerned with the purity of testimony on the part of" his witnesses, referring to Barboza, the perjurer. When Tameleo, Greco, and Limone were sentenced to death, Salvati to life imprisonment, the FBI did not stand silently; they congratulated the agents for a job well done.

Nor did the FBI's misconduct stop after the plaintiffs were convicted. The plaintiffs appealed, filed motions for a new trial, one even took and passed a polygraph test on public television—over and over again protesting their innocence. They sought commutations, appeared before parole boards, seeking clemency from the governor, even appealing to the press. On each occasion, when asked about the plaintiffs, on each occasion when the FBI could have disclosed the truth—the perfidy of Barboza and their complicity in it—they did not. This was so even as more and more evidence surfaced casting more and more doubt on these convictions. In the 1970s, for example, Barboza tried to recant his testimony, not in all cases in which he had participated, but only as to the plaintiffs in this case—the very men the FBI knew to be innocent. In the 1980s, Agent Rico was found by a court to have suborned the perjury of another witness under similar circumstances. Yet, there was still no FBI

---

**2.** Barboza went by several aliases, including Joseph Baron and Joseph Bentley. I refer to him as "Barboza" unless I am quoting from a document where a different moniker was used.

investigation, no searching inquiry to see if an injustice had been done in this case.

Rather, while Salvati and Limone languished in jail for thirty-odd years, and Greco and Tameleo died in prison, Barboza and his FBI handlers flourished. The FBI agents were given raises and promotions precisely for their extraordinary role in procuring the Deegan convictions. Even when Barboza, the "poster boy" for the new federal witness protection program, committed yet another murder, three federal officials testified—now for the second time—on his behalf. FBI officials up the line allowed their employees to break laws, violate rules and ruin lives, interrupted only with the occasional burst of applause.

The FBI knew Barboza's testimony was false, that the plaintiffs' convictions had been procured by perjury, that critical exculpatory information had been withheld—but they did not flinch. After all, the killers they protected—Jimmy Flemmi, along with Barboza, and Jimmy's brother, Stephen—were providing valued information in the "war" against the Italian Mafia, La Cosa Nostra ("LCN").[3] The pieties the FBI offered to justify their actions are the usual ones: The benefits outweighed the costs. Put otherwise, in terms that are more recently familiar, these four men were "collateral damage" in the LCN war. To the FBI, the plaintiffs' lives, and those of their families, just did not matter. As Agent Rico put it in his testimony before the United States House of Representatives Committee on Government Reform, when asked if he had any remorse that four innocent men went to prison, he replied: "Would you like tears or something?" Exh. 170 at 186.

Now is the time to say and say without equivocation: This "cost"—to the liberty of four men, to our system of justice—is not remotely acceptable. No man's liberty is dispensable. No human being may be traded for another. Our system cherishes each individual. We have fought wars over this principle. We are still fighting those wars.

Sadly, when law enforcement perverts its mission, the criminal justice system does not easily self-correct. We understand that our system makes mistakes; we have appeals to address them. But this case goes beyond mistakes, beyond the unavoidable errors of a fallible system. This case is about intentional misconduct, subornation of perjury, conspiracy, the framing of innocent men. While judges are scrutinized—our decisions made in public and appealed—law enforcement decisions like these rarely see the light of day. The public necessarily relies on the integrity and professionalism of its officials.

It took nearly thirty years to uncover this injustice. It took the extraordinary efforts of a judge,[4] a lawyer,[5] even a reporter,[6] to finally bring out the facts. Proof of innocence in this democracy should not depend upon efforts as gargantuan as these.

---

3. La Cosa Nostra, or LCN, is the way the FBI refers to the Mafia or "Italian organized crime syndicate." *See McIntyre v. United States*, 447 F.Supp.2d 54, 58 (D.Mass.2006). Other monikers include "The Office," the "Italian Element," and "the Mob."

4. Judge Mark Wolf in *United States v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999), *rev'd in part by* 225 F.3d 78 (1st Cir.2000), *cert. denied sub nom.; Flemmi v. United States*, 531

U.S. 1170, 121 S.Ct. 1137, 148 L.Ed.2d 1002 (2001).

5. Victor Garo, Joseph Salvati's attorney. Salvati was the first to be freed by dint of Garo's efforts in 1997.

6. Dan Rea, reporter for CBS4 Television Stations, relentlessly pursued the cause of Salvati's innocence.

The claims of the plaintiffs or their estates [7] fit into four categories: malicious prosecution, civil conspiracy, intentional infliction of emotional distress, and negligent selection, supervision, and retention. Their spouses and children have each brought loss of consortium and bystander intentional infliction of emotional distress claims as well.[8]

The federal government has fought hard. The legal doctrines on which it has relied are important ones. They are doctrines designed to give law enforcement room to make critical policy decisions. They are intended to insulate those who bring information in good faith to the authorities, even if the information is later disproved. All the FBI did, the government argued, was exercise their discretion about whom to offer deals, and how to conduct an investigation. All they did was to present their cooperating witness to the state authorities who independently prosecuted the crime. In effect, what they are saying is that it was the *state's* fault—not theirs—for not doing a better job. If the FBI erred at all, it was in not turning over information exculpatory to the defense—nothing more—and that violation is not actionable under this statute, the FTCA.

The government's position is, in a word, absurd. The law they cite does not apply to the extraordinary facts of this case. The issue here is not discretion but abuse, not independent charging decisions but the framing of four innocent men, not the failure to produce exculpatory evidence but procuring convictions by misrepresenta-tion, not letting perjured testimony proceed uncorrected but facilitating it.

The FBI, and not the state, developed Barboza as a witness, knowing that his false testimony would be used to prosecute the plaintiffs for a crime they did not commit. They, and not the state, kept their conduct from being discovered by failing to disclose exculpatory evidence, before, during, and after the trial. They, and not the state, vouched for Barboza to law enforcement and to the very jury hearing the murder case, even when all the information they had flatly contradicted his account.

I begin with the procedural background of the case, which also serves as a chronology within which to frame my specific findings. Thereafter, I proceed to the fact findings and the legal analysis. The evidentiary issues that were reserved during the course of the bench trial are noted as the evidence is considered or rejected, as the case may be. Finally, I address the damages.

In the end I conclude that the defendant is liable to these men and their families. As to damages, plaintiffs' loss of liberty, and, in effect, a lifetime of experiences, is obviously not compensable. To the extent that damages can approach this task, my **total award is One Hundred One Million, Seven Hundred Fifty Thousand, And 00/100 ($101,750,000.00) Dollars.** (I address the individual awards in later sections.)

7. Roberta Werner, Greco's ex-wife, is Administratrix of the Estate of Louis Greco; Saverio Tameleo, Tameleo's son, is Administrator of the Estate of Henry Tameleo.

8. The family members who have filed claims are: Olympia Limone, Peter J. Limone, Jr., Paul Limone, Carolyn Limone Zenga, Janine Limone Arria, Saverio Tameleo (on his own behalf and as Administrator of the Estate of Jeannette Tameleo), Marie Salvati, Maria Sidman, Gail Orenberg, Sharon Salvati, Anthony Salvati, Roberta Werner (on her own behalf and as Administratrix of the Estate of Louis Greco Jr.), and Edward Greco. *See infra* note 193 (discussing the family member claims).

## II. PROCEDURAL BACKGROUND

On March 12, 1965, at approximately 9:30 p.m., Teddy Deegan was murdered. He was found with six gunshot wounds from at least three different weapons. *See* Exhibit ("Exh.") 2070 at 3; Exh. 57 at 26. On October 25, 1967, more than two years later, six men—Peter Limone, Henry Tameleo, Joseph Salvati, Louis Greco, Ronald Cassesso,[9] and Roy French—were indicted for his murder.[10] The ensuing trial—in which Barboza was the star—began on May 27, 1968. All the defendants, including the four plaintiffs before me, were convicted.[11] On July 31, 1968, the death penalty was imposed for Limone, Tameleo, and Greco, but was subsequently vacated four years later.[12] Salvati was sentenced to life in prison.

Between 1970 and 2001, plaintiffs filed more than a dozen motions for a new trial. Each time they were denied relief. They filed a total of seventeen commutation petitions. The first sixteen were denied. *See*

Exh. 340. Tameleo died in prison in 1985, after serving nearly eighteen years. A decade later, in 1995, Greco died after serving twenty-eight years.

In 1995, certain information about the relationship between the Boston office of the FBI and two of the most notorious criminals in Boston history, James J. "Whitey" Bulger and Stephen J. "The Rifleman" Flemmi, surfaced during proceedings in *United States v. Salemme* before now-Chief Judge Mark Wolf.[13] On July 3, 1997, as a result of the *Salemme* disclosures, the deputy attorney general ordered that attorneys from the Department of Justice's Public Integrity Section and Office of Professional Responsibility, in conjunction with FBI agents, conduct an investigation into alleged misconduct in the Boston office of the FBI. *See* Exh. 166 at 3 ("Obstruction of Justice Report").

In December of 2000, that investigative effort focused on Limone's request for doc-

---

9. Ronald Cassesso is also called "Ronald Cassessa" in some of the documents. I refer to him as Cassesso unless quoting a source that provides otherwise. *See* Trial Transcript ("Tr.") vol. 6, 32.

10. Each man faced slightly different charges. French and Greco were indicted for the murder of Deegan, conspiracy to murder Deegan, and conspiracy to murder Anthony Stathopoulos Jr., Deegan's associate. Limone, Tameleo, Cassesso, and Salvati were indicted as accessories before the fact to the murder of Deegan, conspiracy to murder Deegan, and conspiracy to murder Stathopoulos. Barboza was indicted only on the two conspiracy counts. *See* Exh. 338, ¶¶ 46–48

11. Greco was found guilty of murder in the first degree, and Limone, Tameleo and Cassesso were found guilty as accessories before the fact. All four were also found guilty of conspiracy to murder Deegan and Stathopoulos. Salvati was found guilty of being an accessory after the fact. French was found guilty of first degree murder. *See* Exh. 338 at ¶¶ 50–51.

12. *See Commonwealth v. French*, 357 Mass. 356, 259 N.E.2d 195 (1970), judgments vacated as to death penalty sub nom., *Limone v. Massachusetts*, 408 U.S. 936, 92 S.Ct. 2846, 33 L.Ed.2d 754 (1972).

13. *See supra* note 4. Stephen Flemmi was a defendant in the *Salemme* case. He was accused of racketeering and extortion, among other crimes. Beginning in 1965, Flemmi served as a very "valuable and valued confidential informant for the FBI" and was, in return, protected by the FBI in many ways. *Salemme*, 91 F.Supp.2d at 148–9. He claimed that his FBI "handlers" had authorized him to engage in the criminal conduct alleged in *Salemme*. The judge, after extensive hearings, and voluminous submissions, concluded that he was not. However, the hearings, on that issue and others, disclosed the relationships between killers Stephen Flemmi, James Bulger and the FBI over an extended period.

uments pertaining to his case. Special Assistant U.S. Attorney, John Durham ("Durham") responded with five FBI memoranda from the 1960s (the "Durham documents"). Durham made clear that the Department of Justice, the United States Attorney's Office, the Boston FBI office and FBI headquarters, "understand the potential significance of the enclosures" and provided them with the "concurrence and encouragement of the Boston FBI and FBI headquarters." Exh. 4 at 3.

The best measure of the importance of the Durham documents was the firestorm they created. The Suffolk County District Attorney's office immediately filed a motion to vacate Limone's conviction, to grant Limone a new trial, and admit him to bail. Judge Margaret Hinkle of Suffolk Superior Court ruled that the Durham documents were material, exculpatory, and cast "real doubt" on the justice of Limone's convictions. See Exh. 2 at 16. The documents had been wrongly kept from the Suffolk County District Attorney's Office and obviously, the plaintiffs. Indeed, Judge Hinkle noted,

[T]he court system responsible for the Deegan trial now recognize[d] that evi-

dence in the hands of federal officials was indispensable to the administration of justice in the Deegan murder prosecution.

Exh. 195 at 3–4. In granting a new trial, Judge Hinkle concluded that there was a substantial likelihood that the jury would have reached a different conclusion had this evidence been available at trial.

The Suffolk County District Attorney's office immediately agreed and filed nolle prosequis for both Limone and Salvati, the only plaintiffs still alive.[14] It concluded that "it does not now have a good faith basis—legally or ethically—to proceed with any further prosecution of the defendant." Exh. 3B; Exh. 3D; Exh. 3E.[15]

In 2001, the United States House of Representatives Committee on Government Reform ("House Committee") began a lengthy investigation into FBI misconduct in the Deegan case resulting in a report titled: "Everything Secret Degenerates: The FBI's Use of Murderers as Informants." Exhs. 195–195T.[16] The report was a stinging rebuke of federal law enforcement officials for tolerating and encouraging false testimony, for taking

---

**14.** The cases of Greco and Tameleo were posthumously nolle prossed by the state several years later. See Exh. 3G; Exh. 3H.

**15.** Salvati's sentence had been commuted earlier by Governor William Weld (February 5, 1997), after he had served twenty-nine years in jail. See Exh. 340, ¶¶ 19–20.

**16.** The government contested both the admissibility and the weight to be given to this report. The plaintiffs' sought to admit it in connection with the public records exception to the hearsay rule, Rule 803(8), Fed.R.Evid., and on the authority of Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 167–68, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)(conclusions of JAG report about the causes of Navy airplane accident were properly admitted). I admitted the evidence as a public record, see, e.g., Tr. vol.

3, 72–73, leaving open the question of the weight to be given it in my final opinion.

I have found that the House Report proceedings were, in some respects, duplicative of the proceedings before me—similar evidence, similar witnesses, similar questions—but surely not subject to the same evidentiary rules and standards as is this Court. Indeed, the record I reviewed was considerably more complete than the record before the House Committee. By the time of this bench trial, the government had agreed to lift many of the redactions to the documents.

As such, while I have admitted the Report, and have reviewed it, I have not adopted its conclusions as my own. To the extent that evidence before the House—e.g. sworn testimony of government agents—was independently admissible under the Federal Rules of Evidence, I have considered it.

"affirmative steps" to ensure that the individuals convicted would not obtain post-conviction relief and would die in prison. The Report also concluded that the FBI— including "senior staff close to FBI Director J. Edgar Hoover" were in possession of information that "could have led them to the conclusion that Barboza was committing perjury" and did not disclose it. Exh. 195 at 4.

On May 16, 2001, Louis J. Freeh, then-Director of the FBI, said that the Salvati case was

> a great travesty, a great failure, disgraceful to the fact that my agency, or any other law enforcement agency, contributed to that.... [N]othing worse that can happen under a system of law is that an innocent person is either charged, or in this case punished, for that period of time. It is a travesty, a disgrace, it shouldn't happen. . . .

Exh. 171.

The Limone, Tameleo, and Greco/Werner plaintiffs brought the instant litigation in May of 2002. Edward Greco followed suit in April of 2003,[17] and the Salvati plaintiffs filed their case that July. All the cases were consolidated before me.[18]

This case has been litigated for five years and resulted in two published opinions on motions to dismiss, and an opinion by the First Circuit Court of Appeals.[19]

## III. *FACT FINDINGS*

Section A deals with the FBI's efforts to prosecute La Cosa Nostra. It sets the stage for the Deegan trial and the instant accusations in the following ways: The FBI gave extraordinary priority to infiltrating and prosecuting members of the LCN. So important was the task that the FBI was willing to enlist killers to be informants on an ongoing basis, to keep the program so secret that not only state law enforcement but also other divisions within the FBI would not have access to it, and to allow four innocent men to be convicted. Through its illegal wiretap of Raymond L.S. Patriarca, Sr. ("Patriarca"), the top LCN boss, and its "Top Echelon Criminal Informant Program" the FBI received information not only about crimes that *had* taken place but those that *were about to* take place. Indeed, when Barboza testified at odds with that information in the Deegan case—notably, inculpating the plaintiffs—the FBI was no bystander. It knew that the testimony was false. Its fingerprints were everywhere.

Section B deals with the period before the Deegan trial—the role of FBI agents H. Paul Rico and Dennis Condon in the

**17.** Roberta Werner, as Administratrix of the Estates of Louis Greco and Louis Greco Jr. filed separately from her son Edward Greco.

**18.** *See* docket entries ## 151, 216.

**19.** Defendant filed two motions to dismiss, resolved in *Limone v. United States ("Limone I")*, 271 F.Supp.2d 345 (D.Mass.2003) *aff'd sub nom., Limone v. Condon*, 372 F.3d 39 (1st Cir.2004), and *Limone v. United States ("Limone II")*, 336 F.Supp.2d 18 (D.Mass.2004), and a motion for summary judgment, resolved in open court and through Electronic Orders dated Aug. 18, 2006 and Sept. 11, 2006. Several amended complaints have been filed by the various plaintiffs. I held that I would allow motions to conform the pleadings to the evidence at the close of the trial, meaning that I will treat similarly-situated plaintiffs as bringing uniform claims.

Originally, the plaintiffs sued several federal and state law enforcement officials in addition to the United States: former FBI agents H. Paul Rico, Dennis Condon, John Morris, John Connolly, and James Handley, former Assistant U.S. Attorney and current federal district court judge Edward F. Harrington; former Boston police officer Frank L. Walsh; and former Chelsea police officer Robert Renfrew. Those claims are no longer part of this litigation.

investigation and their relationship to two "Top Echelon" informants [20] and to Barboza. The agents used the Flemmi brothers to manipulate Barboza into testifying in the Deegan murder case, passing information to them for transmission to Barboza. They even used their conduits to get information from the defense camp about trial tactics and strategy. When Barboza made it clear that he would lie about Jimmy Flemmi's involvement in Deegan's murder, it did not matter to the FBI. They pressed him to testify nonetheless.

Barboza was Rico's most important witness—indeed a nationally renowned witness against the LCN.[21] He was the "poster boy" for the FBI's new witness protection program, the linchpin for the Bureau's and the Boston office's most important initiative. Since there was no direct federal jurisdiction over murder, state prosecutions were an essential part of the FBI's agenda. And though Barboza was technically a witness for the state, the FBI was in complete control of him. They had constant, direct access—meeting with him before his grand jury testimony, between that appearance and the Deegan trial, and during the Deegan trial—most of the time with no state representative present.

From March of 1967 to September of 1967, the FBI debriefed Barboza about a number of murders, including the Deegan murder. Not once did he implicate the plaintiffs. Indeed, every piece of evidence in the FBI's files from the Patriarca wire, through the information from Top Echelon informants, confirmed the killers as Barboza, Flemmi, and three others—not the plaintiffs.

Given the extraordinary information Rico, Condon, and the FBI hierarchy had, there is no doubt they knew on September 8, 1967, when Barboza excluded Jimmy Flemmi and suddenly included the plaintiffs in the murder, that he was lying. They knew that Limone had been overheard warning Deegan that Flemmi wanted to kill him. They knew that they had never even heard of Salvati before Barboza uttered his name. They knew that Greco and Tameleo had never been linked to this murder.

Still, the FBI persisted, encouraging Barboza to testify, rewarding him for his efforts. And they vouched for him to the state authorities, telling them his story "checked out," which was blatantly false. Without the FBI information, the state investigation was a charade. In so may words, the FBI said "just trust us" to the state, and then vouched for a perjurer.

Section C deals with the Deegan murder trial itself. The state investigation of the Deegan case had stalled. Without Barboza there was no case. Without the FBI there was no Barboza. While the state authorities could corroborate information about the murder—how it happened, where and when—Barboza's testimony was the only link to the plaintiffs. And his testimony about the plaintiffs could not be corroborated because it was false. Only the FBI had the means to prove Barboza's falsity, and they were not talking. Even when Barboza testified that "the FBI never promised [him] anything," they stood mute.

The FBI's role at trial went far beyond the failure to share evidence in their files.

**20.** Vincent James "Jimmy" Flemmi ("Jimmy Flemmi") and his brother Stephen Flemmi ("Stephen Flemmi"). Flemmi has been referred to as "Stephen Flemmi" in the *Salemme* case and *McIntyre v. United States*, 447 F.Supp.2d 54 (D.Mass.2006). The parties refer to him as "Stevie." I will adopt the approach of the other cases and refer to him as "Stephen Flemmi."

**21.** *See Salemme*, 91 F.Supp.2d at 180.

They were a formidable presence through the trial both directly and indirectly. They cultivated, debriefed and prepared Barboza. They corrected his testimony only when it was inconsistent with reports the defense was likely to have or when it made him vulnerable on cross-examination. Condon even testified on Barboza's behalf attesting to the "purity" of Barboza's false testimony. They conferred with and controlled major prosecution witnesses before they testified (Anthony Stathopoulos and John Fitzgerald). They advised Suffolk County Assistant District Attorney ("ADA") Jack Zalkind ("Zalkind") and his staff behind the scenes.

Section D deals with the aftermath—between the conviction and the nolle prosequi of the charges. As time passed, the government should have become more and more concerned about Barboza's testimony and his actions afterwards. His threatened recantation in the Deegan case, the clear evidence that he had lied about Jimmy Flemmi, his demands upon the government, not to mention the fact that he murdered again—this time in California—after he was released from prison, should have rung alarm bells. Instead of investigating Barboza, the government continued to placate him with money, jobs, and in the most extraordinary gesture of all, the FBI imprimatur again, this time testifying on his behalf when he was accused of murdering Clay Wilson. Rico and Condon, together with Assistant United States Attorney Edward F. Harrington ("Harrington"), went to California to vouch for him, just as Condon had done in the Deegan trial—

rather than investigate accusations that he had threatened he could get "anyone" imprisoned for "anything." And by the 1980s, the FBI had yet another reason to suspect perjury—Rico had been cited for suborning perjury in state court under circumstances similar to the Deegan murder trial.

At the same time the FBI was protecting Barboza, ignoring the warning signs, continuing to protect its Top Echelon informants, they stood silent as the plaintiffs filed motion after motion for a new trial, commutation petition after commutation petition. Worse yet, the FBI hinted—without basis—at Greco's continued involvement in organized crime, or Salvati's fraternization with an offender.

Over thirty years after their conviction, Salvati and Limone were finally freed, the charges against them nolle prossed, thanks to the information disclosed in *Salemme* and the investigations it generated. Tameleo and Greco were not so fortunate.

## A. *The FBI Program to "Get" La Cosa Nostra*

In the early 1960s, the FBI focused its energy on prosecuting organized crime in the United States. *See* Exh. 7; Exh. 8B; Exh. 9. That focus meant zeroing in on Raymond Patriarca, the reputed head of organized crime in New England.[22]

Two critical parts of the program were an illegal wiretap at Patriarca's office and the so-called Top Echelon Criminal Informant Program.

---

22. In February 1961, Attorney General Robert F. Kennedy sent a list of top echelon racketeers to the Commissioner of the IRS for targeting. Patriarca was the only individual on the list with his base of operations in New England. *See* Exh. 7. The FBI Director wrote to the Special Agent in Charge ("SAC") of the Boston office on March 12, 1962, emphasiz-

ing the priority of the program—"[t]his case is to continue to receive full time attention and every effort must be made on a daily basis to develop any criminal violation which Patriarca is committing or has committed with [sic] any relevant statute of limitations period." Exh. 10.

### 1. *Patriarca Wire*

On March 6, 1962, the FBI installed electronic surveillance without a warrant at Patriarca's office in Providence, Rhode Island. FBI agents monitored the Patriarca wiretap, transcribing conversations, typing up any important information, and creating highlighted summaries that were transmitted regularly to Washington via "airtels."[23] Each day, Special Agents at the Providence and Boston offices would send the tape recording from the wire, along with the log created by the agents, to Special Agent ("SA") John J. Kehoe Jr. ("Kehoe") in Boston.

Kehoe was the Supervisor of the Organized Crime Squad in the Boston office from 1962 to 1971. *See* Exh. 193A at 29; Exh. 341.[24] Boston agents could access the airtel information by requesting it from Kehoe. And, given their significant roles in the effort against the LCN, Condon and Rico had regular access.

The FBI made every effort to keep the fact of the wire confidential, even within the agency. The Patriarca wiretap was given the informant identification number BS 837 C*. *See* Exh. 12; Exh. 13; Exh. 339. FBI reports describing conversations heard on the wire referred to it as if it were a human source, an informant just like any other.

As described *infra*, in the course of their monitoring, the FBI overheard information about the Deegan murder on this wire *before* its commission—confirmed by Top Echelon informant reports after its commission—information which flatly contradicted Barboza's account at the Deegan trial.

### 2. *"Top Echelon Criminal Informant Program"*

In addition to the Patriarca wire, the FBI's heightened efforts to penetrate and dismantle organized crime included the development of the Top Echelon Criminal Informant Program, officially inaugurated by J. Edgar Hoover on June 21, 1961.[25]

Three aspects of the program are significant: First, the informants involved were to be important enough organized crime figures that they would be able to provide high-level information on a major scale. *See* Exh. 193 at 56. (The corollary—apparently acceptable to the FBI—was that these informants might well continue to commit serious crimes.) Second, these were not merely witnesses getting deals for episodic appearances in court. Their relationship with the FBI was supposed to

---

23. An airtel is an inter-FBI teletype sent by air mail between local FBI offices and headquarters in Washington, D.C. *See United States v. Taglianetti*, 274 F.Supp. 220, 223 (D.R.I.1967) (describing the history of that surveillance); Exh. 339.

24. During the relevant period, Rico and Condon were special agents in the Boston office, assigned to the Organized Crime Squad. Kehoe was their immediate supervisor (Supervisory Special Agent) from 1962 to 1971. James L. Handley ("Handley") was the Special Agent in Charge ("SAC") of the Boston office from 1964 to 1973. *See* Exh. 341.

25. Hoover described the program in a signed memorandum: "To insure that the Bureau meets its responsibilities in connection with the Criminal Intelligence Program, it is mandatory that the development of quality criminal informants be emphasized and the existing program be implemented and greatly expanded." Exh. 8B at 3.

The Boston office was not among the eleven offices originally required to participate in the program as of June 1961. *See* Exh. 8B. However, Hoover also stated, "[e]very office is being advised of this program since in the future it may be appropriate to expand it to include additional offices." Exh. 8B at 8. Massachusetts soon became part of that expansion. SA Rico was assigned exclusively to the development of the Top Echelon Informant Program. Condon was his partner. *See supra* Section III.B.1.

be a lasting one, providing information on a continuing, long-range basis.[26] Third, the program was strictly confidential— which not only meant that its existence would be kept secret from the general public and other divisions within the federal government, but also from state law enforcement agencies.[27] Even when disseminating particular facts to other agencies, as they did from time to time, agents were to take special care to paraphrase the information so that the informants' identities would not be disclosed. *See* Exh. 11.[28]

### 3. *Significance of (1) and (2)*

The Top Echelon Criminal Informant Program, together with the Patriarca wire, gave the agency extraordinary information. This was not just any old tip related by unnamed informants on an ad hoc basis. This was information heard or overheard from the horse's mouth.[29] As such, the FBI's intelligence about the Deegan murder—both *before* and *after* it occurred— was unusually good.

The risks, however, were obvious. Since there was no federal jurisdiction over mur-

der, no federal racketeering statute,[30] the FBI was obliged to work through local law enforcement, with whom it could not—or would not—share critical information, lest the information disclose its unique sources and jeopardize their programs. The result should have been predictable: A state prosecution based on the testimony of a witness that was plainly contradicted by the secret information in the FBI's files.

### B. *The Boston FBI, the Flemmi Brothers and Barboza*

### 1. *Agents Rico and Condon*

Rico was in the FBI from February 26, 1951, to May 27, 1975. He worked in the Boston office from 1962 until he was transferred to Miami, Florida, in April of 1970, partly as a reward for his work on the Deegan prosecution. In 1963, Rico was assigned exclusively to the development of Top Echelon informants. *See* Exh. 51C. He clearly had access to the files generated by both initiatives. Reviewing those files was part of his job.

Indeed, that policy continued to the present, and affected the very trial of this case. The attorneys representing the government were not permitted access to unredacted documents even though they were obliged to certify that all relevant information had been turned over under Rule 26, Fed. R. Civ. Pro. That charade ended when I ordered that lawyers with an appearance in this case had to have access to all of the information in unredacted form. *See* Tr. vol. 5, 11.

---

**26.** "Informants of this type should be developed not only to obtain new cases for prosecution but for utilization on a long range basis in order to provide continuous intelligence information concerning organized crime." Exh. 8A.

**27.** No dissemination of information could be made unless the informant was "fully protected." *See* Exh. 8B at 8.

**28.** Exhibit 11, a letter from Washington to the FBI SACs, dated April 10, 1962, noted:

It is mandatory that our highly confidential informants and techniques are afforded complete protection at all times.... It is of paramount importance in preparing material which is disseminated to other agencies that meticulous care be taken to afford these informants maximum protection by appropriately paraphrasing the material contained therein.

**29.** Condon described it as the "most informative microphone coverage ... up to that date, and not only on a local basis, but on a national basis." Exh. 193A at 19.

**30.** The Racketeering Influenced and Corrupt Organizations Act ("RICO") was not passed until 1970. *See* Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922 (Oct.1970) (codified at 18 U.S.C. § 1961 et seq.).

Condon was in the FBI from January 29, 1951, to May 20, 1977. He was assigned to the Boston office on April 26, 1952, and to the Organized Crime Squad in 1962. As such, he too had access to the case files in the Boston FBI office relating to organized crime, including the Patriarca wire and the Top Echelon Informant Program. *See* Exh. 193A at 28, 30–31.

Agents Rico and Condon worked closely together from 1966 to Rico's transfer in 1970. They were "partners," staying in touch even after Rico moved to Miami. *See* Exh. 170 at 205; Exh. 192 at 176.

 By the time of the instant trial, Rico had died; Condon was unable to appear. Nevertheless, plaintiffs introduced Rico's and Condon's testimony before the House Committee, Rico's testimony before Judge Wolf in *Salemme*, and Condon's deposition.[31] While I was not able to see

---

31. The government objected to the admission of this testimony as hearsay, arguing that, since Rico and Condon were no longer agents of the government at the time of their testimony, their statements were not admissions under Fed.R.Evid. 801(d)(2)(D)

In fact, these statements are admissible under multiple theories. Rico's testimony in the *Salemme* trial is admissible under Fed.R.Evid. 804(b)(1), which excepts former trial testimony from the hearsay rule as long as the party against which it is offered had the opportunity and motive to cross-examine the declarant at the time of the testimony. The government was a party in *Salemme*. Rico's testimony exposed the government to liability; the government's motive and opportunity to cross-examine then and in the instant case are similar, if not identical.

With respect to the House Committee testimony, the agents' employment status at the time of testimony is irrelevant because I do not admit them as vicarious admissions, but as first-hand party admissions under Rule 801(d)(2)(A). Were it not for the operation of the Westfall Act, 28 U.S.C. § 2679(b)(1), which converts suits against individual agents into suits against the United States, Rico and Condon themselves would be the defendants; their testimony would clearly be admissible as admissions. The FTCA puts the government in the shoes of the agent. *See Landham v. Taylor*, 68 Fed.Appx. 608, 609–10 (6th Cir. 2003); *Knowles v. United States*, 91 F.3d 1147, 1150 (8th Cir.1996). This must be so not only for liability purposes but evidentiary purposes as well. The Westfall Act was to "avoid[ ] 'exposure' to 'personal liability' in order to 'prevent a substantial diminution in the vigor of Federal law enforcement and implementation,'" *Wood v. United States*, 995 F.2d 1122, 1126 (1st Cir.1993) (quoting

H.R.Rep. No. 700, 100th Cong., 2d Sess. 3, *as reprinted in* 1988 U.S.C.C.A.N. 5947), not to privilege otherwise-admissible evidence. To be sure, defendant protests that this subjects the government to the admissions of former employees decades after the end of any government service. But it is the Westfall Act itself that creates this bond, and is the reason the government stands before this Court, despite the fact that these individual tortfeasors ended their employment decades ago.

Further, I find that the testimony is admissible under the residual hearsay exception, Fed.R.Evid. 807, which provides for the admissibility of hearsay that is not covered under Rules 803 or 804 but has "equivalent circumstantial guarantees of trustworthiness." The statements have been offered for their truth, they are more probative on the point for which they are offered than any other evidence which the proponent can procure through reasonable efforts, and that admission is in keeping with the purposes of the rules of evidence. While it is undisputed that defendant was given notice in advance of the trial that plaintiffs intended to offer the testimony into evidence, as required under Rule 807, defendant objects because it was not told that the evidence would be offered under an 807 theory per se. Parties are entitled only to notice that evidence will be offered; they do not need to be told all of the possible theories that the evidence may be admitted under. *See Piva v. Xerox Corp.*, 654 F.2d 591, 596 (9th Cir.1981); *United States v. Evans*, 572 F.2d 455, 489 (5th Cir.1978).

To the extent that Rico's and Condon's statements are used not to establish the truth of their statements, but to show their knowledge of or belief in what they testified to, they are obviously not hearsay at all. Fed.R.Evid. 801(c); *see, e.g., Ramirez Rodriguez v. Boeh-*

these witnesses, I was able to evaluate their testimony in the light of the documents they generated or other documents to which they had access.

As described below, Rico's and Condon's accounts of what they knew and when they knew it are resoundingly contradicted by the record, a fact which has had a serious impact on the government's defenses. I find that both men lied in fundamental ways about their relationships with the Flemmi brothers and Barboza, about the information they had concerning the Deegan murder at the time of the trial, and their actions afterwards.

### 2. The Flemmi Brothers

Jimmy and Stephen Flemmi were career criminals who served as Top Echelon informants. Both continued to commit crimes well after they became informants. In fact, Jimmy Flemmi was one of the Deegan co-conspirators, as the FBI well knew.

Stephen Flemmi was close to his brother Jimmy; Jimmy, in turn, was close to Barboza. The FBI used the relationships among the three to get Barboza to testify, and turned a blind eye when Barboza covered up Jimmy Flemmi's participation in the Deegan murder. Indeed, the agents were praised and promoted for their "ingenuity" in manipulating these men. *See infra* Section III.D.1.

#### a. *Jimmy Flemmi*

Before designating Jimmy Flemmi as a Top Echelon informant, *See* Exh. 19A, the FBI—and in particular, agent Condon—had collected extensive information about his criminal activities, which included a series of murders. *See* Exh. 38. From the Patriarca wire, they even had information that he was *about to* participate in the Deegan murder.[32]

Despite the information about Jimmy Flemmi's murderous activities, the FBI targeted him for the Top Echelon program *three days before the Deegan murder*. Indeed, on the very day of the Deegan murder, March 12, 1965, Jimmy Flemmi was assigned to Agent Rico as a Top Echelon informant. *See* Exh. 19A; Exh. 19B; Exh. 44. Even after designating Jimmy Flemmi for participation in the initiative,

*ringer Ingelheim Pharms., Inc.*, 425 F.3d 67, 76–77 (1st Cir.2005).

32. For example, the following facts were reported to the FBI:

May 22, 1964: Condon learned from an informant that Jimmy Flemmi told him "all [Flemmi] wants to do is kill people, and that it is better than hitting banks." That same month a letter from the Boston office to the Director indicated that an informant reported Jimmy Flemmi would probably become the "contract man" in the Boston area.

June 1964: A confidential informant told Condon that Flemmi had volunteered to help with any "hits" the informant wanted to make.

August 1964: An informant reported to Condon a conversation he had had with Barboza. Barboza told him he had heard that Flemmi had killed a man and cut off his head;

when Barboza approached Flemmi with the information, Flemmi replied that he had heard the same about Barboza.

October 1964: An informant reported that Jimmy Flemmi wanted to be the "best hit man" and had committed several murders. Indeed, Jimmy Flemmi was a suspect in a December 1964 murder.

February 23, 1965: An informant reported to Condon that Flemmi had killed several people.

This information was included in memoranda written by Condon prior to Jimmy Flemmi's designation and in the correlator report on Jimmy Flemmi generated on April 22, 1965. *See* Exh. 38.

A "correlator report" is an FBI report prepared by a "correlator" who reviews all of the files in the Boston office, retrieves the information concerning a certain subject, and

the FBI continued to receive information about his penchant for killing.[33]

Flemmi's designation as an informant was reviewed at the highest level of the FBI. On June 4, 1965, the FBI Director asked the Boston SAC for information on the status of Flemmi's designation in the program. *See* Exh. 41. The Boston SAC's response was telling: He noted that Rico, based on information from other informants and sources, believed Jimmy Flemmi had murdered six named individuals, *including Edward "Teddy" Deegan.*[34] The memorandum added that "from all indications, he is going to continue to commit murder." Exh. 43 at 3. The SAC nevertheless recommended Flemmi's continued use by the FBI.

Jimmy Flemmi's victims did not matter to the FBI. All that mattered was that Flemmi "has been in contact with RAYMOND L.S. PATRIARCA and other members of La Cosa Nostra" and therefore "potentially could be an excellent informant." The SAC concluded that Flemmi's "potential outweighed the risks involved." Exh. 43 at 3.

On September 16, 1965, Jimmy Flemmi was "closed" as a Top Echelon informant because he had become a fugitive, and as such, "any contacts with him might prove to be difficult and embarrassing." Exh. 49.

Jimmy Flemmi died on October 16, 1979. *See* Exh. 338, ¶ 55.

Information about Jimmy Flemmi's relationship with the FBI did not surface until the Durham documents were disclosed. Indeed, the stonewalling continued in this litigation: Rico, whose name and signatures are all over the Jimmy Flemmi documents, *see, e.g.,* Exh. 38, Exh. 19A, Exh. 19B, Exh. 44, lied about his relationship with Flemmi. He denied working with, much less opening, Jimmy Flemmi as an informant. *See* Exh. 170 at 169, 221. Condon, he insisted, may have been the one to open Jimmy Flemmi. *See* Exh. 170 at 159. Condon, however, denied any relationship with Jimmy Flemmi as well. *See* Exh. 193B at 26.

### b. *Stephen Flemmi*

On November 3, 1965, the Boston SAC sent a report (drafted by Rico) to the Director targeting Stephen Flemmi as a Top Echelon informant—two months after his brother was closed. *See* Exh. 50B.[35] Stephen Flemmi was assigned to Rico, *See* Exh. 166 at 17, with Condon as his alternate handler (in accordance with FBI policy that two agents be in a position to contact each criminal informant). *See* Exh. 304; Exh. 192 at 176; Exh. 177 at 49; Exh. 188 at 17.[36]

---

places it into a single document—the correlator report. *See* Exh. 339, ¶ A2.

**33.** A March 10, 1965, airtel sent to the Director indicated that Gennaro Angiulo, known to be a high ranking member of the LCN, told Patriarca that Flemmi and Barboza had killed Jackie Francione. Angiulo told Patriarca that Patriarca did not think Flemmi used "sufficient common sense when it came to killing people." Exh. 20 at 5; Exh. 38 at 8; Exh. 4 at 17. A March 19, 1965, memorandum from the Boston SAC to the Director reflected an informant's account that Barboza and Flemmi had gotten the "ok" from Frank Smith to kill Francione. *See* Exh. 31 at 2; Exh. 4 at 8. On May 10, 1965, Flemmi told Rico that he

had been in a shootout with Jimmy O'Toole and Stevie Hughes. *See* Exh. 40C.

**34.** The list also included Frank Benjamin, John Murray, George Ashe, Joseph Francione, "Iggy" Lowry, and a fellow inmate at MCI Walpole.

**35.** His final designation as a Top Echelon informant was made in a report from Boston to the Director on February 8, 1967. *See* Exh. 61B.

**36.** Stephen Flemmi was given the informant symbol number "B–955–C–TE." *See* Tr. vol. 8, 87.

Rico vouched for Stephen Flemmi's information to his superiors because Stephen Flemmi had direct access to Patriarca, as well as LCN bosses Gennaro "Jerry" Angiulo ("Angiulo") and Larry Baione ("Baione").[37] *See* Exh. 167A at 44–45, 50–54, 72; Exh. 167B at 67–68. As with Jimmy, those contacts trumped Stephen Flemmi's illegal and even murderous activities—bookmaking, shylocking, robberies and "possibly" gangland slayings. *See* Exh. 61B.[38]

Again, secrecy was preeminent: Flemmi "was to provide information only to this Bureau...." Exh. 304. He was not even available "to other field divisions." Exh. 61B. Nor was Rico to ever disclose Stephen Flemmi's crimes to any state prosecutors. *See* Exh. 192 at 165.

Stephen Flemmi was rewarded not only with money, *see* Exh. 67, but, according to Flemmi, agent Rico and others[39] promised him that he would be protected from pros-

ecution for his crimes. *See* Exh. 189 at 62–63; Exh. 192 at 157.[40] Flemmi testified (in the *McIntyre* case) that in 1969 Rico tipped him off that he was about to be indicted for the attempted murder of Barboza's attorney, John Fitzgerald ("Fitzgerald"),[41] and the murders of two others, giving Flemmi a chance to flee before the indictments came down. *See* Exh. 189 at 71–72. Flemmi further testified that even while he was "on the lam," he was in regular contact with Rico, who advised him not to return until 1974. Flemmi returned, was arrested, and released on bail approximately one week later, notwithstanding the fact that he had been a fugitive. Within six months, all charges were dropped. *See* Exh. 189 at 75–76, 78.

While Rico denied Flemmi's accusations,[42] I (like the other judges before me) wholly reject Rico's account as not credible.[43] Flemmi did in fact escape prosecu-

---

**37.** Baione was also known as Illario Zannino. *See Salemme*, 91 F.Supp.2d at 141.

**38.** Stephen Flemmi was reported to be the "leader of the group formerly headed by EDWARD 'WIMPY' BENNETT, who, according to informants, had been murdered and buried around 1/19/67." Exh. 61B.

**39.** John Connolly ("Connolly"), John Morris ("Morris"), and James Ring ("Ring"). Connolly was Stephen Flemmi's handler from 1980 to 1990. *See* Exh. 166 at 14–15. Morris was the supervisor of the Boston Organized Crime Squad from December 1977 to January 1983 and served as Flemmi's alternate handler. *See* Exh. 188 at 15, 16, 17, 22. Ring was supervisor of the squad after Morris from 1983 to 1989. *See* Exh. 188 at 40–41.

**40.** This allegation was critical to the hearings before Judge Wolf in the *Salemme* case and Judge Lindsay in the *McIntyre* case. *See infra* notes 4, 13.

**41.** *See infra* note 109.

**42.** *See* Exh. 167B at 97–99. Nevertheless, Judge Lindsay credited Flemmi's testimony to

this effect, based on Flemmi's testimony and on the parties' agreed statement of facts, filed in *United States v. Flemmi*, CR. 99–10371 (Oct. 14, 2003), Exh. 182–3. The statement noted, "This corruption [of federal, state and local law enforcement officers] ... allowed [Stephen Flemmi and other members of the Winter Hill Gang] to evade detection and avoid prosecution for decades". *See McIntyre v. United States*, 447 F.Supp.2d 54, 62 n. 9, 66. *See also Salemme*, 91 F.Supp.2d 141, 182 n. 30 ("The government does not dispute the court's findings that Rico told Flemmi of the forthcoming indictments so that he could flee."), 121.

**43.** I also find Condon's testimony concerning Stephen Flemmi to be wholly incredible. He testified that he was not aware in November 1965 that Stephen Flemmi was an FBI informant. *See* Exh. 193A at 72, Exh. 304. Nor did he know that Stephen Flemmi was approved as a Top Echelon informant. *See* Exh. 193A at 77. He claimed that he did not learn of Stephen Flemmi's status until the *Salemme* hearings. *See* Exh. 193 at 77.

Condon was Stephen Flemmi's alternate handler. Condon's denial that he knew of

tion for these charges under circumstances that can only be explained by his extraordinary access to FBI agents, and in particular to Rico. *See* Exh. 192 at 157.[44]

### 3. *Using the Flemmi Brothers to Turn Barboza into a Witness*

In November of 1966, Rico focused on turning career criminal Joseph Barboza into a cooperating witness against the LCN. *See* Exh. 167A at 50–51, 72–73.[45] Indeed, Barboza was the most important witness Rico had ever developed, *see* Exh. 167A at 87, one for whom he and Condon would receive praise, promotions, and raises. *See infra* Section III.D.1. Barboza's unquestioned importance to Rico makes especially suspect Rico's statements—before the House Committee and before

Judge Wolf—in which he claimed not to remember critical details of reports he authored, initialed, or to which he had access. *See* Exh. 170 at 169, 188.

Based on information Rico had received from Stephen Flemmi—namely, that the LCN had murdered several of Barboza's associates, and was threatening to kill more—Rico believed he had leverage to get Barboza to cooperate against Patriarca.[46] *See* Exh. 59. Over the next year, Rico and Condon worked relentlessly to turn Barboza into a witness in several cases, Deegan among them. *See* Exh. 59, Exh. 167A at 72–75, Exh. 51C at 2–3; Exh. 51D.

Stephen Flemmi was in close contact with his brother who, for a time, was in the same prison as Barboza.[47] Rico thus had a

Stephen Flemmi's status and that Rico, his partner, never shared information about Flemmi, *see* Exh. 193B at 79–80, rings hollow. Moreover, both Rico and Condon were given high praise precisely for their role in developing Stephen Flemmi as an informant, *see* Exh. 51C at 2–3, and for using Flemmi to develop Barboza as a cooperating witness. *See* Exh. 51D at 1–2; *infra* Section III.D.1.

**44.** Flemmi's relationship with his FBI handlers in fact continued until 1990. While Stephen Flemmi was terminated as a Top Echelon informant on September 15, 1969, when indictments were pending against him, *see* Exh. 166 at 14, Exh. 192 at 86, he was reopened in 1980. His new handler was Agent John Connolly. *See* Exh. 166 at 14. In fact, Exhibit 166, the inquiry conducted by the Office of Professional Responsibility of the DOJ described above, reports that Stephen Flemmi's status as an informant was reopened on September 12, 1980, closed again on September 23, 1982, because of investigations into two murders, reopened on July 10, 1986, and finally closed on December 3, 1990, because of Connolly's retirement. *See* Exh. 166 at 14–15.

**45.** In effect, the only reason why Barboza was not a "Top Echelon informant" was because he had limited ability to access other LCN members. He was imprisoned on one charge, awaiting trial on two others. *See*

Exh. 72. He was considered for designation years later when he was released from prison. *See* Exh. 114.

**46.** In his testimony before Judge Wolf, Rico agreed that he used the information from sources to persuade Barboza to be a witness but denied that he told Barboza that Patriarca was going to "take out" his compatriots. *See* Exh. 167A at 78. His statement contradicts the record. Rico agreed that he received information from Stephen Flemmi about threats to Barboza's crew from Patriarca, *see* Exh. 59, and that as a result of receiving that information, he became interested in converting Barboza as a witness. *See* Exh. 167A at 50–52, 72. Rico also admitted that he would meet with Stephen Flemmi one day, Flemmi would visit his brother Jimmy, and the next day the agents "received information from Mr. Barboza about the very topic that you were discussing with (Stephen) Flemmi." Exh. 167B at 79, 83; *see also*, Exh. 76 (FBI telling Stephen Flemmi to see his brother and report on the "Italian element" threats).

**47.** The FBI knew Stephen Flemmi was close to his brother, *see* Exh. 282 at 2, Exh. 86, Exh. 38 at 4, Exh. 37, and as such, would work hard to make certain that Barboza would never implicate Jimmy in the Deegan murder. *See* Exh. 86. Their efforts worked.

conduit through which to send information to Barboza and receive information on Barboza's activities. In effect, it enabled the FBI to affect Barboza's testimony long before they ever met directly with him. *See* Exh. 167B at 79–81, 83.

Stephen Flemmi was a significant source of information about his brother, the LCN, and Barboza. The state authorities prosecuting the Deegan murder knew nothing about the Flemmi brothers' relationship to the FBI.

### 4. *Rico and Condon Meet with Barboza*

The FBI meetings with Barboza beginning in March of 1967 must be put in context.

First, the sheer number: Rico and Condon met with Barboza *more than thirty* times between March of 1967 and his grand jury testimony on October 25, 1967, and then another *twenty-six* times *before* the start of Barboza's testimony in the Deegan trial.[48] At most of those meetings, no Suffolk County officials were present. The FBI met virtually weekly with Barboza, sometimes debriefing him, sometimes "just checking in." *See, e.g.,* Exh. 71A; Exh. 71B–28; Exh. 71B–31. State debriefings of Barboza were attached to FBI memoranda from September 1967 through the trial. *See, e.g.,* Exh. 71A–1; Exh. 71B–54.

Second, the content: Between March 1967 and September 1967, Barboza never mentioned the plaintiffs as having participated in the Deegan murder. Indeed, the plaintiffs had never been mentioned in *any* of the documents Rico and Condon had about the crime. It is fair to say that every piece of evidence in the FBI's considerable files on Deegan pointed to other perpetrators.

The meetings between Rico, Condon and Barboza described below, are divided between those *before* September 1967 when he first mentioned plaintiffs, and those *afterwards* (and before the Deegan trial).

### a. *Meetings Before September 1967*

#### (1) *March 8, 1967*

Rico and Condon interviewed Barboza for the first time on March 8, 1967.[49] They assured him that what he divulged would remain in confidence. Barboza's value as a witness was obvious from the outset. Rico and Condon reported to their supervisors that Barboza said he "knows what has happened in practically every [Gangland] murder that has been committed in this area." Exh. 71B–1.

And from the outset, Barboza imposed an extraordinary condition on the *content* of his testimony: "He said that he would never provide information that would allow JAMES VINCENT FLEMMI to 'fry' but that he will consider furnishing information on these murders." Exh. 71B–1.[50] By

---

**48.** This figure is based on the recorded meetings entered into evidence. There may well have been more in connection with meetings with other witnesses. *See infra,* Section III. C.2 (FBI arranging meetings between Barboza and other prosecution witnesses). The FBI also continued to meet with Barboza during the course of the trial. *See, e.g.,* Exh. 71B–57; Exh. 71B–58.

**49.** This was documented in a March 10, 1967, FBI 302, Exh. 71B–1. A 302 is an FBI form used for reporting an interview with a poten-

tial witness or suspect or to record other actions taken by or observations of an agent. *See* Exh. 339, ¶ 4. Exhibit 71B includes notes from a series of FBI interviews with Barboza from March 8, 1967, to October 14, 1968.

**50.** The defense seeks to introduce this statement by Barboza for the truth of the matter stated—as a statement of Barboza's state of mind and admissible under Fed.R.Evid. 803(3), and *Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). This Rule establishes a hearsay ex-

"fry," Condon understood that Barboza would not implicate Jimmy Flemmi in any capital crimes. *See* Exh. 193A at 54. Rico had a broader interpretation, understanding Barboza to mean that he would not say anything "harmful" to Jimmy Flemmi. *See* Exh. 170 at 220.

Significantly, the agents knew that Flemmi had been involved in multiple murders, including the Deegan murder, *see* Exh. 38, but asked no follow-up questions. *See* Exh. 193A at 54–56; Exh. 193B at 95, Exh. 229.[51] There is no question that they and their superiors fully understood that Barboza would be supplying at best, incomplete, and at worst, false information. They nevertheless pressured him to become a witness for the government.

### (2) *March 21, 1967*

Before their second meeting, Rico requested that a new Barboza Correlator Report be generated, and he reviewed the old one. The reports revealed what Rico likely already knew—that the wire had captured Barboza and Jimmy Flemmi seeking Patriarca's permission to murder Teddy Deegan on March 9, 1965. *See* Exh. 45 at 3.[52]

At the March 21, 1967, meeting with Rico and Condon, Barboza acknowledged colluding with Jimmy Flemmi, telling him about the FBI's overtures and even discussing who might testify about what. *See* Exh. 72 at 2.[53] While Barboza was not ready to testify,[54] he was more eager to provide information to the FBI than he had been before. He was now convinced

---

ception for statements of the declarant's "then existing state of mind, emotion, sensation, or physical condition," as well as statements about conditions such as the declarant's "intent, plan ... design." 5–803 Jack Weinstein, Weinstein's Federal Evidence § 803.05 (2d ed.1987). The question in *Hillmon* was the identification of a dead body as belonging to the insured, Hillmon. The insurance companies maintained that the body was not Hillmon, but a man named Walters who had disappeared at the same time. They offered in evidence letters from Walters indicating that he intended to leave with "a certain Mr. Hillmon." The Court held that the letters should have been admitted to show that before Walters left, he had the intention of going with Hillmon, which made it more probable that he indeed did go with Hillmon.

In the instant case, I agree that Barboza's statement of intent is admissible, that it is relevant, and indeed, that it is worth considerable weight. Evidence before and after the Deegan murder pointed to Jimmy Flemmi's participation, yet Barboza—true to his statement of intention—refused to testify against his friend.

Whether or not this statement is admitted for the truth of the matter—that Barboza in fact intended not to incriminate Flemmi—it is clear that the agents had notice of it (a non-hearsay purpose) at the time when all evidence pointed to Jimmy Flemmi's partic-

ipation. The agents clearly understood that Barboza's comments meant that he would not implicate Jimmy Flemmi.

51. When asked by the House Committee why he did not ask Barboza if Flemmi was involved, Rico responded: "Well, he'd already said he will not tell us right? ... He already said that he would not give us anything that would be harmful to Jimmy Flemmi." Exh. 170 at 220.

52. The March 20, 1967 Barboza Correlator Report compiled all FBI reports and information on Barboza gathered since the last correlator was generated on June 14, 1965. *See* Exh. 73. Rico reviewed them both. *See* Exh. 45 (Rico's signature appears on the lower right-hand corner of the first page, indicating that he received the report on March 20, 1967). *See supra* note 32 for the definition of "Correlator Report."

53. The two talked about Barboza's plan to get the co-defendant in his pending gun charge to testify in two murders. Jimmy Flemmi approved. *See* Exh. 72 at 2.

54. "If I ever testified, you people would have to find me an island and make a fortress out of it." Exh. 71B–2 at 12. As it turned out, the FBI was up for the challenge. *See infra*, Sections III.D.3, III.D.6.

that the "Italian Organization" was their common enemy. *See* Exh. 72 at 2. The agents' plan was working. Barboza was parroting to them the information they had planted with Stephen Flemmi for transmittal to his brother and then Barboza. *See* Exh. 167B at 79–81, 83.

Barboza furnished information about various crimes including the Deegan murder, and as promised, never mentioned Jimmy Flemmi: The supposed motive for Deegan's murder was that he had been causing problems at the Ebb Tide nightclub in Revere, Massachusetts, and that Deegan was looking for an excuse to kill Bobby Donati, a friend of Rico Sacrimone.[55] *See* Exh. 71B–2 at 8; Exh. 72 at 4. The target of the "hit" was not only Deegan, but also Anthony Stathopoulos Jr. ("Stathopoulos"), a friend of Deegan's. One of the men responsible approached Stathopoulos carrying "a .375 magnum and wearing a bullet-proof vest, but STATHO-POULOS was able to take off and get out of the area." Exh. 72 at 4. Barboza did not tell Rico and Condon who that was, and true to form, the agents did not ask. *See* Exh. 193A at 86.

The Director's interest in Barboza was so great, the Boston office sent a teletype to Washington at 11:04 p.m. advising him of Barboza's interview and their as yet unsuccessful efforts to obtain his testimony. *See* Exh. 74.[56]

### (3) *April 11, 1967*

On April 11, 1967, Rico instructed Stephen Flemmi to reiterate the "Italian element's" threats to Barboza at his visit with his brother the next day.[57] Two days later, Barboza repeated what he had been fed by the Flemmi brothers to Rico and Condon. *See* Exh. 76.[58]

### (4) *April 27, 1967*

On April 27, Barboza talked about the Deegan murder again, indicating that he had "heard" a police officer had left the door open to a building in Chelsea, and that Deegan believed he was going to be involved in a burglary. *See* Exh. 71B–4 at 2.

### (5) *May 22, 1967*

By May 22, 1967, Barboza sent word through his attorney, John Fitzgerald, to individuals he identified as LCN members [59] that he was cooperating with the FBI. *See* Exh. 71B–12. He did not discuss the Deegan murder further until the end of July 1967, but offered the FBI information about other crimes. *See* Exhs. 71B–5–71B–17.[60]

---

**55.** Sacrimone and Donati were two other organized crime figures.

**56.** The interview on March 21, 1967, began at 7:30 a.m. and ended at 3:30 p.m. Barboza was put in front of the grand jury between 2:00 p.m. and 2:15 p.m. and invoked his Fifth Amendment privilege against self-incrimination. An airtel was sent on March 28, 1967, with a detailed description of the March 21 interview. *See* Exh. 72. In that airtel, Rico and Condon detail Barboza's conversation with Jimmy Flemmi about Barboza's possible cooperation with the FBI. *See* Exh. 72. The agents did not record that information in the 302 documenting that same interview. *See* Exh. 71B–2.

**57.** Rico instructed Stephen Flemmi to "tell JIMMY that the Italian element is still trying to work against JOE BARBOZA and JERRY ANGIULO is trying to use his connections to see that BARBOZA gets 'buried through the Suffolk County District Attorney's Office.'" Exh. 76 at 1–2. *See also* Exh. 167B at 79–81.

**58.** During this interview, he also discussed the attempted murder of Willie Marfeo ("Marfeo").

**59.** Barboza mentioned Patriarca, Henry Tameleo, Gennaro Angiulo, Peter Limone, and Larry Baione, among others.

**60.** Barboza would ultimately testify in two other cases—one state, one federal—in addi-

As with the Flemmis, Barboza's importance as a witness eclipsed the fact that he was a "professional assassin" and was "acknowledged by all professional law enforcement representatives in this area to be the most dangerous individual known." Exh. 51C at 2.[61]

### (6) *Summer of 1967*

After the FBI turned Barboza into a cooperating witness, pumping him for information for over four months, communicating threats to him by the "Italian element," ingratiating themselves to him, expressing their concerns for his welfare and that of his wife, negotiating for his information and ultimately his testimony, then and only then did they invite Suffolk County investigators in. As Rico put it, disingenuously, to say the least, "[Barboza] *was put in a position* where he decided he wanted to testify. *So we let him testify.*" Exh. 170 at 189 (italics supplied).

On June 30, 1967, and July 31, 1967, Barboza met with Rico, Condon, and Suffolk County investigator Joseph Fallon ("Fallon"). *See* Exh. 71B–16; Exh. 71B–17. Barboza listed the murders he could "talk" on, including the Deegan murder. *See* Exh. 71B–17; Exh. 89.[62] But still he would not testify.

On August 1, 1967, Rico and Condon met with Boston SAC Handley, Organized

---

tion to the Deegan trial. The first, a state case, involved the murder of prizefighter Rocco DiSiglio ("DiSiglio trial"). Gennaro Angiulo and three others were acquitted. The second, *United States v. Patriarca*, ("federal Marfeo trial" or "Marfeo case") involved conspiracy to murder Marfeo and unlawful gambling, resulted in the conviction of Patriarca, Tameleo and Cassesso. They were sentenced to five years. Exh. 2338 at 105. The Deegan trial was the last of the three.

In August 1967, after Rico testified before a Suffolk County grand jury about his conversations with Barboza concerning the DiSiglio murder, the Boston SAC sent an urgent teletype to the Director at 1:03 a.m. As with the Deegan case, *see infra* Section III.D.1, the FBI's responsibility for this prosecution was clear: The SAC noted that Suffolk County District Attorney Garret Byrne commented that this "TREMENDOUS PENETRATION INTO THE LCN AND THE HOODLUM ELEMNET [sic] WAS EFFECTED THROUGH THE OUTSTANDING INVESTIGATIVE EFFORTS OF THE FBI AND HIS OFFICE." Exh. 91. The SAC added, "THIS ENTIRE CASE WHICH WAS PRESENTED TO THE GRAND JURY BY DA BYRNE WAS DEVELOPED THROUGH THE EFFORTS AND THE ABLE HANDLING OF BARBOZA BY SA H. PAUL RICO AND DENNIS M. CONDON. . . . I KNOW THAT THIS INDICTMENT WOULD NOT HAVE BEEN POSSIBLE IN ANY SENSE OF THE WORD IF IT WERE NOT FOR THE EFFORTS OF THESE AGENTS AND THE FBI AT BOSTON." *Id.*

Accordingly, the SAC recommended commendations for Rico and Condon, as well as a commendation for Kehoe "WHO SUPERVISED THIS ENTIRE PROGRAM AND WAS INVOLVED DEEPLY IN THE DEVELOPMENTS AND THE PLANNING RELATIVE TO BARBOZA AND THE MATTERS ATTENDANT TO THIS INDICTMENT." *Id.*

61. *See also* Exh. 45 at 7–8 (Boston airtel reporting that Barboza was heard on the wire asking Patriarca for permission to kill a man by setting his house on fire, despite the fact that the man's mother lived there as well); Exh. 170 at 189. (Rico noted: "I'm not a big supporter of Barboza." He was a "stone killer" but the "instrument that we had.").

62. The Deegan murder had a special importance since, of the murders Barboza could testify about, it stood out by virtue of its many participants. In the others, either Barboza was the only assailant or the crime was committed with Jimmy Flemmi, whom Barboza would not implicate. For example, the FBI had information that: Eaton was murdered by Barboza, *see* Exh. 57 at 15; Francione was murdered by Barboza, *see* Exh. 57 at 24; DiStasio and O'Neil were murdered by Barboza, accompanied by Jimmy Flemmi, *see* Exh. 57 at 37–38. Exhibit 57 is a January 1966 FBI report entitled, "Boston Gangland Murders: Criminal Intelligence Program," which contains ample information on many of the Gangland murders.

Crime Squad Supervisor Kehoe, U.S. Attorney Paul Markham ("Markham"), Suffolk County D.A. Garret Byrne ("Byrne"), and Fallon to discuss Barboza's testimony in the Deegan trial and related immunity issues.[63] On August 28, 1967, Rico and Condon, now joined by Suffolk County Detectives John Doyle ("Doyle") and Frank Walsh ("Walsh") interviewed Barboza. Doyle asked point blank whether Barboza would furnish information on the Deegan murder. *See* Exh. 71B–22. While state law enforcement had some evidence regarding the crime, there is no question that the case was weak; no charges were forthcoming. *See infra* Section III.B.4.b.3. It was only after Rico and Condon offered Barboza to them that there was any chance of a successful prosecution.

Whatever the significance of the Deegan prosecution to the state, there is no doubt that the FBI was also extraordinarily interested. The federal authorities had to use the state apparatus to prosecute murder cases. *See supra* Section III.A.3. Once it was clear that Barboza was to be the star in three prosecutions (two state, one federal), *see supra* note 60, his credibility was essential. The FBI was not about to let him out of their sight—monitoring his debriefings with state law enforcement, participating directly and indirectly in the trial itself, communicating all major developments to FBI Headquarters.

Still not ready to testify in the Deegan murder, on August 28, 1967, Barboza offered more information about Deegan's murder, beyond the "trouble at the Ebb-Tide" refrain: That Deegan had robbed Carmen Puopolo (a bookmaker in Everett), that Deegan had in fact murdered Anthony Sacrimone (and not just Sacrimone's friend), and that he was affiliated with the McLaughlin faction in the McLaughlin–McLean Gang war.[64] *See* Exh. 71B–22.

Finally, Rico and Condon's efforts bore fruit—Barboza agreed to testify. But just because he was to be Suffolk County's star witness clearly did not mean that Rico and Condon would have no further contact. Rico, Condon, and Barboza continued to meet before, during, and after the Deegan trial—with state officials present or without.

### b. *Barboza Mentions the Plaintiffs for the First Time on September 8, 1967*

Barboza implicated the plaintiffs in the Deegan murder *for the very first time* on

**63.** The meeting was documented in an airtel from the SAC to the Director. *See* Exh. 89.

**64.** According to the FBI, the McLaughlin–McLean feud was responsible for "many" of the "prominent" Gangland murders in Boston. The origins of the feud are summarized in the FBI's 1966 Gangland Murders Report. *See supra* note 62. "A review of the files of the Boston Office reflect that the feud originally started over a fight that took place in a cottage in Salisbury Beach, Massachusetts, approximately three years ago. In attendance at the party was GEORGE MC LAUGHLIN who made a pass and used very vulgar language to the wife of one of the other individuals at the party. As a result of this, a fight ensued." Exh. 57 at 4. According to FBI documents, Barboza and the Flemmi brothers were aligned with the McLean faction. *See, e.g.,* Exh. 50A. The LCN, however, was not involved. A November 11, 1965, FBI memorandum reporting a contact with an especially valued and reliable Top Echelon informant states that at that time, "the LCN in this area has not actively taken part in this gang war," although there was concern they might become involved in the future. Exh. 50A at 1. If anything, the concern at the end of 1965—several months after the Deegan murder—was that the LCN would intervene on the *McLaughlin* side.

Thus, when Barboza asserted that the motive behind the Deegan killing was Deegan's affiliation with the McLaughlins, and that the LCN therefore wanted him "rubbed out," the FBI plainly knew that this was likely false.

September 8, 1967. But before that statement is described, it must be put into context: Barboza's account was totally inconsistent with the list of participants that both federal and state law enforcement had from their informants. But for the FBI, the contradiction—and the impropriety—went far, far deeper. They had better—even conclusive—information which categorically contradicted Barboza, which implicated Jimmy Flemmi, Patriarca, and Barboza, and exonerated the plaintiffs. The minute Barboza's mouth identified the plaintiffs, Rico and Condon had to have known he was lying.

I describe first, what the FBI knew about the Deegan murder by September of 1967 and then, what the state authorities knew.

### (1) *What the FBI Knew about the Deegan Murder Before The Murder*

(a) **October 17, 1964 (five months before the murder):** Jimmy Flemmi told an FBI informant that *he* wanted to kill Deegan because Deegan owed his brother money.[65] While the FBI informed the Everett Police Department that Deegan was suspected of killing Anthony Sacrimone (which was also included in the informant's account), they declined to tell them about the threat to Deegan. *See* Exh. 14 at 2.

(b) **October 20, 1964 (five months before the murder):** The agents learned from the Patriarca wire that Limone, rather than orchestrating Deegan's murder as Barboza would later claim, had warned Deegan that Flemmi was out to kill him.[66]

(c) **March 4, 1965 (eight days before the murder):** Patriarca was overheard on the wire telling Angiulo that Jimmy Flemmi had gone to Providence to seek permission to murder Deegan.[67]

(d) **March 9, 1965 (three days before the murder):** Flemmi and Barboza were overheard asking for the "ok" to hit Deegan. Flemmi called Deegan "an arrogant, nasty sneak" who "should be killed." Patriarca told them to collect more information on Deegan and then to contact Angiulo who would give them a final answer.[68]

(e) **March 10, 1965 (two days before the murder):** A Top Echelon informant reported that Jimmy Flemmi said Patriarca had given the "ok" to hit Deegan and a "dry run" had already been made. The informant said that Flemmi suggested he have an alibi for "the next few evenings," in case he was suspected of the murder.

---

65. This information was available to the FBI in three forms: an October 19, 1964, memorandum by Rico, an October 19, 1964, airtel to the Director, and the April 22, 1965, Flemmi Correlator. *See* Exh. 14 at 1; Exh. 4 at LIM010-0247; Exh. 38 at 2-3.

66. This information was documented in an airtel from the SAC Boston to the Director dated October 23, 1964, written by Kehoe on October 20, and initialed as read by Rico, among others, *see* Exh. 15A, as well as in the April 1965 Flemmi Correlator, *see* Exh. 38 at 1-2, Exh. 4 at LIM010-0240.

67. This was documented in an airtel to the Director on March 10 which was written by Kehoe and initialed as read by Rico, among others. *See* Exh. 20. It was also documented in the April 1965 Jimmy Flemmi Correlator. *See* Exh. 38 at 1, 8-9; Exh. 4 at 10, 17-18.

68. This was documented as information collected from the wire in a March 12, 1965, airtel drafted by Kehoe and sent by the Boston SAC to the Director and the SACs at Albany, Buffalo, and Miami. The airtel was initialed as read by the SAC, the ASAC, and Agents Finnegan, Brady, Murphy, Reppucci, Lardner, Dunn and Opley. *See* Exh. 18B; Exh. 18C; Exh. 18D. It was also documented in the April 1965 Jimmy Flemmi Correlator, *see* Exh. 4 at 17-18; Exh. 38 at 9, and the June 1965 Barboza Correlator, *see* Exh. 45 at 3.

*See* Exh. 4 at 4; Exh. 26; Exh. 29.[69] The Deegan murder appeared imminent; the FBI did nothing to stop it.[70]

### (2) *What the FBI Knew after the Murder*

(a) **March 13, 1965 (the day after the murder)**: One of Rico's most valued Top Echelon informants, *see supra* note 69, reported that Jimmy Flemmi confessed that *he* had participated in Deegan's murder along with Roy French ("French"), Joseph Romeo Martin ("Martin"), Ronnie Cassesso ("Cassesso"), and Barboza—with no mention of the plaintiffs. That account would be repeated over and over with minor variations in *every single document*

69. This information—though not from the wire—was especially reliable. It was reported by one of the FBI's most valued Top Echelon informants. Although his identity was not disclosed, the record reflects he was developed by Rico, used by Rico to develop Stephen Flemmi, and credited by the FBI with providing them with "a wealth of information regarding high-level organized crime," Exh. 51I, and "accurate and authentic data regarding gangland strife." Exh. 51D. *See also* Exh. 348 (listing the FBI documents for which this informant was the source).

At the close of the bench trial, I ruled that the parties would be allowed to reopen the evidence with respect to a narrow set of issues—namely, to allow the plaintiffs to introduce less-redacted versions of the trial exhibits, as well as new exhibits, the relevance of which only became apparent in light of other lifted redactions, which had been the subject of a long standing discovery dispute. Plaintiffs have filed sealed motion [docket entry # 558] to reopen the evidence and offer sealed Exhibit 348 as a party admission. That motion was granted, and Exhibit 348 admitted. *See* Electronic Order dated July 25, 2007. Plaintiffs also filed a motion [docket entry # 551] to admit a series of less-redacted substitute exhibits, as well as three documents—proposed Exhibits 344, 346, and 347—not previously marked as exhibits. The plaintiffs submitted a list of the government's objections and their responses. The plaintiffs' motion was also granted, over those objections. *See Id.*

Lastly, there were several evidentiary issues left unadjudicated. *See* docket entry # 553. Exhibits 175A and 175B, are now admitted, but I do not rely on them at all. Exhibit 182 is also admitted, discussed *infra* note 148. With respect to the following exhibits, I had reserved on some aspect of the purpose for which they were to be admitted: Exhibits 121A and 121B are admissions by the government and come in for their truth. *See infra* Section III.D.5. Exhibits 26, 29, and 101 re-

main admitted for their original purposes. Exhibit 71B–1 is discussed *supra* note 50.

70. This information was documented in a memorandum written by Rico dated March 15, 1965, *see* Exh. 26, and initialed as read by Special Agent Charles Reppucci from the Providence office, *see* Exh. 29, and Kehoe, *see* Exh. 26. Exhibits 26 and 29 are the same document with different recipient information on the bottom right hand corner. *See also* Exh. 4 at 4; Exh. 36 at 7–8. The government has submitted a copy of Exhibit 26 as Exhibit 2348. The government's submission, however, contains a second page indicating that the information was also disseminated by SA Donald V. Shannon to Captain Robert Renfrew of the Chelsea Police.

Plaintiffs contend that the second page was not originally part of the March 15 memorandum. That second page is identical to the second page of Exhibit 28, which is a *different* March 15 memorandum authored by Rico, reflecting an informant conversation the day after the murder, March 13. Plaintiffs point to the fact that Exhibit 28 was comprised of two pages when submitted to the plaintiffs as part of the Durham documents, Exhibit 4 and as Exhibit 77 to the House Committee on Government Reform, whereas Exhibit 26 was always comprised of just the one page—when produced as part of the Durham documents and as Exhibit 72 to the House Committee. That the second page of Exhibit 2348 actually belongs to Exhibit 28 and not Exhibit 26 is further confirmed by Agent Kehoe's statement to the Justice Task Force. *See* Exh. 36 at 9.

I find, therefore, that the information contained in Exhibit 26—that Deegan was *about* to be murdered—was not shared with Captain Renfrew. As plaintiffs point out, there is no reason why the FBI would have known to send the information to Chelsea rather than to Revere or Everett or Dorchester. *See* Exh. 33.

the FBI had before Barboza's September 8 tale. And at least as to Patriarca, Flemmi and Barboza, it was confirmed by the wire. *See* Exh. 24; Exh. 4 at 5. In broad outlines, the informant related the following:

The plan was for Barboza, Jimmy Flemmi, Cassesso, Martin and French to kill Deegan and Stathopoulos when the latter two were robbing a finance company in Chelsea, Massachusetts. Patriarca had approved the "hit," and a dry run had been taken. French, Deegan's confederate, was the traitor, letting Barboza and his group know when and where the Deegan robbery would occur. With Deegan and French in the alley outside the finance company, and Stathopolous watching in their getaway car, Cassesso and Martin were supposed to shoot Deegan. Barboza and Flemmi would then shoot Stathopoulos. In fact, the Stathopolous part of the plan went awry when Chelsea Police Captain Kozlowski, in plain clothes, appeared at Barboza's car. Barboza and Flemmi fled.

Jimmy Flemmi reportedly told the informant that the reason Cassesso and Martin did the shooting was that they wanted to prove to Patriarca that they were capable individuals. Flemmi indicated that they did an "awful sloppy job." Exh. 28. *See also* Exh. 4 at 5.

While the March 13, 1965, memorandum indicates that information was disseminated by SA Donald Shannon to Captain Renfrew of the Chelsea Police, it was communicated without any indication that it came from a highly trusted source, or that the participation of Flemmi, Patriarca, and

Barboza had been fully corroborated by the FBI's illegal wire.

(b) **March 13, 1965:** An informant, reporting to Rico, confirmed the earlier report.[71]

(c) **March 19, 1965:** Kehoe sent an airtel to the Director summarizing the prior information. He reiterated the five participants—French, Cassesso, and Martin as the Deegan shooters, Flemmi and Barboza as the proposed shooters of Stathopoulos. *See* Exh. 31. Meanwhile, the Chelsea police had confirmed that French, Barboza, Flemmi, Cassesso and Martin were together at the Ebb Tide restaurant, leaving at "approximately 9 o'clock and return[ing] 45 minutes later." Exh. 31.

(d) **March 23, 1965:** A potential criminal informant ("PCI"), whose information was rated "very good," reported that Barboza confessed that he had shot Deegan with a .45 caliber gun. The informant also stated that "JIMMY FLEMMA [sic]" had gone to Providence to see Patriarca just before Deegan was killed, and that Barboza and "FLEMMA [sic]" were very friendly. *See* Exh. 34.[72]

(e) **March 24, 1965:** Kehoe sent an airtel to the Director, signed by Boston SAC Handley. The Director instructed Boston to "advise the appropriate authorities" of the possible perpetrators of the Sacrimone and Deegan murders. He instructed Boston only to do so, however, while maintaining "full security to BS 837–C*," the Patriarca wire. *See* Exh. 30A; Exh. 30B.

I find that to the extent that the FBI "shared" any information with local authorities *before* offering up Barboza as a witness, it was very general information

---

71. Rico documented this information in a March 15, 1965, memorandum, which was read by Kehoe. *See* Exh. 27.

72. This information was documented in a April 6, 1965, memorandum to the SAC Boston, read by Charles Reppucci, *see* Exh. 34, the April 1965 Jimmy Flemmi Correlator Report, *see* Exh. 38 at 1, 24; Exh. 4 at 10, 25, and the June 1965 Barboza Correlator, *see* Exh. 45 at 1, 10.

already in the possession of the state.[73] The FBI could *not* disclose information that they had before the killing—that it was *Flemmi* and *Barboza* who sought permission from *Patriarca* to kill Deegan, that *Limone* warned Deegan—or its source—without compromising the wire. Nor would they identify their Top Echelon informants and why they found their information so extraordinarily reliable.

(f) **June 1965 and July 1965:** The critical Patriarca wire information was repeated in reports over and over again.

And in each case, the account of the Deegan murder there mirrors all of the earlier ones.[74]

I find that Rico, Condon, and the FBI hierarchy were well aware of these documents and their implications for the plaintiffs, notwithstanding their subsequent denials. Indeed, the conclusion is inescapable: Rico and Condon lied about what they knew on September 8, 1967, just as they lied concerning their relationship to the Flemmi brothers. *See supra* Section III.B.2.[75]

**73.** The government points to language in a March 24, 1965, memorandum, Exh. 33, to argue that local authorities effectively knew what the FBI knew. Exhibit 33 notes that the FBI provided Captain Renfrew of the Chelsea Police with "the same information, as furnished by" the Top Echelon informant described in footnote 69. It goes on to say, "[t]his informant also furnished basically the same information as did BS 837–C* relative to the murder of EDWARD DEEGAN on 10/17/64. This information was furnished to Inspector HENRY DOHERTY of the Everett, Mass. PD on 10/18/64." Exh. 33.

The plaintiffs' position is that this makes no sense. The information provided to Doherty in October 1964 predated the Deegan murder. It concerned the *Sacrimone* murder, identifying Deegan as the *perpetrator*. A handwritten note on the Director's request continues the error. It reads: "Already disseminated. Sacrimone 10/18/64—Doherty, Everett PD. Deegan 3/15/65—Renfrew Chelsea PD." Exh. 30B. The FBI's October 19, 1964, airtel indicated that even if Doherty was given information about Deegan as the possible perpetrator of the Sacrimone murder, there is no indication that the FBI told him about the threat made on Deegan's life by Jimmy Flemmi, which was documented in the same FBI memorandum. *See* Exh. 14.

The March 24 airtel response also summarized information that had been collected by the Chelsea Police. It noted that Chelsea's investigation "reflected" that Stathopoulos was at the scene but left because he thought the Chelsea police were about to arrest Deegan and French attempting to commit a burglary. Stathopoulos called attorney Al Farese who called the Chelsea Police Department to

bail out Deegan and French. But Deegan and French had not been arrested. When the Chelsea police found Deegan's body, they immediately looked for French. French reported that he was at the Ebb Tide all night, but their investigation indicated that after French got a call at 8:45 p.m., he left the Ebb Tide with Barboza, Flemmi, Cassesso, Martin, and Imbruglia—returning about 45 minutes later. A Chelsea Police officer identified Martin's car as being parked at the scene with two men inside. *See* Exh. 33.

**74.** *See* (I) the June 14, 1965 Barboza Correlator, Exh. 45 at 7, a report initialed as read by D.V. Shannon, and signed by Rico as retrieved and read on March 20, 1967 (the day before Rico and Condon's second meeting with Barboza), Exh. 45 at 1; (ii) a June 6, 1967, prosecution memorandum in *United States v. Patriarca*, written by Walter Barnes and Edward Harrington, Exh. 81 at 1, 18; (iii) a July 18, 1967, report on Barboza from Boston to headquarters, prepared by Agent Thomas H. Sullivan, Exh. 68; (iv) a July 20, 1965 report prepared by Charles Reppucci, a Boston agent, sent from Headquarters to the U.S. Attorney's Office in Providence, the FBI offices in Boston and New York, and the Assistant Attorney General, Criminal Division, Organized Crime and Racketeering Section, and approved by SAC Handley, Exh. 46; (iv) the Boston Gangland Murders report of January 1966, Exh. 57.

**75.** At one point in his testimony Rico denied even knowing about the Patriárca wire, a preposterous claim given its importance to his job, *see* Exh. 170 at 188. When asked if he knew about Jimmy Flemmi's involvement in

Although Rico claimed that he was not aware of the pre-September 8 information when Barboza was spewing his lies, *see* Exh. 170 at 198, he either authored the documents described above or initialed them as read. Barboza was his singular achievement, dealing with the LCN his principle responsibility. It is inconceivable that any detail of Barboza's accounts of gangland murders escaped Rico's attention.[76] By the second day of the House Committee hearing, Rico stopped testifying entirely on Fifth Amendment grounds. *See* Exh. 170 at 107.[77]

Condon was likewise privy to the documents described above, given his role as former employer. It is true that the existence of the employment relationship without more does not subject an employer to adverse inferences based on its employees' silence. *See Veranda Beach Club Ltd. v. Western Sur. Co.*, 936 F.2d 1364, 1374 (1st Cir.1991)(declarant invoking the Fifth Amendment did so in relation to wrongdoing in which his employer had little, if any, involvement); *cf. Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F.Supp. 340 (D.Mass.1993) (evidence suggesting that the employer had benefitted from and tacitly approved the wrongdoing of the employee). Here, it is reasonable to infer that Rico invoked the Fifth Amendment in response to questions about Flemmi, Barboza and the Deegan murder trial, to protect not only himself but the government as well. His wrongdoing was done with the full knowledge and approval of his superiors, and redounded to their benefit.

There is also precedent for imputing silence of an employee to his employer under Rule 801(d)(2)(D), even that of a former employee. *See RAD Servs., Inc. v. Aetna*, 808 F.2d 271, 275 (3d Cir.1986); *Brink's Inc.*, 717 F.2d at 700; *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 521–22 (8th Cir.1984); *Lentz v. Metropolitan*, 437 Mass. 23, 768 N.E.2d 538, 542 (2002); *F.D.I.C. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969, 977–79 (5th Cir. 1995); *LiButti v. United States*, 107 F.3d 110, 120–21 (2d Cir.1997). The approach is case by case, considering, for example, whether the "non-party witness is pragmatically a non-captioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation," *LiButti v. United States*, 107 F.3d at 123.

As described above, there is ample evidence to support wrongdoing on the part of Rico, attributable to the United States, with or without drawing an adverse inference from Rico's asserting the Fifth Amendment privilege.

---

the Deegan murder before the killing, he equivocated saying, "it's possible that I had information that he might have been involved or going to be involved ..." *Id.* at 161. After being confronted with documents with his name on them he conceded, "evidently, I did [know that Deegan was to be killed]," and that Jimmy Flemmi was involved. *Id.* at 189.

**76.** Indeed, in one of the most troubling parts of his already troubling testimony before the House Committee, Rico conceded "now that everything is said and done it appears that [Barboza] didn't tell the whole truth." Exh. 170 at 187. Further, asked specifically about Salvati, he acknowledged that after he heard all of the facts at the House hearing, he believed Salvati was not guilty. *See* Exh. 170 at 157–158. In fact, his testimony could not be more disingenuous. The information before the House Committee comprised the memoranda *Rico* generated, initialed or about which he had to have been familiar. Whatever Rico learned at the House Committee hearing was hardly new to him; he had to have known that Barboza's account of the plaintiffs' complicity in the Deegan murder contradicted all of the FBI's intelligence. As for Salvati, he conceded that he had had no information, much less derogatory information, before Barboza mentioned his name. *See* Exh. 170 at 189, 193, 211.

**77.** There is some question as to whether an adverse inference may be drawn against the defendant from Rico's invocation of his Fifth Amendment right. Were Rico the defendant here, there would be no question that his silence could support such an inference. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Brink's, Inc. v. City of New York*, 717 F.2d 700, 709 (2d Cir.1983). As discussed in *supra* note 31, defendant here is not only Rico's employer; it stands in his shoes under the FTCA.

Adverse inferences may also be drawn against the government in its role as Rico's

Rico's partner, and his position in the Organized Crime Squad, *see supra* Section III.B.1., yet he too lied.[78] For example, he denied ever seeing a copy of Kehoe's January 14, 1966, "Boston Gangland Murders" report, Exh. 57,[79] which repeated who the five perpetrators of the Deegan murder were (Barboza, Flemmi, Cassesso, Martin and French). *See* Exh. 193B at 21, 57. This was so even though he admitted his initials were on the cover of the Kehoe report, signifying that he had viewed it. *See* Exh. 324 at 1, 6.[80] He went so far as to deny that Rico shared *any* information with him about Deegan's death, *see* Exh. 193B at 21, or that he knew what the wire disclosed about Flemmi, Barboza and Patriarca, *see* Exh. 193B at 228.

In short, I do not find the accounts of either agent—concerning what they knew when Barboza pointed the finger at plaintiffs—to be remotely credible. They had every reason to believe that the men Barboza identified, Limone, Tameleo, Greco and Salvati, had absolutely no involvement in the Deegan murder, while the man he left out, Jimmy Flemmi, did.

### (3) *What the Local Authorities Knew about the Deegan Murder*

Following the Deegan murder, the local police (Chelsea and Boston Police Departments as well as the Massachusetts State Police) had some information implicating the same five individuals as did the FBI.[81] What they did not know was how accurate that information was—i.e. the extent to which the information had been fully confirmed by an illegal wiretap, and the FBI's multiple, and ostensibly very reliable, informants. This was critical: It is one thing for state authorities to believe that an informant said thus—and—so.. It is another to know that the information came from a valued informant with whom the FBI had a long-standing, committed relationship. And still another to understand that the plot in question was actually overheard before it was executed.

Shortly preceding the murders, Captain Joseph Kozlowski ("Kozlowski") of the Chelsea Police saw a red car with the rear licence plate folded over near the crime scene. He saw two men inside—the man in the back seat had dark hair with a bald spot on the center of his head. *See* Exh. 21. Lieutenant Thomas Evans ("Evans") reported that he followed up on Kozlowski's lead. He went to the Ebb Tide with Captain Renfrew and Detective Moore, where they saw a red car with the rear license plate creased down the middle, belonging to Romeo Martin. The police brought Martin and Imbruglia to the police station for questioning. Kozlowski said the car looked like the one he had

---

78. *See supra* Sections III.B.2.a. and III.B.2.b.

79. The Kehoe report was very similar to documents that Condon himself had generated about Barboza and the Deegan murders, *see, e.g.,* Exh. 87 (Crime Conditions in Boston report) which likely reiterated the same information. Agent Sullivan, the author of that report, indicated that the information in it "was obtained from the review of the files of the Boston Office by DENNIS M. CONDON" including the Deegan file. *See* Exh. 87 at 4.

80. Exhibit 324 was admitted as a prior inconsistent statement, namely, a statement that was inconsistent with that which Condon had

given at his deposition. *See* Tr. vol. 19, 16–17. In fact, it is entitled to substantive treatment. Assuming Exhibit 324 was a business record of the FBI, as the parties conceded, a hearsay statement within it is admissible if there is an independent grounds for its admissibility. Here the statements of Condon are admissible as statements of a party under Fed.R.Evid. R. 801(d)(2). *See also* Fed.R.Evid. 805.

81. There is absolutely no doubt that they did not have access to the Durham documents, and surely, not to the broader record developed in this case. *See supra* Part II.

seen earlier, but did not recognize either man. *See* Exh. 22 at 2

Lieutenant Evans' report also recounts information derived from Captain Renfrew's informant: French had received a phone call around 9:00 p.m., shortly after which he left the Ebb Tide with Barboza, Cassesso, Jimmy Flemmi, Romeo Martin, and two others, returning by 11:00 p.m. At that point Martin allegedly said to French, "We nailed him." [82] *Id.* at 3.

But local authorities did not have enough evidence to proceed against any of the individuals known to be at the Ebb Tide. *See* Exh. 57 at 27 ("[A]s yet, [the police] have not obtained sufficient evidence to warrant prosecution against any of the above individuals.").[83]

After a few weeks, the Chelsea investigation of the Deegan murder effectively ended.[84] New life was breathed into it when the FBI persuaded Joseph Barboza to turn state's evidence two years later.

### c. *The September 8 Interview and the Indictment*

On September 8, 1967, Rico and Condon met with Barboza, joined by Doyle and Walsh, and *for the first time* Barboza named the plaintiffs as among the partici-

pants in the Deegan murder (along with French and Cassesso). It should have been a stunning moment for the FBI, one that cast profound doubt on Barboza, his credibility, and his use as a witness in a capital case. The FBI agents listening to him, and the agents overseeing them, *plainly knew that this account was false* insofar as it implicated the plaintiffs.

Barboza identified Tameleo and Limone as the instigators:

(a) Limone, rather than trying to protect Deegan as the wire indicated, approached Barboza to have Deegan killed for $7,500, and then threw in an additional $2,500 for Stathopoulos.

(b) The motive was the fact that Deegan had robbed an Angiulo-affiliated bookmaker.

(c) Barboza asked Tameleo—not Patriarca as the wire indicated—for permission to do the hit; Tameleo replied, "[Deegan] has to go."

(d) Barboza met Greco in the "early part of March" in Florida and enlisted his help; Barboza returned to Boston "around the eighth of March." Exh. 71A–1 at LIM012–2144.

---

82. A City of Boston informant report put Barboza, French, Cassesso and Stathopolous together on the night of the murder—but not Jimmy Flemmi. *See* Exh. 24. A certain "Officer Robson" reported that Stathopolous said "he saw Cassesso with a gun in his hand that night." Exh. 25. The government points to two other local police reports—the "Cass Report," Exh.2047 and the "Stuart Report," Exh.2050. The Cass Report restates the information in the Evans Report. Detective Lieutenant Inspector Richard Cass was sent by the Massachusetts State Police to aid in the investigation on March 13, 1965. This document is a report to his supervisor summarizing what the Chelsea Police had learned. (Exhibit 2050 is the same document as Exhibit 24.)

83. Moreover, the state authorities had no witness who placed Jimmy Flemmi *at* the murder scene. *See* Exh. 21; Exh. 22; Exh. 23; Exh. 24; Exh. 57 at 26–27.

84. Exhibit 2060 is an August 10, 1965 letter from Massachusetts State Police Lieutenant John Colling to New Hampshire State Police Detective William Smith. The letter explains that on March 17, 1965 (the week of the murder), a New Hampshire officer responded to Evans' inquiry regarding local gun merchants. Colling instructed the New Hampshire police not to look into the matter further; Evans would take it up when he returned from vacation. The letter is the only indication that any investigative effort was made after the few days following the murder.

And as to the night of the killing, Barboza wove Salvati and Greco into the story:

(a) Greco was at the Ebb Tide before the murder and left with Martin.

(b) "Joe the Horse" (i.e. Joe Salvati), Barboza and Cassesso were in Martin's car.

(c) Barboza was carrying a .357 Magnum, while Salvati had a .38 Smith and Wesson. *See* Exh. 71A–1.[85]

So important was Barboza's information that on the next day, September 9, 1967 (even before Doyle's report was prepared),[86] the Boston FBI office sent an "urgent" teletype to the Director, informing him that Barboza had agreed to testify in the Deegan murder. The teletype listed those whom Barboza had implicated, including the plaintiffs and excluding Flemmi. *See* Exh. 310.[87] No one pointed out the blatant contradictions between this account and *every single one* that preceded it.

Barboza met twice more with Suffolk County investigators Walsh and Doyle in the days leading up to the indictments, always with the FBI present.[88] By the second meeting, Barboza's tale grew more elaborate:

(a) Limone's motive was that Deegan, accompanied by Attorney John Fitzgerald, had "got $1,000.00 off of Peter Limone for George McLaughlin."

(b) Tameleo approved Limone's directive to "hit Stath."

(c) Greco drew a map of the area for Barboza, left the Ebb Tide before Barboza, wore a brown topcoat, and shot Deegan with a .45.

And, significantly, Barboza added (d) that Salvati wore a bald wig. *See* Exh. 71A–3.

The "wig" detail was telling. Chelsea Captain Kozlowski had reported that the man in the back seat of Martin's car had a bald spot—and Jimmy Flemmi fit the bill, as Rico knew. *See* Exh. 170 at 220. Salvati, by contrast, had a full head of hair. Although Kozlowski had been in plain clothes on the evening of the murder, Barboza's September 8, 1967 statement referred to him as a "Chelsea Police Captain." Exh. 71A–1. Barboza clearly had been told about Kozlowski's report.

By October 16, there was another new detail: Barboza reversed himself—Greco had *not* been at the Ebb Tide with the rest of the men; Martin had gone to pick him up. Barboza had obviously been told about the witness accounts in the Chelsea reports excluding Greco from the group at the Ebb Tide. Nor could Barboza recall what Greco was wearing. By the time of the Deegan trial, there would be even more "corrections" enabling Barboza to account for any reports the defense had.

Indeed, I reject Barboza's (as well as Rico's and Condon's) repeated, even indignant, denials that the FBI showed Barboza such reports or told him about them so that he could adapt his testimony.[89]

---

85. The FBI 302 documenting this interview includes state investigator Doyle's September 11, 1967 write-up, without comment by Rico or Condon

86. Doyle's report was dated September *11,* 1967.

87. Another teletype sent later that day reiterated Barboza's story, and promised to keep headquarters apprised. *See* Exh. 92.

88. On September 12, 1967, the investigators were joined by both Rico and Condon, and on October 16, 1967 by Rico. *See* Exh. 71A–2; Exh. 71A–3.

89. Condon denied to the House Committee that Barboza was ever shown any report to help him with his testimony. *See* Exh. 193B at 8. In fact, he testified at the Deegan trial that he took pains not to "impart any infor-

Someone in law enforcement had to have done so, either the FBI directly or state law enforcement in the FBI's presence.

Not only did Rico and Condon shore up Barboza's testimony with information from their files, and even information from the defense,[90] they went so far as to tell ADA Zalkind that Barboza's story "checked out"—an astonishing comment given what they knew. Tr. vol. 7, 102.[91]

mation that I might have concerning the circumstances surrounding the case." Exh. 105C at 5813. Barboza was positively indignant at the suggestion during his Deegan trial testimony. See Exh. 105A at 4489. Later he conceded that he had been shown an airline ticket by U.S. Attorney Markham, and that Zalkind may have read from transcripts but did not let him look at them. Id. at 4660.

90. The FBI not only had direct access to Barboza before and during the Deegan trial, they also had indirect access through the Flemmi brothers. Rico used that access to keep abreast not only of the prosecution's case, but also the defense's. See Exh. 167B at 83. Stephen Flemmi told Rico that Jimmy's lawyer, Joseph Balliro, was trying to turn Jimmy against Barboza. See Exh. 167B at 82; Exh. 86 (Rico FBI memo in which Stephen Flemmi reports that Balliro was trying to get Jimmy to destroy Barboza's credibility. Rico used the interview as yet another occasion to shore up the loyalty of the Flemmi brothers, suggesting that "the organization" was behind this, and that they would "use anyone to save their own skin.") Flemmi also reported concerning defense efforts to discredit Barboza because of his mental condition, see Exh. 97, and to line up prisoner witnesses against Barboza. See Exh. 100.

91. The record is not clear as to why Barboza singled out these men. Clearly the FBI was interested in prosecuting Tameleo and Limone. Even if Rico did not suggest the names to Barboza, the FBI was clearly thrilled when he implicated them. See Exh. 92 (reporting that Barboza had fingered Limone and that he, like Angiulo, would likely be held without bail); Exh. 106 (reporting that Tameleo and Limone were prominent members of the Patriarca family and that Tameleo was a "capo."); supra note 60 (Tameleo was also named in the Marfeo case.) The only explanation for why Barboza would not implicate Patriarca would be the FBI's concern about deriving the prosecution from the illegal wire.

As to Salvati and Greco, the evidence suggests Barboza simply had disputes with them.

Greco had angered Barboza by interceding in a 1965 dispute between a certain Marvin Karger ("Karger") and Barboza, and the FBI knew it. Karger reported to Agents John F. Sweeney and Raymond F. Ball about it. Karger supposedly owed Barboza money. Barboza approached Karger outside of Arthur Farms in Revere, held his hand in his pocket as if holding a knife, and told Karger he was going to "stick him." According to Karger, Greco then got in between the two men and told Barboza "before you touch him, you have to touch me." Exh. 283. Several days after Sweeney and Ball filed their report of the interview, Rico and Condon met with Barboza, along with Doyle and Walsh. See Exh. 71B–43. Barboza told a different story, that Greco asked him to slap Marvin Karger in the face. See Exh. 210.

Salvati testified in the bench trial that he barely knew Barboza; their only connection was $400 that Salvati had borrowed from Barboza, which Salvati refused to pay back, despite a series of threats. See Tr. vol. 16, 78–83. His testimony was buttressed by the affidavit of Roxsan Ambrosini—quoting Barboza saying that Salvati had "burned" him out of $400 and that because of revenge he got back at Salvati by falsely testifying about his being involved in the Deegan murder. See Exh. 297; infra Section III.D.6.

F. Lee Bailey ("Bailey") testified that Barboza told him he had gotten in touch with Rico because he wanted to make a deal with the feds after "two of his lieutenants were murdered and his bail money was stolen." Tr. vol. 8, 28. Rico told him he would have to finger "somebody pretty big because he, Barboza, was pretty big." Tr. vol. 8, 28. Barboza told Bailey that several names were suggested to him, including Limone and Tameleo. Further, he was told that if he named two people the FBI wanted, Barboza could name two of his own. Barboza told Bailey he chose Greco and Salvati because Greco had either beaten him up or embarrassed him at a night club, and Salvati owed money. See Tr. vol 8, 28–30.

Plaintiffs initially offered these statements as statements against penal interest. See Fed.

On October 25, 1967, French and Greco were indicted for the murder of Deegan, conspiracy to murder Deegan, and conspiracy to murder Stathopoulos. *See* Exh. 338, ¶ 45. Limone, Tameleo, Cassesso, and Salvati were indicted as accessories before the fact in Deegan's murder, conspiracy to murder Deegan, and conspiracy to murder Stathopoulos. *Id.*, ¶ 46. Barboza was indicted on two conspiracy counts. *Id.* ¶ 48.[92]

That afternoon the Boston office sent an "urgent" teletype to the Director reporting this information. *See* Exh. 94B.

## C. *The Deegan Trial*

### 1. *Trial Preparation: An Allegedly "Independent Investigation"*

The prosecutor assigned to the Deegan trial, Jack Zalkind, could not have been more junior. This was his first murder case. *See* Tr. vol. 7, 26. Despite his testimony that the FBI "really had nothing to do with the preparation of the Deegan case for trial," Tr. vol. 7, 101, that he conducted an investigation independent of the FBI, his claim is completely belied by the record. To all intents and purposes, his "independent investigation" involved little more than running in place.

Zalkind *did not* interview Barboza until *after* indictments had been returned.[93] Indeed, Zalkind had serious concerns about Barboza's reliability—as well he should— concerns which were allayed by the assurances of Rico and Condon. *See* Tr. vol. 7, 104.

The FBI, however, had no compunction about meeting with Barboza at just about any time. The FBI agents were his consistent interrogators from March 1967 on, joined by the state authorities only in the late summer of 1967. Barboza was transferred from the Barnstable House of Correction to federal custody on September 18, 1967. He remained there until after the Deegan trial. *See* Exh. 71B–24; Exh. 71B–60.

Zalkind had no idea of the extent of Rico and Condon's role in producing Barboza's testimony—how many times they met with him, *see* Tr. vol. 7, 108, what they said to him both before Suffolk County had any access to him, and after. *See* Tr.7, vol. 79. He did not know that Rico and Condon were present at every single interview even when state authorities were preparing "their" witness, *see* Tr. vol. 7, 108–109, recording information about his debriefings, passing it on to their superiors.[94]

In fact, Zalkind ultimately conceded that decisions about his three major witnesses—Barboza, Fitzgerald (who testified about an LCN attempt to bribe Barboza, *see infra* Section III.C.2) and Condon—

---

R.Evid. 804(b)(3); Tr. vol. 8, 26–27. In their post-trial briefing, however, the plaintiffs indicated that they did not wish to rely upon them as such, and were not offering them for the truth. *See* Docket Entry # 535 at 17. Under the circumstances, however, I fail to see how these statements—Bailey's report of what Barboza said to him—are admissible at all unless it comprised information communicated to the federal government (like letters sent to the authorities, the proposed lawsuit dealing with the Barboza's polygraph, etc.)

92. Romeo Martin was deceased. *See* Exh. 57 at 31.

93. Barboza, he remarked, "was such an unreliable person that he might accuse me if he ever decided to become an alien witness that he might accuse me of having shaped his testimony so I didn't want that to be a factor." Tr. vol. 6, 22.

94. Nor did Zalkind even have any role in the "deal" Barboza was offered for his testimony. *See* Tr. vol. 6, 10. Barboza was facing a habitual criminal charge in connection with a stabbing. He was facing a sentence of more than 80 years. *See* Tr. vol. 6 at 8–9; Exh. 105B at 5902. That charge was later dropped.

were made after consulting with the FBI. *See, e.g.,* Tr. vol. 7, 103. Given Barboza's significance in the LCN "war," it is inconceivable that the FBI would have taken a back seat. *See supra* Section III.B.3. Rico agreed that he and Condon were "on top of the [Deegan] case right from the start," Exh. 118; that he worked closely with the state authorities,[95] providing them with information, helping them develop their prosecutions. *See* Exh. 167A at 49.[96]

Apart from Barboza, Zalkind agreed that John Fitzgerald, a critical witness for the prosecution, was the FBI's "boy." Tr. vol. 7, 120. It was up to Rico and Condon to "tak[e] care" of Fitzgerald, "right up until the point where Fitzgerald testified in Deegan and afterwards." *Id.* As with Barboza, Rico and Condon had contact with Fitzgerald long before Zalkind ever did. *See* Tr. vol. 7, 123. And, as with Barboza, Zalkind did not know what Rico and Condon said to him. *See* Tr. vol. 6, 27.

Zalkind even called Condon to the stand to "impress upon the jury that Barboza

had not been coached or had been given any of the facts of this case by the FBI." Tr. vol. 6, 16. Of course, Zalkind had absolutely no idea whether this was true. Given the way Barboza's story changed in critical ways having to do with the plaintiffs, given what the FBI knew, as described above, I believe that it was not.

To be sure, Zalkind testified that no FBI agents put pressure on him to use Barboza as a witness. *See* Tr. vol. 6, 21. They did not have to. The FBI offered Suffolk law enforcement a witness to an unsolved murder in which the state investigation had stalled. More significantly, this was a witness for whom the FBI was vouching and Zalkind relied on that. *See* Tr. vol. 7, 104–05.

While Zalkind insisted that he prepared for the Deegan trial as any good trial lawyer would do, that preparation could not have been more limited. He could confirm Barboza's testimony but only to the extent it conformed with the previous local reports. *See* Exh. 22; Exh. 2167.[97]

---

95. Again, Rico's testimony before the House Committee was pure sophistry: "We were not involved in the—to my knowledge, in the preparation of the trial," he said. But when reminded that Agent Condon had testified he stated: "Well, it depends on what you're talking about preparation. I think that we made Barboza available at a time when they came to interview him, we would be there, but it wasn't as if we're directing the investigation." Exh. 170 at 196. Condon denied even knowing what Barboza would testify to, *see* Exh. 193B at 86, which I find wholly improbable.

96. When pressed, Zalkind conceded that while he conferred with "his" people, Doyle and Walsh, *see* Tr. vol. 7, 103, they were regularly conferring with the FBI. *See* Tr. vol. 7, 104. Doyle was present with the FBI when Barboza was interviewed long before Zalkind ever talked to him. Walsh met with another witness, John Fitzgerald, along with Condon. *See* Tr. vol. 7, 121–22.

97. The documents that were shown to Zalkind to buttress the government's position

that Zalkind did an "independent" investigation could not be weaker. For the most part, they supported the view that without Barboza, the state authorities had little or no evidence on which to base a prosecution. *See* Exh. 2167. For example, French was initially in the sights of state law enforcement when attorney Alfred Farese received a call from a client that Deegan and Roy French were arrested while doing a "B & E." Farese called the Chelsea police and was told that Deegan had been killed. *See* Exh. 22. His call inadvertently focused police attention on French who was then arrested but released.

French explained the blood stains on his sleeve by referring to a fight at the Ebb Tide. Joseph Errico of the Revere Police confirmed that there had been a fight at the Ebb Tide, in which a man was bleeding, supporting French's explanation. Captain Kozlowski, who had happened on the crime scene at 10:00 p.m. could not identify the men. *See* Exh. 22.

But when Barboza extended the circle of participants to include the four plaintiffs, Zalkind had absolutely no way of corroborating that information. Barboza was his only source. For example:

(1) When Barboza told Zalkind that one motive for Deegan's murder was to retaliate for Deegan's killing of Sacrimone, he could check that Deegan was suspected of Sacrimone's murder, *see* Tr. vol. 7, 40, *but he had to rely on Barboza for the link between that murder and these plaintiffs.*[98]

(2) He could corroborate Barboza's account that three guns had been used, but he had to rely on Barboza for who had wielded the weapons. *See* Tr. vol. 7, 82, 84.

(3) He had general information that some of the plaintiffs associated with individuals that had been linked to LCN. He could confirm innocuous facts on the periphery of Barboza's testimony—that Barboza and Louis Greco hung out at a coffee shop or a donut shop in Revere. *See* Exh. 2106; Exh. 2176; Tr. vol. 7, 17. He knew that each of the plaintiffs, except for Salvati, had "pretty good criminal records." Tr. vol. 7, 63.

Far, *far* more significant than the information Zalkind had—both from his own investigation and from the FBI—was the information the FBI kept from him.[99] Zalkind did not know the extent of the FBI's relationship with Barboza, the FBI's relationship with the Flemmi brothers, the Top Echelon informant Program, or the Patriarca wire. *See* Tr. vol. 7, 94. He did not have any FBI reports on *anything*, *see* Tr. vol. 7, 121, 123, much less those which confirmed Barboza was lying when he *excluded* Jimmy Flemmi from the offense, or when he *included* the plaintiffs who had never been linked to this offense. *See* Tr. vol. 7, 101–02.[100]

Zalkind surely did not know what the FBI had overheard on the Patriarca wire,

**98.** That was the pattern: Barboza would say something; Zalkind would corroborate it—at the periphery. Barboza said that Peter Limone did not like Deegan, an Irish kid "shaking up" Italian boys, that Limone once gave Deegan $1,000 for someone's defense and now Deegan was just shaking him down for the money. Fitzgerald confirmed only that Limone had given him $1,000. *See* Tr. vol. 7, 42. Barboza said that the reason he was testifying was that he was supposed to borrow money from Ralph Lamatino, that "Lamatino" then killed someone who was to give him bail money, that that was an "office" [LCN] hit. Tr. vol. 7, 49. Zalkind confirmed that Lamatino was murdered, but not the Lamatino–Barboza connection. *See* Tr. vol. 7, 44. Barboza said that Deegan was killed because he had robbed Puopolo. *See* Tr. vol. 7, 53. Zalkind confirmed that Puopolo had been robbed. *See* Tr. vol. 7, 49, 95. And when Greco's alibi involved his wife, Zalkind could corroborate that a divorce proceeding had been pending. *See* Exh.2023.

**99.** He vaguely remembered seeing something about Fitzgerald, where he was staying or something like that, but it had no real consequence to the trial itself or to the evidence. *See* Tr. vol. 6, 12. In any event, as with Barboza, Zalkind agreed that Fitzgerald's handlers, the people that had the most contact with him, were Condon and Rico. *See* Tr. vol. 6, 12, 13.

**100.** Zalkind did not know that no report mentioned that Limone had called for or offered to pay for the murder of Edward Deegan. *See* Tr. vol. 7, 110. Nor did he know the reports documented just the opposite—that Limone tried to warn Deegan. There was nothing remotely suggesting that Tameleo had approved the hit for Barboza, that Limone offered an additional $2,500 for the murder of Stathopoulos; no one put Greco in the alley at the time of the Deegan murder, *see* Tr. vol. 7, 111; nothing in the reports corroborated Barboza's claim that Salvati was sitting in the back of the car in a bald wig. Zalkind did not even know that Jimmy Flemmi was bald. *See* Tr. vol. 7, 88. He did not know that the only incident confirmed at the Ebb Tide did not concern Deegan pulling a gun on someone, but concerned Barboza doing so. *See* Tr. vol. 7, 99.

including Patriarca's approval of the Barboza–Jimmy Flemmi hit, Limone's efforts to warn Deegan, the fact that Greco, Salvati, and Tameleo had not been mentioned at all in connection with the Deegan murder. *See* Tr. vol. 6, 14, 25; Tr. vol. 7, 102.[101] Zalkind testified that he first heard about the federal wiretap either during Judge Wolf's hearing in *Salemme,* or the House Committee proceedings.[102] But he surely had never seen the wiretap summaries that Rico and Condon had before the Deegan murder—implicating Patriarca, Jimmy Flemmi and Barboza. *See* Exh. 38 at 9. Nor did Zalkind know that in the raft of information the FBI had—extraordinary information from extraordinary sources—nothing, absolutely nothing corroborated Barboza's account of the plaintiffs' role.

*Had Zalkind known:*

● that Jimmy Flemmi was opened as an informant on the day that Deegan was murdered, he testified that he would be "duty bound" to disclose that to the defense, and that they would have moved for the dismissal of the case;

● that Jimmy Flemmi was involved in the murder, he testified that "the case would have been dismissed or I would have

moved to ... amend the indictment...." Tr. vol. 7, 133. As to any further impact, he added, "I can't answer that question."

And finally, when asked: "Do you believe the defendants in the Deegan case received a fair trial," his answer was unequivocal: "No, because there was exculpatory evidence that should have been given to me." Tr. vol 7, 133.

## 2. *The Trial*

The Deegan murder trial started on May 27, 1968, and was completed on July 31, 1968. *See* Exh. 338 ¶ 49. The FBI was a formidable presence throughout, both directly and indirectly—through the witness they cultivated, debriefed, and prepared (Barboza), through the witnesses they conferred with before testifying and effectively controlled (Stathopoulos and Fitzgerald), through the extraordinary testimony of Agent Condon buttressing Barboza's account, which he knew was false, through the strings they pulled behind the scenes advising Zalkind and his staff, and finally, through the exculpatory information from their illegal wire and Top Echelon informants, which they hid from the defense and the prosecution alike.[103]

---

**101.** He did not know that three days before the murder Jimmy Flemmi had been overheard on an illegal wiretap in the company of Joseph Barboza saying that Deegan was an arrogant nasty sneak, *see* Tr. vol. 7, 102, or that Limone had been overheard saying that Jimmy Flemmi was out of control and about to murder Deegan. *Id.*

**102.** By late summer 1971, the existence of the illegal wiretap had been made public—featured in an article in *The Boston Globe* article. *See* Exh. 135A (an FBI memorandum explains that *The Globe* had first acquired copies of the logs during the Marfeo trial in 1968). Indeed, following the article, local law enforcement—including Boston Police Commissioner Edmund McNamara and Suffolk County DA Garrett Byrne—requested access to the infor-

mation gathered over the wire. They were flatly denied, due to the need for "strict adherence" to the "Department's long-standing policy of non-disclosure of sensitive intelligence information." *See* Exh. 135A; Exh. 135B; Exh. 135C; Exh. 135D; Exh. 135E; Exh. 135F. That is to say, it is likely that Zalkind knew about the *existence* of the wire some time before the *Salemme* hearings or the House Committee proceedings, but after the Deegan trial. He surely did not know the information that had been gleaned from the wire and its significance.

**103.** Condon testified that he was in court only on the day he testified at the Deegan trial, because of a witness sequestration order. *See* Exh. 2338 at 13. He did not need to be physically in Barboza's presence every day of

Barboza testified about the Deegan murder, substituting the plaintiffs in critical places, as he had the first time he mentioned their names on September 8, 1967. He falsely substituted Limone and Tameleo for Patriarca as approving and/or initiating the "hit," Salvati for Flemmi (in the car with Barboza and Cassesso), and Greco for Cassesso (as Deegan's actual shooter, along with French) in the alleyway with Martin.

Barboza also elaborated on Greco's role in planning the murder, see Exh. 105A at 3280, 3288–89, and Limone and Tameleo's role in the distribution of the money, see id. at 3225–28.

And as to his "deal," Barboza testified that the FBI promised that he would not get indicted "on a case," and that they would bring his cooperation to the attention of the judge. Id. at 4458–60, 4620. He agreed that while in federal custody he had been receiving money from loan sharking. Id. at 3587.[104] While Barboza

testified that he was hoping for some consideration in the latter, as far as the FBI was concerned, they "never promised me anything." Id. at 4654. The latter comment was simply stunning.

Barboza's lies were flatly contradicted by documents in the hands of the FBI, documents which were never revealed to Zalkind or the defense counsel. For example: the FBI knew that the "bald man" Captain Kowzlowski had seen was Flemmi. They allowed Barboza to testify that Salvati wore a "bald wig." They knew that Limone had tried to warn Deegan about Barboza's and Flemmi's intentions. They allowed Barboza to testify that Limone had ordered the "hit." United States Attorney Markham even "correct[ed]" Barboza when he got certain dates wrong.[105] They knew that Greco had never been mentioned in connection with the murder. They allowed Barboza's testimony about Greco meeting the others at the Ebb Tide to be "corrected" when no witness put

---

the trial to exercise control over him. He had clearly helped to prepare Barboza's testimony *before* the trial. *See* Exh. 71A–5 (discussing some "points of information" concerning the Deegan murder with Walsh, Rico and Condon). He had monitored Zalkind's encounters with Barboza). *See* Exh. 71A–6 (statements made by [Barboza] to Zalkind, Rico and Walsh on February 21, 1968). He had monitored the discussions of another Assistant District Attorney in Zalkind's office. *See* Exh. 71B–32 (telling Barboza to be "polite and responsive"); Exh. 71A–7 (more discussion of the case with Zalkind, Walsh, Rico and Condon on March 29, 1968); Exh. 71A–8 (same, 4/10/68). He had even dealt with Barboza's complaints about Zalkind *on the eve* of trial, *see* Exh. 71B–52 (Barboza complaining that Zalkind did not spend enough time with him preparing for the case (5/29/68), and during the trial, *see* Exh. 71B–54 (same, 6/12/68). And while reports during the trial are few and far between, and do not say much (to record conversations about Barboza's testimony *during the trial* would have been to violate the sequestration order), FBI reports confirm that Condon met with Barboza regularly, even

during this period of time. *See* Exh. 71B–58 (7/5/68); Exh. 71B–61 (meetings during July, 1968 while awaiting the "finishing of testimony").

**104.** He also acknowledged that he had only been indicted for a misdemeanor in connection with his role in the Deegan murder, *see* Exh. 105A at 3806, 3835, while the others were indicted for capital murder, and that he was serving a four to five year concurrent sentence at Walpole for possession of a firearm, and was facing a "habitual criminal" charge, which could mean more than 80 years. *See id.* at 3806, 3834, 4039, 4667; *see also,* M.G.L. c. 279 § 25.

**105.** Barboza told Rico and Condon that he had met Limone the first week in February 1965 to arrange the deal, *see* Exh. 71A-l. At trial, he changed that to mid January, *see* Exh. 105A at 3206, after he was shown an airline voucher by USA Markham, placing him in Florida on the original date. *See* Exh. 105A at 3583–3586, 3597, 3668–70. Barboza also testified that Walsh had shown him the ticket. *See* Exh. 105A at 3584, 4676–77.

Greco there on the evening in question. Exh. 105A at 3306; Exh. 27. They knew that informant reports made Barboza, Martin or French the Deegan shooters, not Greco. They allowed Barboza to testify as to a motive for the Deegan murder—part of the McLaughlin–McLean dispute—when they knew that the LCN was not involved at all in those battles. *See supra* note 64.

As for the claim that "the FBI never promised [him] anything," the FBI knew that to be completely false. For example, the FBI did not disclose the extent to which Barboza and his family would be protected under the nascent federal witness protection program, *see* Exh. 71B–7, Exh. 71B–14, Exh. 71B–17, or affirmatively supported with jobs and money, *see* Exh. 71B–2.[106] Nor did the FBI disclose perhaps the most extraordinary part of Barboza's deal—that he would be allowed to lie about his buddy Jimmy Flemmi.

If Barboza's false testimony were not sufficient to convict the plaintiffs, Condon's testimony was the coup de grace. Condon testified that he was "always concerned about the purity of testimony on the part of any witness involving any matter that I am concerned with." Exh. 105C at 5812. His statement was a blatant endorsement of Barboza's perjury.

In addition, Condon falsely denied that he and Rico were "major figures" with regard to the investigation surrounding the information furnished by Barboza. Perhaps even more significant, Condon refused to produce the memoranda of his meetings with Barboza citing "a federal Executive Order," Exh. 105C at 5811, 5831–5832.[107]

When Condon testified that, in all the meetings he had had with Barboza, he had never shown Barboza any reports or told him the facts and circumstances surrounding Deegan's death, *See* Exh. 105C at 5803–04, *see also supra* note 89, the comment strained credulity. Barboza's testimony was "corrected" to make it conform to reports the defense had or were likely to get. In fact, to the extent it was true at all, it was profoundly disingenuous: When it came to the four plaintiffs, there *were no reports* to show Barboza.

**106.** On money: AUSAs Barnes and Harrington acknowledged in a letter dated February 12, 1970 to Deputy Assistant Attorney General of the Criminal Division Henry E. Petersen, "I think it fair to state that it was agreed by all in the Department of Justice that at the time [Barboza] was released from Government protection every effort would be made to provide him with a job and an unspecified sum of money." Exh. 117A at 2. Henry Petersen indeed recalled that Barboza "expected a $10,000 payment at the time his testimony was concluded." Exh. 117B.

On immunity: There was an oral promise "at the very beginning" that the authorities would bring the extent of his cooperation to the attention of any sentencing court. Exh. 2341 at 42–44. The Justice Department determined that even Barboza's future crime—his 1970 murder of Clay Wilson—came under that promise. *Id.; see also infra* Section III. D.6.

On protection: Harrington testified that, in addition to their promise, the Justice Department thought it was important to support Barboza as the "poster boy" for the witness protection program. "[T]he Federal Government made the judgment that in committing ourselves to supporting him to the extent of his cooperation, the sentencing authority would send the signal to other individuals, who might be looking to see whether the Government would live up to its commitments." *See* Exh. 2341 at 45. He added, "he was singular, he was an original accomplice witness, or one of the first, and he was the poster boy for the Witness Protection Program, and for that reason, judgments were made because of his singular status." *Id.*

**107.** That same rationale obviously applied to the Durham documents as well.

Finally, two other significant witnesses testified-attorney John Fitzgerald,[108] who reported a bribe that Tameleo and Greco allegedly offered to influence Barboza's testimony, and Stathopoulos, the other intended victim of the Deegan killers. Both agreed that they had met with the FBI before their testimony, and had even conferred with Barboza, meetings necessarily arranged by the FBI.

Fitzgerald, whom Zalkind described as the FBI's "boy," Tr. vol. 7, 120, met with the FBI fifteen to twenty times beginning in May of 1967. *See* Exh. 2312 at 5833.[109] He testified that Tameleo and Greco had offered Barboza a bribe in July of 1967 to keep him from testifying in the Deegan case.[110] The FBI well knew that the bribe offer predated any mention by Barboza of the plaintiffs as participants in the Deegan murder,[111] but never provided Zalkind with reports or information about Fitzgerald's conflicting statements. Condon even denied having any "personal knowledge" of meetings between Barboza and Fitzgerald, *see* Exh. 105C at 5822, 5835–36, although

FBI reports he authored show otherwise. *See* Exh. 89.

Stathopoulos described what occurred on the evening of March 12, 1965, and was asked to identify the man he saw coming out of the alleyway where Deegan was killed. He saw French and a second person, and heard a voice he did not recognize say, "Get him too." Exh. 105F at 4962–64. While Stathopoulos never knew Greco before, had never been able to identify anyone from a photo array, *see* Exh. 2351, and indeed, in earlier reports, had noted that it was Cassesso and Martin he had seen, *see* Exh. 25, at trial, he pointed at Greco. He "looks like the man," Exh. 105F at 4961, Stathopoulos said—although he could not be sure. *Id.* at 4961, 5027–28.

The defense obviously knew something of the FBI's involvement with Stathopoulos and Fitzgerald. *See, e.g.,* Exh. 105A at 3717, 3723. But what the defense did not know was that these federal witnesses were corroborating a story that the FBI knew was false. Despite defense requests for information, for copies of FBI memoranda or reports associated with the Dee-

108. He represented Stathopolous, Deegan, and Barboza at various times. *See* Exh. 2312 at 4882, 5168–69.

109. On January 30, 1968, John Fitzgerald was critically wounded when his car exploded as he attempted to start the ignition. His right leg had to be amputated. *See* Exh. 291. An FBI teletype sent to the Director that same day reported that Stephen Flemmi had previously advised that Patriarca was "incensed" at Fitzgerald, and that he was on the "hit parade." *Id.* In addition to serving as an important witness in the Deegan trial, Fitzgerald was also a key witness in the government's case against Patriarca. It is believed that the "hit" was orchestrated to prevent him from testifying. He was in federal protective custody.

Stephen Flemmi was eventually indicted for Fitzgerald's attempted murder, but fled the jurisdiction before he could be arrested. Sev-

eral years later the charge was dropped. *See supra* Section III.B.2.b.

110. Robert Glavin also testified that Cassesso had offered him a bribe to "cop" to Deegan. *See* Exh. 2312 at 5581–82. He acknowledged that he too met with Condon and Rico, *id.* at 5419, 5579, in a motel room to which he had been taken while in jail on state charges. *Id.* at 5892–5905.

111. Information with respect to the bribe was uncovered by the FBI in July of 1967. Documents generated at the time suggest that the bribe involved the Marfeo prosecution and Barboza's testimony against Patriarca and Tameleo. *See* Exh. 287. The plaintiffs were not even mentioned by Barboza in connection with the Deegan murder until September 8, 1967. Indeed, in the FBI's memoranda, it is clear that the alleged bribers did not care if Barboza testified in other Boston cases. *See* Exh. 287; Exh. 288; Exh. 71B–64; 71B–19.

gan murder, no reports or memoranda were provided. *See* Tr. vol. 6, 37; Tr. vol. 9, 9.[112]

To be sure, there was evidence that two of the defense lawyers had relevant information from sources other than government discovery in the Deegan case. Attorney Chisholm (representing Cassesso), and Attorney Balliro (representing Tameleo), participated in the federal Marfeo conspiracy case. *See infra* note 60. As a result of that representation, they knew about the existence of the illegal Patriarca wire, *see* Tr. vol. 9, 39, and were given access to some airtels.[113] However, counsel denied receiving any information about the Deegan murder in these airtels. Nothing in the record suggests otherwise. *See* Tr. vol. 9 at 58.[114] The government jealously guarded information about the wire; it would be unlikely that they would have disclosed any more information in the federal prosecution than they had to. Indeed, the FBI plainly took advantage of the fact that in a state prosecution they could claim a privilege with respect to federal memos, as Condon had done in his testimony.

Balliro also had information by virtue of his representation of Jimmy Flemmi. He testified that if he had known that Rico had turned Jimmy Flemmi as an informant on March 12, 1965, he would have withdrawn from the Deegan case. *See* Tr. vol. 9, 28–29. In fact, Balliro had a serious conflict of interest even without that information. Jimmy Flemmi had admitted that he was the "bald man" in the back of Barboza's car on March 12, 1965. See Tr. vol. 9, 30. Balliro acknowledged that he had not cross-examined Barboza about whether the man in the car was Jimmy Flemmi rather than Salvati, *see* Tr. vol. 9, 52, because ethical rules prohibited him from disclosing Flemmi's confession. *See* Tr. vol. 9, 56.[115] It was only with Judge Hinkle's order that Balliro revealed what Flemmi had told him. But whether or not Balliro ought to have recused himself from the representation of Tameleo by dint of Jimmy Flemmi's confession is irrelevant to the *government's* obligations in this case.

**112.** Joseph Balliro ("Balliro"), who represented Tameleo, testified that he had never seen documents indicating: that Patriarca had authorized Deegan's murder, *see* Tr. vol. 9, 10, Exh. 26, that Jimmy Flemmi admitted to an FBI informant that he was involved in killing Deegan, along with French, Martin and Cassesso, *see* Tr. vol. 9, 11–12, Exh. 28, that the FBI had multiple informants who reported to them that these individuals were responsible for the Deegan murder, *see* Tr. vol. 9, 13, Exh. 31, that Limone warned Deegan about Jimmy Flemmi and that Flemmi had gone to Providence to get permission to kill Deegan, *see* Tr. vol. 9, 17, 19, Exh. 38. The defense was not aware that Jimmy Flemmi and Stephen Flemmi were informants, *see* Tr. vol. 9, 24, Exh. 34, or that Barboza told agents that he was one of the shooters, *see* Tr. vol. 9, 26. Nor did they know that the FBI used Stephen Flemmi and Jimmy Flemmi to monitor defense preparation in the Deegan murder trial. *See* Exh. 86; Exh. 97; Exh. 100. *See supra* note 90. Balliro testified that

he had no idea that whatever communications he had with Jimmy Flemmi were relayed to Stephen Flemmi and then to Rico and Condon. *See* Exh. 27; Exh. 86; Exh. 89; Exh. 97; Tr. vol. 9, 25.

**113.** *See* Order of the Court, dated September 18, 1967, Exh.2014. The order refers to "transcripts of logs." However, only summary "airtels" were produced.

**114.** The parties agreed that Exhibits 306 and 307, for example, were included in the federal production in the Marfeo case. Although Balliro remembered nothing about the content of the materials he had been shown in the earlier case, I admitted these documents for the limited purpose of showing what some of the airtels in the Marfeo case consisted of.

**115.** He did not have information from any other witnesses that Jimmy Flemmi had been a participant in the Deegan murder. *See* Tr. vol. 9, 57.

### 3. *The Verdict*

On July 31, 1968, Peter J. Limone, Henry Tameleo, Louis Greco, and Joseph Salvati were found guilty.[116] Limone, Tameleo, and Greco were sentenced to death; Salvati was sentenced to life imprisonment. *See* Exh. 338, ¶ 39.

Joseph Barboza pled guilty to the Deegan conspiracy charges. The habitual criminal indictment was dismissed.[117] Barboza was sentenced to one year and a day to be served concurrently with the four to five year term he was serving on other charges. *See* Exh. 294 at 6.

### D. *Between the Deegan Murder Trial and the Nolle Prosequi*

### 1. *Praises for Rico and Condon*

Perhaps the best measure of the FBI's responsibility for the Deegan verdict was its behavior afterwards. The FBI took credit for Barboza's testimony from the very start. *See, e.g.,* Exh. 111 at 5. The day that Barboza testified before the Deegan grand jury and indictments were returned, the Boston office sent a teletype to the Director noting that Barboza was "originally developed by the agents of the Boston office." Exh. 94A.[118] When the Deegan defendants were convicted and sentenced, the SAC Boston sent a teletype to the Director, reporting Suffolk County DA Garret Byrne's statement that the prosecution was a *"direct result* of FBI investigation and particularly noted development of principal government witnesses Joseph Baron, aka Barboza, and Robert Glavin," and that Agent Condon's testimony was "most effective." Exh. 106 (italics supplied). The SAC added that Rico and Condon were responsible for Barboza's and Glavin's development as witnesses, and that Rico was responsible for the development of Fitzgerald. The SAC recommended letters of commendation for Rico and Condon, as well as incentive awards. *See* Exh. 106; Exh. 51G.[119]

Developing Barboza was a major step in Rico's and Condon's careers. As noted above, Barboza was Rico's greatest achievement. Both Rico and Condon were recommended for quality salary increases as a result. *See* Exh. 51C; Exh. 51G; Exh. 193A at 126–28. In particular, SAC Handley praised their deft handling of Stephen Flemmi to turn Barboza in language worth quoting:

> [Stephen Flemmi][120] was developed by these agents and via *imaginative direction and professional ingenuity* utilized said source in connections with interviews of JOSEPH BARON [Barboza], a professional assassin responsible for numerous homicides and

---

116. Greco was found guilty of murder in the first degree, and Limone and Tameleo (along with Cassesso) were found guilty as accessories before the fact. All four of these men were also found guilty of conspiracy to murder Deegan and Stathopoulos. Salvati was found guilty of being an accessory after the fact. French was found guilty of first degree murder. *See* Exh. 338, ¶¶ 50–51.

117. USA Markham was present at the plea. Zalkind represented that Barboza's cooperation had been essential in the federal prosecution of Patriarca, Tameleo and Cassesso, as well as the Deegan trial. *See* Exh. 294 at 6.

118. Likewise, at the time of the indictment, Suffolk DA Byrne commented that the "entire case" was "developed through the efforts and able handling of Barboza" by Rico and Condon. Indeed, he added, "this indictment would not have been possible" but for their efforts. Exh. 91.

119. Agent William T. Boland was also cited for his testimony undermining the alibi testimony of Greco's wife. *See* Exh. 106.

120. In the memorandum, Stephen Flemmi is referred to by his informant symbol number— BS 955 C–TE. *See* Tr. vol. 2, 87.

190

acknowledged by all professional law enforcement representatives in this area to be the most dangerous individual known. SAS RICO and CONDON contacted BARON in an effort to convince him he should testify against the LCN. BARON initially declined to testify but through utilization of [Stephen Flemmi], the agents were able to convey to Baron that his present incarceration and potential for continued incarceration for the rest of his life, was wholly attributable to LCN efforts directed by GENNARO J. ANGIULO, LCN Boston head. As a result of this information received by Baron from [Stephen Flemmi], said individual said he would testify against the LCN members.

Exh. 51C at 2–3 (italics supplied).[121] *See also* Exh. 51F (recommending Rico for another quality salary increase in March 1968 for his work developing Barboza); Exh. 193A at 133 (Condon received a quality pay increase in March 1968 for developing Barboza). Rico and Condon also received "incentive awards" for their efforts. *See* Exh. 51D (recommending Rico and Condon for incentive awards for using Stephen Flemmi in the development of Barboza); Exh. 51E (informing Rico that he has been given an incentive award); Exh. 53D (informing Rico that he has been given an incentive award).

After the plaintiffs were sentenced, FBI Director J. Edgar Hoover sent letters of thanks and commendation to the two agents, lauding their "highly instrumental" role in the Deegan investigation, and noting that the effective prosecution was a "direct result" of their efforts. Exh. 51G. (as to Rico); Exh. 53F (as to Condon).

## 2. *The Involvement of the FBI Hierarchy*

The entire FBI hierarchy was implicated in supporting Barboza's perjury. Rico and Condon reported to their supervisors. The Boston office, in turn, kept Headquarters informed of Barboza developments every step of the way.

After each meeting with Barboza, Rico and Condon would sit with a stenographer and dictate the results of the interview.[122] *See* Exh. 193A at 183; Exh. 71B. The reports were then sent to Kehoe, as supervisor of the Organized Crime Squad,[123] and later to FBI Headquarters and the United States Attorney's Office. *See* Exh. 193A at 74, 99, 230–33. Boston SAC Handley had custody of the reports documenting Rico and Condon's interviews with Barboza. *See* Exh. 105C at 5850. In addition to the reports, Rico and Condon were in regular contact with Kehoe about their progress with Barboza. *See* Exh. 193A at 99–100.

Airtels and memoranda were sent from the Boston office to Headquarters, starting with the details of the Deegan murder, *See supra* Section III.B.4.b., continuing through Rico and Condon's development of Barboza as a witness in the federal Marfeo and state Deegan trial, *See supra* Sections III.B. and III.C., and all the way through the defendants' motions for new trials and parole board hearings, discussed in Section

---

121. At this point, Barboza had not yet agreed to testify in the Deegan matter. SAC Handley's recommendation memo refers to the indictments against Patriarca, Tameleo, and Cassesso in the Marfeo case. Barboza told Agents Condon and Rico that he could testify in the Deegan matter on July 31, 1967.

122. These reports are referred to as "302s." Exh. 339, ¶ A4.

123. Condon testified that it was likely that Kehoe read the reports. *See* Exh. 193A at 153.

III.D.[124] The Boston office would update Headquarters on developments as soon as they happened. *See* Exh. 311; Exh. 106; Exh. 104.

Barboza's development and testimony, in short, was not the work of two renegade agents. It was known to, supported by, encouraged, and facilitated by the FBI hierarchy all the way to the FBI Director.

### 3. *Protecting and Providing for Barboza*

Barboza became the first participant in the informal witness protection program. In fact, he has been referred to as "the poster boy" for the nascent program. *See* Exh. 2341 at 44. When Barboza was released on parole a year after the plaintiffs' convictions in the Deegan case, the federal authorities set up a life for him in Santa Rosa, California. *See, e.g.,* Exh. 121A. On February 12, 1970, AUSA Walter Barnes and Deputy Chief Edward Harrington [125] wrote to Deputy Assistant Attorney General for the Criminal Division, Henry E. Petersen, requesting further funds for Barboza. Barnes and Harrington explained that Barboza's "testimony and his example as an individual who the Government was able to protect against the violent Boston underworld, has been the single most important factor in the successful fight on organized crime in New England in the last 50 years." Exh. 117A. Moreover, Barnes and Harrington warned that Barboza indicated that unless he was given money for living expenses, he would "publicly retract his testimony given in the aforesaid cases [126] and will make known to the press that the Government did not give him a fair chance to go 'straight.' " Exh. 117A.

In addition to keeping Barboza safe and cared for, the FBI also viewed him as a continuing asset in their LCN investigations. Notwithstanding all the government knew about this "professional assassin," on April 14, 1969, Barboza was even designated as a target for the Top Echelon Criminal Informant Program. A memorandum to the Director noted that as Barboza "becomes acquainted in the San Francisco area, he will undoubtedly be in a position to furnish worthwhile information concerning criminal activities." Exh. 114.

### 4. *1970 Rico Admission*

While Barboza was being paid and protected, Rico admitted in a 1970 interview conducted by Suffolk County investigators that Jimmy Flemmi was probably involved in the Deegan murder: "[I]f the truth were known there were probably more involved than were convicted, namely Flemmi." Exh. 118.[127] In fact, even be-

---

124. For example, the Boston office and Headquarters continued to keep tabs on the Deegan prosecution long after the trial ended. On November 23, 1970, the Boston SAC sent an airtel to the Director alerting him that the defendants' motions for a new trial had been denied. The airtel indicated that additional motions were expected to be filed and the "Bureau will be kept advised." Exh. 133.

125. Edward Harrington was an Assistant United States Attorney in the District of Massachusetts until he became Deputy Chief of the United States Organized Crime Strike Force in May of 1969, and Chief in October 1970. He left the government on March 31, 1973, to go into private practice. *See* Exh. 2341 at 7–8. He returned to serve as the United States Attorney for the District of Massachusetts from 1977–1981. He currently serves as a Senior Judge on the United States District Court for the District of Massachusetts.

126. The Deegan murder was one of the cases mentioned.

127. The interview was apparently conducted in response to accusations made by Boston City Police Officer William Stuart. William Stuart filed an affidavit, Exh.2049, reporting that he had informed Detective Doyle of his

fore the Deegan defendants were indicted, Rico "believed" that Jimmy Flemmi had been one of the Deegan murderers. *See* Exh. 43 at 3.[128]

Just like Zalkind's supposedly independent investigation pretrial, this investigation foundered because the FBI refused to disclose anything that cast doubt on Barboza's testimony.

### 5. *Barboza Attempts to Recant*

At roughly the same time, during the summer of 1970, Boston Herald reporter James Southwood contacted DA Byrne. He reported that several months earlier Barboza had admitted that Greco was not in the alley on the night of the Deegan murder. Suffolk County contacted AUSA Harrington who then reported to the FBI that Barboza denied having made the statement to Southwood.[129]

On July 17, 1970, after returning to Massachusetts from California without telling the federal authorities, Barboza was arrested in New Bedford on assault and weapons charges. Boston sent an immediate teletype to the Director. *See* Exh. 121A. Three days later the charges against him were nolle prossed, but his parole was revoked and he was returned to Walpole. A July 22, 1970, memorandum from the Director to the Attorney General[130] noted that Justice Department Organized Crime Strike Force attorneys and the Suffolk

County District Attorney's office were attempting to get Barboza transferred out of Walpole because of the danger to him there. *See* Exh. 121C; *see also* Exh. 121B (a July 21, 1970 memorandum from Boston to the Director conveying the same information).

By the summer of 1970, the news about Barboza was worse. The FBI learned that Barboza's threats to recant the Deegan trial testimony could well become a reality. Barboza had arranged for Attorney F. Lee Bailey to represent him. The two first spoke shortly before Barboza was arrested on the assault charges. Bailey then visited him at a local jail, and four times at Walpole. Bailey characterized his representation of Barboza as being engaged "[t]o aid in the overturning of certain of the convictions in what was styled *Commonwealth v. French.*" Tr. vol. 8, 22. Barboza even signed an affidavit on July 28, 1970 stating that "I wish to recant certain portions of my testimony during the course of the [Deegan] trial insofar as my testimony concerned the involvement of Henry Tameleo, Peter J. Limone, Joseph L. Salvati and Lewis Grieco in the killing of Teddy Deegan." Exh. 123.

On August 11, 1970, Bailey requested permission from the Superintendent at Walpole to conduct a polygraph. The letter received by the Department of Corrections included a handwritten note indicat-

---

belief, based on his informants, that Greco, Limone, Salvati and Tameleo were innocent. The government sought the affidavit's admission as proof of yet another Suffolk County independent investigation. While there is no indication that the FBI had this report, Rico plainly knew why he was being interviewed, namely that informant information in the possession of the state authorities was at war with Barboza's testimony.

**128.** In more recent testimony, Rico confirmed that given all the information he had about the Deegan murder, it was "logical" that Jim-

my Flemmi was involved. *See* Exh. 170 at 193.

**129.** All this was recorded in a June 22, 1970, FBI airtel from SAC Boston to the Director, noting that the Bureau would be kept advised of all future developments. *See* Exh. 119.

**130.** The memorandum was copied to five other individuals in the FBI—Sullivan, Bishop, Gale, Staffeld, and Benjamin—as well as the Deputy Attorney General and the Assistant Attorney General for the Criminal Division.

ing that Doyle from the Suffolk County DA's office called on August 17, 1970, to report that polygraph evidence was inadmissible and there was no "valid reason" why they should allow the test. *See* Exh. 124A.

Given how closely the FBI was monitoring Barboza, given Harrington's fears that he could well recant, and Doyle's relationship with the FBI, I have no doubt that the FBI was aware of these activities. Indeed, an FBI airtel from the Boston SAC to the Director reported that Bailey went so far as to file a petition on August 19, 1970 to enjoin the DA's office from interfering with the examination, and further, that "[t]he Bureau will be kept advised of all developments." *See* Exh. 124B. Bailey testified that the parties came to an agreement that the polygraph could go forward and the case was dismissed.

But no polygraph was ever done. On August 28, shortly before it was scheduled, Barnes and Harrington paid Barboza a visit.[131] According to an "urgent" teletype from Boston to the Director, Barboza told them that he was still on the government's side, and only signed the affidavit because the LCN paid him to. He agreed not to take the polygraph. *See* Exh. 126; Exh. 2341 at 19–20.[132] According to Harrington, Barboza even claimed Bailey was the conduit for the LCN bribe. *See* Exh. 2341 at 25.[133] Significantly, the FBI never

bothered to pursue the allegation. On September 4, 1970, Bailey filed a motion to withdraw his representation of Barboza.[134]

Harrington insisted that there was nothing he or Barnes said that could have been interpreted by Barboza as pressure to go back to his original story. *See* Exh. 2341 at 30. The facts suggest otherwise. Barboza was at Walpole because of a probation revocation warrant brought by the Suffolk D.A. The FBI plainly was in a position to "influence" the prosecution of that warrant, just as they had influenced the Deegan trial. Indeed, in the FBI documents dealing with the proposed recantation, the pendency of the warrant and its impact on Barboza is a consistent theme. In the airtel (reporting Bailey's lawsuit), the FBI could not have been more clear. It noted that "[i]n view of" Bailey's motions, the DA's office is going to move to revoke Barboza's probation.[135] Exh. 124B. At the August 28 visit with Barnes and Harrington, Barboza told them how "disturbed" he was about the probation revocation warrant, and how much he wanted the DA to withdraw it. The memorandum noted that the FBI had decided not to do anything to help. In fact, a subsequent airtel reported that even though Barboza's "parole violation time" was about to run out, the "DA's office" planned to continue his probation hearings, ostensibly to ensure his presence in the area. *See* Exh. 127. It also had the effect of keeping Barboza in custody until

---

131. Harrington testified at his deposition that Barboza had originally requested to meet with Barnes and Condon, but Condon was unavailable so Harrington went in his stead. *See* Ex. 2341 at 19–20.

132. Barboza also requested that his wife be relocated and that he be taken into federal custody at Fort Knox. *See* Exh. 126.

133. Plaintiffs object to Barboza's statements being offered for truth. *See* Exh. 2341A. The government responds that they offered it for

the non-hearsay purpose of simple notice to the government of that charge, and I agree.

134. Bailey testified that he became aware of the Harrington and Barnes meeting with "his" client some time before September 4; plainly, that meeting was the basis for his withdrawal. *See* Tr. vol. 8, 17.

135. The memo, Exhibit 124B, says "invoke" instead of "revoke." In context, this is clearly an error.

after the motions for new trial in the Deegan case were resolved. Barboza plainly got the message.

Seven days later, Barboza wrote a letter to Harrington. In the letter, Barboza referred to Bailey and the polygraph.

> Ted, when you Walter [sic] came down to see me, you & Walter asked me not to do something & I didn't. How long can the little money I bled out of those creeps last, what will happen to my wife & babies then? Bailey, said I'll come running to him in the end, *I never will!!* I feel Bailey is going to shaft me so more just like his promise that him & [illegible] could get me indicted when I refused to take the polygraph test. I'll never take it.... Please Ted in some way give me some sign of hope to give me the strength to endure this threat of Bailey's. Because all I can think of is that insidious bastard plotting different ways to bury me deeper in the can....

Exh. 129 (emphasis in original).

The letter is ambiguous. It surely suggests that Barboza refused to take the polygraph because Harrington asked him not to. It also betrays Barboza's fear of Bailey, who was threatening him with a perjury prosecution. Either way, by 1970 the FBI's confidence in Barboza's testimony—if they ever had any—should have been waning.

To be sure, the FBI knew that the LCN was not above bribing or threatening Barboza. There had been a bribe attempt with respect to Barboza's testimony in the Marfeo case; there had been an attempt

on the life of Fitzgerald, Barboza's former counsel, ostensibly for his failure stop Barboza's testimony. *See supra* note 109.

At the same time—and this should have been significant—Barboza was only proposing to recant his testimony *with respect to these plaintiffs*, not his testimony regarding the other Deegan defendants nor his testimony in the Marfeo case. This position was entirely consistent with everything that the FBI had in their files before September 8, 1967.[136] In effect, Barboza was saying as of 1970 precisely what the FBI informants and wire had disclosed before that date.

### 6. *Barboza Murders Clay Wilson and Brags about His False Testimony in the Deegan Trial*

When Barboza was originally released on parole in 1969, the FBI sent him to Santa Rosa, California where they "cared for" him. Exh. 186 at 10–11.[137] But their "caring for" him did not stop him from committing crimes—even murder—again.

Under the alias "Joseph Bentley," Barboza met Clay Wilson and his wife Roxsan Ambrosini. Barboza made a deal with Wilson to cash millions of dollars worth of negotiable bonds that Wilson had stolen. *See* Exh. 184 at 8, 11.[138] Barboza threatened Clay and Ambrosini lest they interfere with his plans. The content of his threats was significant.

Barboza revealed himself as "Joseph Barboza" and as a participant in the witness protection program. *See* Exh. 184 at 14–15. He bragged that he "had put this

---

**136.** Harrington indicated that he believed this was a false recantation because Barboza's trial testimony in the federal prosecution of Patriarca had been consistent with the wire information. But he acknowledged that he knew nothing about the Deegan case. Nor did he check to see if the wire had confirmed the Deegan testimony. *See* Exh. 2314 at 26–

27. If he had, he would have learned that it did not.

**137.** Deposition of Tim Brown, Detective Sergeant in the Sonoma County Sheriff's Department.

**138.** Deposition of Roxsan Ambrosini.

man, Joseph Salvati, in the penitentiary, and that he could do anything he wanted like that." Exh. 184 at 24. He warned them that no one "burned" him and got away with it. *Id.* He told them "that Salvati 'burned' him out of $400 and that because of revenge he got back at Salvati by falsely testifying about his being involved in the Deegan murder." *Id.* He then told them that Salvati "was never going to get out of prison because he received a life sentence." Exh. 184 at 24; Exh. 297.[139]

Barboza told Ambrosini and Wilson that he

> had the government wrapped around his little finger, and he could manipulate them any time he wished. He informed us that he could do this anytime he was in trouble because all he would have to say to them was that he was going to change his testimony in prior trials. To him, this was merely a game of chess and he would always counteract the government's future moves on him. He said that he could continue his violent lifestyle and get away with it.

Exh. 297; *see also* Exh. 184.

Threats turned to reality when Barboza murdered Clay Wilson in front of his wife, shooting him in the head. *See* Exh. 184 at 121. Barboza was not apprehended for Wilson's murder until a Walpole inmate named William Geraway ("Geraway")

wrote a letter to the Sonoma County, California Sheriff's office identifying Barboza as Wilson's killer. *See* Exh. 186 at 13–23. Detective Sergeant Brown of Sonoma County, conducted an investigation to confirm Geraway's report. In February 1971, Barboza was returned to California to stand trial for Wilson's murder. *See* Exh. 186 at 56.

As with everything having to do with Barboza, the FBI took a great interest in the Wilson case. On October 13, 1970, the San Francisco FBI office sent an urgent teletype to the Director and to Boston letting them know that eyewitness Paulette Ramos told Santa Rosa police that Barboza killed Clay Wilson. *See* Exh. 131.[140] Both San Francisco and Boston continued to track the Wilson investigation. *See* Exh. 132.[141]

In fact, Rico, Condon, and Harrington went to California to testify on Barboza's behalf. *See* Exh. 138. It was an extraordinary gesture, handled in an extraordinary fashion. Detective Sergeant Brown learned from the press that two agents from the FBI were to be called as witnesses for Barboza. *See* Exh. 136; Exh. 186 at 51. The District Attorney of Sonoma County immediately complained to Hoover, expressing how "disconcerting" this was for the prosecution, because "it presents a picture of a house divided against itself." Exh. 136.[142]

**139.** Wilson and Ambrosini took it as a threat—"if he did that to Salvati because of $400, what do you think he would do to Clay if [he] got burned for a million—for millions of dollars." Exh. 184 at 25 (quoting from Exh. 297). Barboza also showed Ambrosini "papers and news clippings and pictures of this man lying in a pool of blood and things like that." Exh. 184 at 28. According to Ambrosini, Barboza kept a closet in his house full of "artifacts"—scrapbooks, papers—from the "Deegan/Salvati thing." Exh. 184 at 31–32.

**140.** The document indicates it was read by Clyde Tolson and Sullivan of the FBI.

**141.** October 15, 1970 memorandum from Boston to San Francisco and Director regarding developments in the Wilson case.

**142.** He added, "[w]hen and if F.B.I. agents testify as defense witnesses, it would be appreciated that they do me the courtesy of contacting me first and allowing me to interview them concerning their possible testimony." *Id.*

Shortly after the District Attorney's letter, Harrington explicitly requested permission for federal officials to testify on Barboza's behalf in response to a subpoena. *See* Exh. 137A. Harrington wrote that "it is essential that the government should fulfill its commitment to Baron [Barboza] to do all within its power to insure that he suffers no harm *as a result of his cooperation with the federal government.*" Exh. 137A (italics supplied). *See also* Exh. 137C (Harrington requesting permission to expand the scope of Condon and Rico's testimony). The statement is curious. Whatever harm that would be visited on Barboza in the Clay Wilson matter came not as a result of his *cooperation,* but as a result of his *crime.* On December 2, 1971, the Attorney General granted them limited permission to testify. *See* Exh. 137D.

In effect, what Condon, Rico, and Harrington were seeking to do in the Wilson trial was precisely what Condon had done in the Deegan trial: vouch for Barboza. They planned to describe Barboza's contributions to the prosecution of the LCN and put the Clay Wilson allegations in the context of reports that two LCN hit men had traveled to Santa Rosa to kill Barboza.

And they sought to undermine the testimony of Geraway, the inmate who had identified Barboza as Wilson's killer, by testifying to his reputation as a "congenital liar." Exh. 137C. As Brown reported, "when those fellows finished their testimony, Mr. Barbosa [sic] was a national hero." Exh. 186 at 27.[143]

After their testimony, the DA allowed Barboza to plead down from first to second degree murder. *See* Exh. 186 at 71–72; Exh. 139A. The San Francisco office immediately notified both the Director and Boston. *See* Exh. 139B.

Harrington maintained an ongoing relationship with Barboza. Barboza wrote to Harrington on August 22, 1972, asking for help overturning the Wilson conviction. *See* Exh. 134E.[144] Harrington replied that he should consult with his attorney about filing a motion for a new trial, but that Barboza's "cooperation with the federal government will be brought to the attention of California Parole Authorities." Exh. 134D. Sometime after March 31, 1973, Harrington appeared before a Montana parole board on Barboza's behalf. *See* Exh. 2341 at 57.[145]

143. Brown testified that he "believed" that the federal authorities testified because they feared Barboza would recant his prior testimony. He based his belief on a statement from Agent Ahlstrom, a California FBI agent. *See* Exh. 186 at 55. I have no other details about the Ahlstrom statement—who he was, when it was made, etc.—and therefore cannot consider it.

However, the reported statement is in fact consistent with the evidence. Harrington had been concerned about Barboza's possible recantation in February of 1970, even before Barboza consulted F. Lee. Bailey. *See* Section III.D.3. The fact that the government was prepared to vouch for Barboza, apparently without a full investigation, attests to his singular role in the Patriarca prosecutions. The last thing the Bureau wanted was for the edifice built by Barboza to come tumbling down.

The Barboza statements recounted above by Ambrosini were introduced as statements against penal interest under Fed.R.Evid. 804(b)(3). There is no indication that Rico, Condon or Harrington had talked to her before they testified.

144. Exhibits 134A–134G are admitted only as evidence of an ongoing relationship between Barboza and Harrington—not for the truth of the statements contained in the letters.

145. Harrington testified that he had appeared before the parole board *after* he returned to private practice on March 31, 1973, *see* Exh. 2341 at 8, and was given a special designation by the Department of Justice to do so. *Id.* at 57–58. In fact, Harrington recalls that he was "almost explicitly, if not explicitly" asked to testify before the Board by the Attorney General. *Id.* at 57. (I find this testimony

Barboza was released on parole on October 30, 1975, after serving less than five years. *See* Exh. 144A. He died several months later, on February 11, 1976. *See* Exh. 338, ¶ 54.

### 7. *Rico's Methods Are Exposed—Still Nothing is Done*

By 1988, the FBI should have had even greater concerns about its LCN initiative and the methods employed. That year, the Supreme Court of Rhode Island in *Lerner v. Moran*, 542 A.2d 1089 (R.I.1988), Exh. 301, found, among other things, that Rico had urged one of his informants to lie under oath, in part to mask another Rico informant's role in a murder. *Lerner*, 542 A.2d at 1090. The Court found that in the trial of Patriarca Family member Luigi Manocchio, Rico's informant John Kelley admitted that in a related case (a case against Maurice Lerner) he had testified falsely—at Rico's direction.

The pattern revealed was chillingly like that in the Deegan case. During Lerner's trial, Kelley testified that he had *personally* "cut down" the shotgun used in the murders. However, during the Manocchio trial, Kelley stated that his *armorer* had actually "cut down" the shotgun. Kelley said that Rico had directed him not to mention the armorer's role in the murders because the armorer was a valuable FBI informant that Rico wanted to keep on the streets. *Id.*

The Rhode Island Supreme Court credited Kelley's testimony. *Id.* at 1090–91. The court also found that Rico had caused Kelley to lie about the promises that Rico had made to obtain his cooperation. *Id.* at 1091. In addition, it stated that, "Kelley's [perjurous] testimony [at the Lerner trial] was then corroborated in all material aspects by Special Agent Rico." *Id.* The Court also noted Kelley's explanation of why he had lied under oath: "Agent Rico told me ... that I should just do as he said, and everything would come out all right." *Id.*

Rico's modus operandi with respect to Kelley was identical to that with respect to the Flemmi brothers and Barboza. Rico vouched for Kelley on the stand, just as Condon had vouched for Barboza. Kelley perjured himself at Rico's direction to protect and facilitate the FBI's informant program, just as Barboza had.[146]

---

responsive, over plaintiffs' objection. *See* Exh. 2341A.)

Harrington also helped Barboza with personal matters, including facilitating a book deal for him. In May 1972, Harrington wrote Barboza that he would be "very happy" to speak with the author of Barboza's book, and that he "hope[s] the book has a financial success." Exh. 134A. In 1973, Harrington again corresponded with Barboza regarding the book, sending him a copy of the government's brief from the Patriarca trial and a list of gangland murders. *See* Exh. 134F. The following year, an unnamed individual wrote to Harrington on Barboza's behalf, informing him that Barboza was dedicating the book to him. *See* Exh. 134G (The name of the author has been redacted from the exhibit submitted to the Court. The letter was written with familiarity, referring to Harrington as "Ted," and wishing him a happy new year—"Hope

this year will be a good one for all of us, but I'm not sure.").

Although the series of 134 exhibits were not admitted for their truth, Harrington's statements made before he left government practice at the end of March 1973 may be taken for their truth as admissions of a party under Fed.R.Evid. Rule 801(d)(2).

**146.** The Rhode Island revelation puts Rico's 1970 comments into context. Rico told the Suffolk investigators he believed "that the case, Deegan, was accurate as could possibly be, *that unless perjury were committed* there was no way to free the three men [Detective] Stuart claims were the wrong guys. Limone, Greico, Tameleo." Exh. 118. He was correct—the only way to free the wrongfully convicted plaintiffs was for the FBI's secret information, showing that Barboza had committed perjury, to come out.

Despite these extraordinary revelations, the record discloses no investigation into Barboza's testimony or into any other Rico—developed witnesses.[147]

### 8. *The FBI and Stephen Flemmi in the 1980s*

Stephen Flemmi was officially closed in 1969 when he became a fugitive with respect to the attempted murder of Fitzgerald, but was officially reopened in 1980, with Agent Connolly as his handler. *See supra* note 39. (Flemmi testified, however, that as far as he knew, he remained open the entire time—as he was in constant contact with the FBI, in particular Agent Rico. *See* Exh. 189.)

Stephen Flemmi, along with James Bulger, was the leader of the so-called "Winter Hill Gang," a prominent Boston organized crime group, from the late 1970s to the early 1990s. "[T]he long term survival of the organization was attributable, in part, to the ability of members of this group to corrupt federal, state and local law enforcement officers. This corruption guaranteed a flow of information from law enforcement to the organization which allowed its members to evade detection and avoid prosecution for decades." Exh. 182 at 3.

During his tenure as an informant, Flemmi "self-reported" criminal activity to Agent Connolly, including gambling, loan sharking, and book-making. In addition, there were over one hundred reports mentioning Flemmi's illegal activities; the DOJ Office of Professional Responsibility concluded that "it is virtually certain" that

Connolly and/or Morris and Ring received at least some of this information. *See* Exh. 166 at 5. The record before me compels the same inference. The Bureau did not abide by policies requiring a written inquiry into whether his continued use was justified, *see* Exh. 166 at 5, Flemmi's value as a source of information on the LCN remained paramount.

Indeed, in 1981, Flemmi participated in the murder of Roger Wheeler. *See* Exh. 182 at 9–10. Flemmi was closed again on September 23, 1982 due to investigations into that murder. *See* Exh. 166 at 14–15. Nonetheless, on May 3, 1984, Connolly sent a request to Ring, asking to reopen Flemmi, as he'd been an "extremely valuable" Top Echelon informant, providing sensitive information used to obtain Title III coverage of the LCN. Exh. 158B. In 1986, Boston forwarded that request to the Director, noting that Flemmi "REMAINS IN A POSITION TO PROVIDE VALUABLE INFORMATION AT THE POLICY MAKING LEVEL OF THE LCN." Exh. 158C. On July 10, 1986, Flemmi was reopened as a confidential informant; his status was upgraded to Top Echelon that December. *See* Exh. 166; Exh. 158D.

From the beginning, Flemmi's knowledge of LCN goings on was more important to the FBI than any of the crimes they knew him to be committing. *See supra* Section III.B.2.b. As time went on, the FBI only became more and more embroiled with Flemmi and his crimes; with each passing year, the stench of their relationship intensified, heightening the FBI's interest in keeping it from public view.[148]

---

147. The Rhode Island decision, Exhibit 301, is admitted as notice to the FBI.

148. Some of the findings here rely on Exhibit 182, the parties agreed-upon statement of facts in *United States v. Flemmi,* submitted in connection with Stephen Flemmi's plea agreement in that case. Initially, I admitted

it as an admission by the government. *See* Tr. vol. 4, 117. Alternatively, it is admissible under the residual hearsay exception, Fed. R.Evid. 807, which allows for hearsay that is not covered under Rules 803 or 804 but has "equivalent circumstantial guarantees of trustworthiness." The statement of facts was

### 9. *Deegan Defendants' Efforts Post–Conviction*

From the moment of their convictions, the Deegan defendants tried to clear their names, first through motions for new trial, and then through a series of commutation petitions.[149] Those efforts should be evaluated in the context of the ongoing incestuous relationships between the FBI, Stephen Flemmi and Barboza.

For a prisoner convicted of first degree murder to become eligible for parole, he had to receive a commutation from the Governor with advice and consent from the Governor's Council. The process began when an inmate petitioned the Massachusetts Parole Board, sitting as the Advisory Board of Pardons ("Advisory Board"). If the Advisory Board granted a hearing, it would consider all evidence for and against the petition at a public hearing. If the Advisory Board voted in favor of the petition, it would be sent to the Governor, along with all the evidence submitted. The Governor reviewed the petition and decided whether or not to grant it. Once approved, the petition would be referred to the Governor's Council, and finally, the Parole Board. *See* Tr. vol. 10, 22–23.

It was the Advisory Board's policy to send requests to law enforcement agencies—including the FBI—for information relevant to the Board's evaluation of a petition. *See* Tr. vol. 10, 24. The FBI never provided the Advisory Board with any of the information it had concerning the innocence of Limone, Tameleo, Greco, and Salvati. *See* Tr. vol. 10, 26, 29, 31–34. To the extent it provided any information, it was the opposite—information that cast aspersions on them.

By continuing to withhold the exonerating information, the FBI hamstrung the Advisory Board and the Governor just as it had hamstrung Zalkind in 1967 and 1968. Without the FBI's secret information, there was no way that the Advisory Board could conduct an independent investigation as to commutations. This was all the more true after Barboza's demise in 1976. The key to the plaintiffs' freedom remained in the FBI's closed hands.

#### a. *Salvati Commutation Petitions*

Joseph Salvati filed six commutation petitions, five of which were denied without a hearing. *See* Exh. 340 at ¶¶ 14–19.[150] Sal-

---

agreed upon by both Flemmi and the United States. There is no reason to question its credibility. Rule 807 requires that the government be given notice in advance of trial that the exhibit was to be offered. They were. *See* docket entry # 448, plaintiff's preliminary exhibit list (Trial Exhibit 182 was Exhibit 1591 on the initial list). Parties are entitled only to notice that evidence will be offered; they do not need to be told all of the possible theories that the evidence may be admitted under. *See Piva v. Xerox Corp.*, 654 F.2d 591, 596 (9th Cir.1981); *United States v. Evans*, 572 F.2d 455, 489 (5th Cir.1978).

The plaintiffs wish me to make further findings regarding Rico's involvement in the Wheeler murder. I decline. While there is evidence in the record indicating that Stephen Flemmi and Rico were both involved in that crime, *see* Exh. 182 at 8–10, Rico was no longer employed by the federal government.

Moreover, those findings are not necessary—there is ample proof that Flemmi and the FBI remained embroiled in a symbiotic, putrid relationship well into the period in which the plaintiffs were pursuing commutations.

**149.** Under Massachusetts law, inmates could seek commutation of their sentences and release on parole. *See* Tr. vol. 10, 21.

**150.** His first was filed in November 1975 and denied on March 10, 1976; the second was filed in March 1976 and denied on March 2, 1977; the third was filed on February 5, 1979 and denied on February 23, 1979; the fourth was filed in July 1980 and denied on November 11, 1980; the fifth was filed on November 13, 1985 and although the Board initially voted to grant a hearing, the petition was denied without one. *See* Exh. 258; Exh. 259; Exh. 260; Exh. 261; Exh. 262A; Tr. vol. 10, 24.

vati's sixth petition, filed on October 25, 1988, *see* Exh. 263A, eventually led to his release.

The Advisory Board contacted the FBI at least four times in relation to Salvati's petitions, requesting information on his involvement in the Deegan murder. Each time the FBI refused to disclose the exculpatory information they had suggesting Salvati's innocence. On February 4, 1986, Chairman of the Massachusetts Parole Board, John Curran ("Curran"), requested information from the FBI. *See* Exh. 262C. The FBI responded only by informing the Board that Salvati had been seen with a certain individual at the Museum of Fine Arts, an individual apparently known to the Massachusetts State Police. *See* Exh. 262D.[151]

Two years later, on August 8, 1988, Curran requested information from the FBI again. *See* Exh. 262F. On June 7, 1989, the DA's office also wrote to the FBI requesting "any information that your office has with regard to Mr. SALVATI'S involvement with the Deegan murder" so that they could respond to the Parole Board's inquiries. Exh. 335.[152] A handwritten note on the FBI's copy of the document indicates that "[John] Ford [of the DA's office] was advised that [the] info [was] previously submitted to [the] Board of Pardons" by SA Ring. Exh. 335. The FBI provided no further information. *See* Tr. vol. 10, 27. Not deterred, Curran once more requested information regarding Salvati from the FBI on November 30, 1989.

*See* Exh. 263C. The FBI responded by referencing its March 24, 1986 response—Exhibit 262D.

On April 29, 1991 the Advisory Board recommended approval of Salvati's sixth commutation petition. The Governor's Council voted favorably on February 5, 1997—almost six years later—and the Parole Board granted Salvati parole on February 26, 1997. Salvati was released on March 20, 1997, having served 29 years, four months, and 23 days in prison. *See* Exh. 267A; Exh. 266A.

### b. *Limone Commutation Petitions*

Limone also filed six petitions for commutation, all of which were denied. *See* Exh. 340, ¶¶ 6–12. As with Salvati, the Advisory Board requested the Boston FBI office provide information concerning Limone's involvement in the Deegan murder, and on each such occasion the FBI failed to produce the exculpatory information contained in its files. *See* Tr. vol. 10, 28, 31. During the Advisory Board's consideration of Limone's 1983 commutation petition, FBI agents John Connolly and John Morris made an unannounced visit to Parole Board member Michael Albano's office. At no time during this visit did they provide him with any documents similar to or the same as the Durham documents. *See* Tr. vol. 10, 29–30.

The record does not disclose what they said, but it is reasonable to assume it was not remotely favorable to Limone.[153] They

---

151. The letter indicated that the Massachusetts State Police had already forwarded information concerning that individual to the Parole Board. No further information was provided in the record before me.

152. "As in the cases of Peter LIMONE and Louis GRECO, we are preparing a response concerning [Salvati's] petition for executive clemency." Exh. 335.

153. No further information was provided to me on the content of that visit. However, when coupled with the FBI's refusal to provide exonerating information, then-U.S. Attorney Weld's letter to Governor Dukakis "strong[ly]" recommending that Limone's petition be denied, and Connolly and Morris's evident interest in protecting Stephen Flemmi and his secret status, *See supra* Section III.

volunteered written information sure to keep Limone in prison. In response to an inquiry from the Parole Board, SA Ring wrote that Limone was convicted based on the testimony of Barboza. He then suggested that Limone had been involved in commissioning Barboza's murder,[154] concluding by stating that "[c]urrent law enforcement intelligence reflects that Peter Limone continues to be considered an important cog in the Boston Organized Crime element. Should he be released, he would enjoy a position of elevated status within the Boston Organized Crime Structure." Exh. 277C. Then–U.S. Attorney William Weld also chimed in, writing a letter to Governor Dukakis in which he stated that it was the "strong recommendation of this office that the petition for commutation of Peter Limone's sentence be denied." Exh. 277F.[155] The FBI was copied on the letter.

### c. *Tameleo Commutation Petitions*

Tameleo filed two unsuccessful petitions with the Advisory Board. *See* Exh. 340, ¶¶ 3, 4. He died in prison in 1985 without ever having attained post-conviction relief. *Id.* at ¶ 5.

### d. *Greco Commutation Petitions*

In December of 1983, Louis Greco filed a petition for commutation with the Advisory Board. *See* Exh. 340, ¶ 22; Tr. vol. 10, 32. Two subsequent petitions were filed by Greco with the Advisory Board.

*See* Exh. 340, ¶¶ 24, 26; Tr. vol. 10, 32–33. Again, the Board sought information from the FBI, *see* Tr. vol. 10, 32–33; Exh. 225F; again nothing exculpatory was forthcoming, *see* Tr. vol. 10, 32–34.

On December 16, 1987, SAC Ahearn responded to the Advisory Board's request for information, stating: "Grieco [sic] is considered, upon review of available intelligence, to be a member of the Patriarca La Cosa Nostra Family." Exh. 225H, ¶ 1. During discovery in this trial, however, the defendant could find no documents describing such "available intelligence." Exh. 243 at 4, 5.

Greco was granted a hearing on his first petition for commutation, after which a majority of the Advisory Board voted in favor of commutation on January 10, 1985. *See* Exh. 340, ¶ 22. Governor Michael Dukakis denied that commutation in March of 1986. Greco was then granted a hearing on his second petition for commutation, and again a majority of the Advisory Board voted in favor of commutation on January 15, 1988. *See* Exh. 340, ¶ 24. Governor William Weld, however, denied Greco's second petition on January 19, 1993. His third petition, filed on November 21, 1995, *see* Exh. 340, ¶ 26, became moot. Greco died in prison on December 30, 1995. *Id.*, ¶ 27. On January 3, 1996, Greco's third and last petition was closed administratively, due to his death.

D.8, it is clear as day that the agents went to Albano to get him to deny Limone's petition.

154. "On February 11, 1976, Joseph Barboza Baron was executed in gangland fashion.... This murder continues to be actively investigated by the Federal Bureau of Investigation, the New England Organized Crime Strike Force, and the San Francisco Authorities." Exh. 277C. The very next sentence reported that Limone was an important organized crime figure still.

155. "Confirming our conversation of earlier today, it is the understanding of this office and of the Boston Organized Crime Strike Force that top-level members of organized crime in Boston desire to have Peter Limone assume charge of the day-to-day operations of organized crime in this area, if Mr. Limone is released from prison and if these top-level members should become involved in litigation with the Government." Exh. 277F.

## 10. *The Conspiracy of Silence*

The findings in Section III.D.—about the efforts to provide for Barboza, testifying on Barboza's behalf in the Wilson trial and before the parole board, the refusal to investigate Rico's conduct when exposed by the Kelley incident, the continued nondisclosure of the Durham documents despite the Advisory Board's (and the Suffolk DA's office's) repeated requests, the FBI's continued relationship with Stephen Flemmi—share a single motivation: The FBI wanted to maintain the secrecy of their Top Echelon informant program and keep their LCN prosecutions, including Deegan, from being undermined.

Pulling just one thread threatened to unravel the entire skein: Had the FBI come forward about Barboza's perjury in the Deegan case, his credibility would have been shattered in the Marfeo case—a case that Harrington noted had been described by many as "the single most important prosecution of the [last 50 years]." Exh. 117A. Had the FBI come forward with their secret documents in response to the Advisory Board's requests, the Top Echelon informant program and its members would have been exposed, as would the contents of the Patriarca wire. The documents pointing to the plaintiffs' innocence included reports from Top Echelon informants, Flemmi's status and his relationship to Barboza would be at risk of disclosure. And, if the FBI's dealings with Stephen Flemmi had come to light, their efforts to protect him from prosecution after prosecution would have been extinguished.

In short, the FBI was intent on keeping the lid on the very scandal that came to light during the 1995 *Salemme* proceedings. Maintaining their conspiracy of silence in connection with the four plaintiffs here was part and parcel of that effort.

## IV. *CONCLUSIONS OF LAW*

Plaintiffs bring six claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671–2680: malicious prosecution, civil conspiracy, intentional infliction of emotional distress, bystander intentional infliction of emotional distress, negligent selection, supervision, and retention, and loss of consortium. I ruled on several of these legal issues in previous opinions dealing with defendant's motions to dismiss. *See Limone v. United States,* 271 F.Supp.2d 345 (D.Mass.2003) (*"Limone I "*), *aff'd Limone v. Condon,* 372 F.3d 39 (1st Cir. 2004); and *Limone v. United States,* 336 F.Supp.2d 18 (D.Mass.2004) (*"Limone II "*). Those decisions turned on the factual allegations in the complaint. Given the facts as alleged, I found—and the First Circuit agreed—that plaintiffs' claims could proceed. Now that they have proceeded through trial, the question before me is whether the facts as alleged have been proved.

I find that they *have* been proved. The FBI was responsible for the framing of four innocent men. They suborned perjury and suppressed exculpatory evidence at trial and thereafter for the next thirty years.

I will not repeat my earlier legal findings in any detail. To the extent that they address issues reiterated by the government (albeit indirectly) at trial, I will summarize and refer to them here.[156]

---

156. The government addressed only a limited number of issues in its final briefing, noting that it continued to stand on all defenses it had raised previously. *See* United States' Proposed Report—Trial Findings of Fact and Rulings of Law, docket entry # 544 at 42 n. 27. Defenses raised perfunctorily may not be considered on appeal. *See Muniz v. Rovira,* 373 F.3d 1, 8 (1st Cir.2004) ("It is a bedrock appellate rule that issues raised perfunctorily,

## A. *Prior Issues*

### 1. *Discretionary Function Exception*

■ The government claimed pre-trial that it was immune from plaintiffs' FTCA claims because its conduct involved "discretionary functions," namely, decisions about how to conduct investigations, whom to prosecute, whether to disclose exculpatory evidence, and how to manage informants.[157] (The government reiterated these objections in their post-trial findings of fact and conclusions of law, specifically with regard to claims of negligent supervision. *See infra* Section IV.E.) The "discretionary function exception" contained in 28 U.S.C. § 2680(a) preserves the government's sovereign immunity from claims "based upon the exercise . . . or the failure to exercise . . . a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." Congress' purpose in carving out this exception to the FTCA's waiver of sovereign immunity was "to prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Coyne v. United States*, 270 F.Supp.2d 104, 112 (D.Mass.2003) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)).

Because "the party who sues the United States bears the burden of pointing to . . . an unequivocal waiver of immunity," plaintiffs bear the burden of showing that the discretionary function exception to the FTCA's broad waiver of immunity does not apply here. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir.1995); *see also Hydrogen Technology Corp. v. United States*, 831 F.2d 1155, 1162 n. 6 (1st Cir. 1987). Plaintiffs have carried this burden by showing that government agents strayed outside of the bounds set on their discretion by statute, constitution, and their own rules and regulations.

As my findings of fact make clear, I do not find defendant liable under any claim based *solely* on the decisions to recruit Barboza and Flemmi, or *solely* on the failure to disclose exculpatory information. My findings are based on the totality of the FBI's conduct, of which those claims are only a part. That totality cannot remotely fit within the discretionary function exception without doing violence to everything for which our country stands.

As its title implies, the discretionary function exception immunizes only the conduct of agents exercising judgment within their lawful discretion. No government actor has "discretion" to violate the Constitution, statutes, regulations or rules that bind them. *See Muniz–Rivera v. United States*, 326 F.3d 8, 15 (1st Cir.2003).[158] Where government agents took illegal actions, as when they suborned perjury, *see infra* Section IV.B.2.b.1, they acted outside their discretion. Where their actions violated their constitutional obligations, *see infra* Section IV.E.1, as when they framed innocent men, they acted outside of their

without developed argumentation, will not be considered on appeal.'").

**157.** Specifically, defendant targeted plaintiffs' claims 1) for negligent supervision, 2) based on the decisions to use Barboza and Flemmi as cooperating witnesses/informants, 3) based on failure to investigate or prosecute Flemmi's criminal activity, and 4) based on failure

to disclose exculpatory information to the Deegan defendants or state agencies.

**158.** The Court must ask "whether the challenged acts . . . are of the nature and quality that Congress intended to shield from tort liability." *United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

discretion.[159] Where their actions were in violation of FBI or Department of Justice ("DOJ") rules and regulations, they acted outside of their discretion.[160] Some truths, as they say, are self-evident:

> If any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.

*Limone v. Condon,* 372 F.3d 39, 45 (1st Cir.2004).

As I discuss in the sections that follow, the FBI's conduct fits into each of these categories—illegal, unconstitutional, and in violation of their own rules.

### 2. *The FTCA's Exception for Malicious Prosecution Claims*

Prior to 1974, the FTCA barred claims for certain intentional torts. *See* 28 U.S.C. § 2680(h). In 1974, Congress amended the statute to allow for claims based on intentional torts committed by law enforcement officials. *Id. as amended by* Pub.L.

No. 93–253, § 2, 88 Stat 50 (1970). The government argued that the intentional tort exception barred plaintiffs' malicious prosecution claims because those claims arose from conduct occurring before 1974. As I held in *Limone II,* 336 F.Supp.2d at 29–30, this is an erroneous construction of 28 U.S.C. § 2680(h). Claims for intentional torts are barred only when the claims accrued before 1974, not when the underlying conduct occurred before 1974.

I concluded in *Limone II,* as a matter of law, that the plaintiffs' malicious prosecution claims did not "arise" until their cases were favorably terminated—sadly, many, many years after 1974. Moreover, I found that even if the government's crabbed reading of the FTCA were correct, defendant's alleged post–1974 misconduct brings its acts within the ambit of the FTCA. *See Limone II,* 336 F.Supp.2d at 30–37.

Accordingly, based on my finding that there was a favorable termination of plaintiffs' claims in the 2000's as well as post–1974 misconduct, I reject the government's argument that § 2680(h) bars this claim.

---

**159.** This is not to say that defendant's violation of plaintiffs' due process rights is per se actionable under the FTCA. The conduct alleged must still fulfill the elements of a tort as to which Congress has waived government immunity. For the purposes of the FTCA, that such conduct is unconstitutional means only that it can never be protected as a "discretionary function."

**160.** FBI rules provide that "no employee shall engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct or other conduct prejudicial to the Government." Exh. 178 at LIM007–1521, FBI Manual of Rules and Regulations ("MRR"), Part I, Section 1(D)(18). In addition, the FBI's Manual of Instructions ("MOI") states that "[w]hile it is proper for the FBI to use informants in appropriate investigations, it is imperative that special care be taken not only to minimize their use but also to ensure that individual rights are not infringed and that

the government itself does not become a violator of the law." Exh. 177 at LIM007–1256, MOI Section 108(IV).

Beginning in 1977, FBI rules provided that "under no circumstances shall the FBI take any action to conceal a crime by one of its informants." FBI Manual of Instructions ("MOI") Section 108(IV)(C)(1); Limone II, 336 F.Supp.2d at 41 (D.Mass.2004). (This rule does not appear to have been a part of the MOI excerpts submitted by plaintiffs as part of the trial record. However, the existence of agency rules is a matter of law, not fact. *See infra* Section I.C.1.b. After 1977, whenever the government acted to cover up this broad pattern of crime, it violated its own rule and acted outside of its discretion. Where it wronged these plaintiffs in the course of such action, the discretionary function exception cannot protect it.

There were also extensive FBI rules and regulations regarding sharing of information with state law enforcement agencies.

## B. *Malicious Prosecution*

Under the FTCA, the United States may be sued for torts arising out of the negligent or wrongful acts or omissions of its employees or agents. *See* 28 U.S.C. § 1346(b); 28 U.S.C. § 2671 *et seq.*[161] The FTCA operates as a waiver of the United States' sovereign immunity for such claims, but with some limitations. In order to be attributed to the United States, the act or omission must be one for which a private person could be sued under "the law of the place where the act or omission occurred," and must have been committed within the scope of the actor's employment.[162] 28 U.S.C. § 1346(b)(1).

■ Plaintiffs here bring claims under the state tort of malicious prosecution. The common law of Massachusetts serves as "the law of the place" for FTCA purposes. To prove a claim for malicious prosecution in Massachusetts, plaintiffs must show that defendant (1) instituted

criminal proceedings (2) with malice, (3) without probable cause, and (4) that those proceedings terminated in plaintiffs' favor. *See Limone II*, 336 F.Supp.2d at 36–37; *Correllas v. Viveiros*, 410 Mass. 314, 572 N.E.2d 7, 10 (1991); *Miller v. City of Boston*, 297 F.Supp.2d 361, 366 (D.Mass. 2003).

The government contests the claims on several levels. First, it argues that it did not *initiate* the Deegan prosecution at all. As Rico noted, and as has been repeated as a mantra throughout these proceedings, "all" that the federal authorities did was "suppl[y] a witness" to the local police and the Suffolk County District Attorney's Office. The local authorities were "supposed to be able to handle the case from there on," Exh. 170 at 186, conduct their own investigation, and exercise independent judgment. If Barboza, unprompted by the FBI or other United States officials, decided to frame Limone, Tameleo, Greco, and

**161.** Before the FTCA was enacted, the common law immunized the federal government from liability to a person injured by the negligence of an employee. Compensation for government negligence required private bills, a substantial burden to Congress. 92 Cong. Rec. 6370 (1946) (remarks of Sen. La Follette). The FTCA was enacted in 1946 to provide a better procedure to deal with such claims. Title IV of the Legislative Reorganization Act of 1946, Pub.L. 601, tit. IV, 60 Stat. 812, 842 (1946).

Until the 1974 amendments, the FTCA waived the government's sovereign immunity only for negligent actions of government agents acting within the scope of their employment—not for intentional torts. That changed on March 16, 1974 after a series of highly publicized and plainly illegal home raids by federal agents in Collinsville, Illinois, *see* 1974 U.S.C.C.A.N. 2789, 2791 (1973). As a result, Congress amended the FTCA by allowing a lawsuit for certain intentional torts committed by federal law enforcement agents, notably including malicious prosecution.

Individual government officials stand in a different position. Constitutional claims may be brought against individual federal employ-

ees, *see Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). All such individual claims were dropped in this litigation.

**162.** This does not mean, however, that the United States cannot be held liable for the actions of government employees performing uniquely government functions. *Indian Towing Co. v. United States*, 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Such liability is assessed by identifying an analogous private claim, looking at "like circumstances" under state law as applied to private, as opposed to public, entities. "Like circumstances" does not mean the "same circumstances" and courts are required to "look further afield" to find appropriate analogies. *United States v. Olson*, 546 U.S. 43, 43, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005) (remanding for lower courts to find appropriate state tort doctrine covering safety inspections by private persons analogous to duties of federal mine inspectors).

Salvati, and the state authorities missed it, the federal defendant is not responsible.

Second, if I conclude that the defendant initiated the prosecution, the government asserts that it had probable cause to do so. A conviction is generally "conclusive proof" of probable cause as a matter of law. *Della Jacova v. Widett,* 355 Mass. 266, 244 N.E.2d 580, 582 (1969).

Since the government claimed it did not initiate this prosecution, and that there was probable cause if it did, it does not address factors three and four—malice and termination in favor of the accused.[163]

I find against the government on all fronts. As it has done from the outset, the government relies on legal categories which have no application to the extraordinary facts at bar.

*On initiation:* The case law immunizes those who provide information in good faith to law enforcement officers, who, in turn, make an independent decision about whether to bring charges. If the charges turn out to be unfounded, the information-givers are protected. But the FBI was more—far more—than an ordinary information-giver. They were in *de facto* and active control of this prosecution. The same FBI that praised Rico and Condon for their roles in the Deegan convictions

admitted as much; the "successful prosecution" of the local murder case was a "direct result" of their "noteworthy development of a pertinent witness." Exh. 51G. And apart from encomiums heaped on the two, the facts establish the FBI's substantial and ongoing influence. Without Barboza, the state prosecution was going nowhere. And without the federal government, their threats, their inducements, their protection, and their preparation, there was no Barboza. *See infra* Section IV.B.1.a.

Even if the FBI were not in *de facto* control of the Deegan prosecution, they must nevertheless be held responsible for it. They were not remotely good faith providers of information. On the contrary, the information they provided was false and misleading; critical exculpatory information was withheld, and they knew it. *See infra* Section IV.B.1.b. Without this information, which was effectively locked away in the FBI's files, there could be no independent state investigation. In so many words, the FBI said "just trust us" to the state, and then vouched for a perjurer. *See infra* Section IV.B.1.c.

Finally, the FBI's "initiation" goes beyond the 1968 Deegan trial. It continued to suppress exculpatory facts over the next

---

**163.** In *Limone I,* I addressed the government's argument that the Greco and Tameleo plaintiffs had not met the favorable termination prong because they died in prison before their convictions could be officially reversed. I determined that position to be absurd and fundamentally unjust. "First, government wrongdoing that effectively denied access to post-conviction remedies would excuse the failure to show favorable termination. Second, in the unique factual circumstances of this case, I find that Greco and Tameleo have satisfied the 'favorable termination' requirement under a theory of constructive reversal. The reasoning behind the court decision vacating Limone's conviction and the nolle prosequi formally issued

in favor of Limone apply in at least equal measure to them." *Limone I,* 271 F.Supp.2d at 361. Since that decision on July 17, 2003, Suffolk County has entered nolle prosequis for both Greco (September 23, 2004) and Tameleo (January 25, 2007). *See* Exh. 3G; Exh. 3H.

Prior to trial, the government pressed a different argument, albeit with the same effect. It argued that the Greco and Tameleo plaintiffs' malicious prosecution claims do not survive the death of the victim pursuant to the Massachusetts Survival Statute, G.L. c. 228 § 1. I addressed the issue in my electronic order denying the United States' Motion for Summary Judgment, dated September 11, 2006. I reiterate that ruling in Section IV.B.5.

thirty years, all the while supporting Barboza until his death, ensuring that he would never recant. Plaintiffs' counsel, who filed motion after motion for a new trial, the courts that considered them, the parole boards that reviewed successive commutation petitions, and the governors who evaluated them could hardly act independently when they lacked an accurate picture of what had happened, who Barboza was, or how false his testimony had been. *See infra* Section IV.B.1.d.

*On probable cause:* Probable cause requires an analysis of the information available to the FBI at the time it initiated this prosecution. *See infra* Section IV.B.2. Those facts include not only what Barboza said to the state authorities, but what the FBI knew to be the case from all of its other sources—information that did not amount to probable cause to believe that these men had been involved in the Deegan murder. On the contrary, the FBI had proof—substantial proof—that they had not been involved. *See infra* Section IV.B.2.a.

While a conviction is ordinarily conclusive proof of probable cause, it is not so here. *See infra* Section IV.B.2.b. It cannot be so when it is "impeached on some ground recognized by law, such as fraud, conspiracy, perjury or subornation of perjury," and when those factors are the "sole foundation" of the conviction. *Della Jacova v. Widett,* 244 N.E.2d at 582.

- This verdict was impeached by Barboza's perjury, in which the FBI was fully complicit. Not only did the FBI know Barboza was lying when he implicated the plaintiffs, they a) rewarded him, b) buttressed his testimony to account for potential cross-examination, c) vouched for him, and d) even testified on his behalf. Indeed, the conclusion is inescapable and I draw it: The FBI suborned his perjury as a

matter of law, even if they did not say to him, in so many words, "make up a case against Limone, Salvati, Greco and Tameleo"—even if those names were Barboza's idea rather than the FBI's directive. *See infra* Section IV. B.2.b.1.

- This verdict was impeached by the FBI's failure to disclose the exculpatory Durham documents which, as the Suffolk District Attorney himself acknowledged, "undermine[d] material aspects of the testimony that was given at trial" by Barboza. Exh. 1 at 8. In fact, this verdict was impeached because plaintiffs were framed. Their constitutional rights to a fair trial, to minimal due process, were wholly undermined. *See infra* Section IV. B.2.b.2.

Finally, the FBI's misconduct was the sole cause of this conviction. The government's claim that the state had the relevant information in its files is absurd. The state itself, in its comments before the Massachusetts Superior Court, said otherwise, as did former ADA Zalkind; moreover the record in the case makes it clear. Nor was there any other intervening cause—no counsel impropriety, conflict of interest, or ineffective assistance—which was responsible for the result. *See infra* Section IV.B.2.b.3.

### 1. *Initiation*

The FBI maintains that the plaintiffs were convicted as a result of the acts of the Suffolk County District Attorney's Office, for whom they are not responsible. Jack Zalkind, the ADA, and his staff did an independent investigation and determined on their own to initiate the prosecution. All that the FBI did was provide Zalkind with a witness—Barboza. In effect, the FBI was no more than Barboza's hosts, making him "available" to the state.

208

These protestations by the FBI ring hollow, a dodge to escape responsibility.

Initiation law developed as a compromise between the "right of the individual to be free from arrest or prosecution upon a charge of which he is innocent and the right of the community to be protected from crime." *Burnham v. Collateral Loan Co.*, 179 Mass. 268, 60 N.E. 617, 617 (1901). On the one hand, the community's interest is to encourage citizens and officers to come forward with evidence of crime without fear that they will be sued if the defendant is subsequently exonerated. On the other hand, the individual's interest is to hold accountable those responsible for a wrongful prosecution and conviction. *Della Jacova v. Widett*, 244 N.E.2d at 582.

The results of this compromise are pragmatic standards: The issue is not who formally started the prosecution, signed the papers, swore out the complaint, etc. The case law requires that "the defendant must have, *in some sense*, initiated the prosecution." *Correllas*, 572 N.E.2d at 10 (italics supplied) (holding that Massachusetts malicious prosecution law does not require the defendant to have sworn out the criminal complaint to be held liable).[164] In earlier decisions, this Court held that a party may "initiate" a prosecution not only by conducting the prosecution him or herself, but also by "tak[ing] an active part in continuing or procuring the continuation of criminal proceedings initiated ... by another...." *Limone I*, 271 F.Supp.2d at 358 (citing *Mitchell v. City of Boston*, 130 F.Supp.2d at 215).

■ However "initiation" is defined, the premise on which any protection for the information-giver is based is that the information be truthful:

[I]f a person discloses *fairly and truthfully* to the officer, whose duty it is to detect crime, all matters within his knowledge which, as a man of ordinary intelligence, he is bound to suppose would have a material bearing upon the question of the innocence or guilt of the person suspected, and leaves it to the officer to act entirely upon his own judgment and responsibility as a public officer, as to whether or not there shall be a criminal prosecution, and does no more, he cannot be held answerable in an action for malicious prosecution, even if the officer comes to the wrong conclusion and prosecutes when he ought not to do so.

*Burnham*, 60 N.E. at 617 (italics supplied).

The truthfulness requirement is essential. If the information given to law enforcement is false, misleading, or incomplete (*and the information-giver knows it*), the receiving officials can hardly exercise their discretion in an intelligent manner. An independent investigation is all but impossible. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988) (A prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—"none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."). As this Court noted in *Limone I*, citing to *Jones*, police officers cannot hide behind the officials whom they have defrauded. *See Limone I*, 271 F.Supp.2d at 358. Where the deceit continues, where the officers are instrumental in the continued confinement of the plaintiffs, the liability likewise continues. *See Jones*, 856 F.2d at 994.

**164.** Indeed, the case law even recognizes the law of inducement. Where one party, for example, acts to induce a police officer to bring charges, that party may well be responsible for the initiation. *Tangney v. Sullivan*, 163 Mass. 166, 39 N.E. 799, 799–800 (1895).

I apply these principles to the case at bar.

### a. *The FBI's Role in Bringing about the Prosecution of the Plaintiffs: More than a Host*

█ Undermining organized crime was a priority of the FBI nationwide, as well as in the Boston Office. It was the special responsibility of Rico and Condon—under the watchful eye of their Boston supervisors, and supervisors up the line, to and including the FBI Director. Barboza, as well as the Flemmi brothers (Top Echelon informants), were critical figures. Rico admitted that Barboza was "the most important witness" he had ever developed at that time. In fact, Barboza inaugurated the witness protection plan, a program that was tremendously significant to the FBI. Since Barboza was Rico's most important witness, in the Boston FBI's most important program, Rico and Condon were not about to yield any control over him. And they did not. They were his constant interrogators, even companions—before, during, and after the Deegan trial—with the state authorities or without.

By the FBI's own admission, the state authorities did not have a prosecutable case until they had Barboza. *See supra* Section III.B.4.b.3. It was only *after* the FBI had met with Barboza myriad times, pumped him for information over five months about the murders he knew of, communicated threats to him by the "Italian element," ingratiated themselves to him by promising protection to him and his family, and made decisions about the prosecutions *they* wanted to initiate, that the FBI invited the state authorities to meet with him.

Nevertheless, the government argues that the FBI did not initiate the Deegan prosecution because it did not furnish Barboza to Suffolk County *for the purpose* of testifying in the Deegan matter. Nor did they "manufacture a story on the Deegan murder, pressure Barboza to recite it to the state, [give] Barboza to the Suffolk County District Attorney's Office and pressure and induce the state authorities to pursue claims against Limone, Tameleo, Greco and Salvati." United States' Proposed Post–Trial Findings of Fact and Rulings of Law, docket entry # 544 at 23. Barboza cooked up the story about the plaintiffs entirely on his own. In fact, in their most recent submissions, the government suggests that the reason why this was a Suffolk County-initiated prosecution is that the Deegan case was not particularly important to the FBI. It paled in comparison to the federal Marfeo case (*United States v. Patriarca*), in which Barboza was to testify against Patriarca, Tameleo, and Cassesso. *See supra* note 60.

Since the Deegan case was not particularly important, so the argument goes, it made sense that Rico and Condon did no more than simply make Barboza available to the state authorities. Likewise, given the case's lack of significance, Rico's and Condon's testimony that they just did not remember seeing information that contradicted Barboza's account, made sense and should be found credible by the Court.[165] Suffolk makes its *own* decisions, they argue, apparently because the FBI was not especially interested.

In support of this "Deegan didn't matter" argument, the government reiterates the number of times that other murders were mentioned in the Condon–Rico–Barboza meetings. And they emphasize lan-

---

**165.** Harrington said as much several years later. He believed in Barboza's veracity because what he said *in the Marfeo case* checked out with the Patriarca wire. *See* Exh. 2341 at 26.

guage in FBI memoranda from the summer of 1967, after the FBI had debriefed Barboza multiple times: In June, Exh. 71B–15, and July, Exh. 71B–16, Barboza listed a number of murders he could "talk" on, including the Deegan murder. *See* Exh. 71B–17; Exh. 89. Then, on August 28, 1967, "Detective John Doyle mentioned to Baron [Barboza] the possibility of Baron furnishing information relative to the murder of Edward Deegan." Exh. 71B–22. This supports the view that Deegan was a state-initiated prosecution: Doyle, not Rico or Condon, popped the question.

The notion that the FBI was just a bystander in the meetings before the Deegan indictment is not supported in the record. After numerous meetings with only federal authorities, Barboza offered information about a number of murders, a menu if you will, including the Deegan murder. The FBI had first pick. *See supra* Section III.B.4.a.1–6. The FBI chose the Marfeo prosecution (conspiracy to murder Marfeo and illegal gambling), *See supra* note 60, arguably because of the involvement of Patriarca, Tameleo, and Cassesso. But that choice does not suggest that the two state cases, DiSiglio and Deegan, were insignificant.

DiSiglio involved Angiulo.[166] Deegan involved Tameleo and Cassesso, as well as Limone, in whom the FBI was interested.[167] The Deegan prosecution offered the possibility of a more substantial punishment, the death penalty, than had the federal Marfeo prosecution. *See supra* Section III.B.4. In any event, the FBI had to

have cared about Barboza's credibility in all the proceedings; if he were not credible in the Deegan case, it would cast doubt on the Marfeo convictions as well.

However one characterizes the Deegan prosecution—very important as plaintiffs suggest, or not, as defendant contends—and whoever first "popped" the question of testimony in the Deegan case, the conclusion is the same: The FBI agents were in complete control. (Indeed, the government's argument better explains the utter callousness with which the FBI dealt with the plaintiffs. They were indifferent to the fact that four innocent men would be convicted.) Nor does it matter to the question of initiation whether the FBI suggested the names of the plaintiffs, or whether Barboza did so on his own. The FBI knew Barboza was lying on September 8, 1967, but nonetheless vouched for him to the DA and the jury, rewarded and supported him, helped him withstand cross-examination at trial, and, thus, as I find in the following section, suborned his perjured trial testimony.

The Deegan case was the functional equivalent of a federal prosecution, or at the least, a joint federal-state effort—the FBI's star witness, the FBI's testimony, the FBI's investigative effort. And significantly, when it was all over, the FBI took credit, not simply for Marfeo, but for Deegan. *See supra* Section III.D.1. Unlike the paradigmatic innocent, well meaning, citizen described in the case law, the FBI did not merely provide a witness and stand back, letting local law enforcement do the

---

**166.** *See supra* note 35. Indeed, the DiSiglio indictment in August of 1967, which was based on Rico's account of Barboza's testimony, resulted in a flurry of congratulatory messages noting that this "tremendous penetration into the LCN and the Hoodlum Elemnet [sic] was effected through the outstanding investigative efforts of the FBI and this office." Exh. 91. *See supra* note 60.

**167.** *See supra* note 91. The FBI's interest in Limone is suggested by a teletype singling him out and indicating that he "like Angiulo, when indicted, will be detained indefinitely awaiting trial and bail will not be granted to him." Exh. 92.

rest. They were not remotely bystanders, much less innocent "hosts."

#### b. *The Information Provided by Barboza Was False or Misleading— and the FBI Knew it*

In fact, the FBI was not innocent at all. Whatever immunity is offered to the ordinary provider of information to law enforcement plainly does not apply here.

The federal government knew Barboza was lying about these plaintiffs and said nothing. Every piece of information they had contradicted his account. And it was not just "ordinary" information, the ramblings of this or that informant—this was high quality information from the Top Echelon Criminal Informant Program, from the Patriarca Wire. *See supra* Section III.B.4.b.3.

To the extent that Rico and Condon denied knowing about the contradictory evidence at the time Barboza implicated the plaintiffs, or fully understanding its significance, I find their account wholly and completely incredible. The evidence in question had been relayed to Rico by one of his top informants, and by the Patriarca wire; it implicated another of his top informants (Jimmy Flemmi); it was summarized in reports he himself authored or reviewed. Equally preposterous is the claim that his partner Condon and the FBI hierarchy—through Kehoe, the head of the Organized Crime Squad, the SAC, or even

the Director—never saw the information at all. *See supra* Section III.B.4.b.1.

Finally, as I describe below, the government did more than just remain silent in the face of Barboza's perjury and fail to disclose information contradicting it. They assisted him, suborning his perjury—a finding which, on its own, makes them initiators for the purposes of malicious prosecution law. In *Manning v. United States*, 2006 WL 3240112 (N.D.Ill. Sept.28, 2006), for example, the court held that where FBI agents had "assisted in the creating of false evidence upon which prosecutors relied in causing or continuing the prosecution," such conduct plainly satisfied the malicious prosecution initiation prong. *Manning*, 2006 WL 3240112 at *31. Nor is there any question that intentional omissions or the conveyance of half truths to the prosecuting authority constitute initiation under Massachusetts law as well. *Cf. Mason v. Jacot*, 235 Mass. 521, 127 N.E. 331, 332 (1920) with *Burnham*, 60 N.E. at 617.[168]

#### c. *There Was No Independent Investigation: There Could Not Be*

The government argues that the state authorities conducted two "independent" investigations: the first over the night and weeks following the murder, and the second conducted by Doyle and Walsh two years later. The first investigation was a dud; it left the state without a prosecutable case. The second investigation was

---

168. The cases the government relies on are unavailing. Interpreting Puerto Rican law, the First Circuit concluded in *Negron–Rivera v. Rivera–Claudio*, 204 F.3d 287 (1st Cir. 2000), that just reporting a crime to the police and cooperating with the ensuing investigation is not enough to meet the initiation element. *See Negron–Rivera*, 204 F.3d at 290. But the Court added a caveat: "It is conceivable, in a different case, that a defendant could 'instigate' an otherwise independent prosecution." *Id.* at n. 1 (internal citations omitted)

(italics supplied). Nor is *Senra v. Cunningham*, 9 F.3d 168 (1st Cir.1993), supportive of the government's argument. Interpreting Rhode Island law, the First Circuit held that "[t]he chain of causation is broken if the filing of the information [criminal complaint] by the attorney at the state Attorney General's office was free of pressure or influence exerted by the police officers or *knowing misstatements made by the officers to the Attorney General's office.*" *Senra*, 9 F.3d at 174 (italics supplied).

illegitimate from the start. It was premised on Barboza's story—a story that the FBI knew to be false. Since the proof of its falsity was in the FBI's files, Zalkind could hardly confirm it. As the fact findings show, the most Zalkind could do was confirm Barboza's story on the periphery; the key allegations depended entirely on Barboza's say-so.

There could not be anything remotely resembling an "independent" investigation in which the state authorities exercised meaningful discretion about whom to prosecute and how. Zalkind admitted as much: What he was *not told* was far more critical than the information he had.[169] If he had had the information the FBI had, he would have done what the present Suffolk County prosecutors did—*stop this prosecution.* And if he had shared that information with the defense, the judge in the Deegan trial might well have done what Judge Hinkle did-*put an end to the tragedy. See infra* Section III.C.1.

Indeed, the government implies that Zalkind somehow did not need the information that the FBI was withholding. The argument offends logic, not to mention constitutional law. If the FBI had concealed only their special relationship with Barboza and the inducements offered to him, that alone would have been enough to hamstring Zalkind.

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). If the jury could not have fully evaluated Barboza without this information, Zalkind surely could not.

But the FBI's withholding went much further. They withheld the Durham documents, including exonerating information about the plaintiffs on the Patriarca wire, as well as information garnered from the Flemmi brothers. It is clear that if Zalkind had had this information he would have had to do what the current Suffolk County authorities did—acknowledge that his ethical and legal obligations precluded prosecution.[170]

#### d. The FBI's Efforts Continued over Thirty Years

As the record reflects, the FBI's efforts did not stop with the conviction. Over the next thirty years, by protecting Barboza in extraordinary ways, by not disclosing the exculpatory information they had, by jealously guarding the only means for discovering the injustice, the information in their files, and by alternately coddling and pres-

169. To be sure, the FBI now argues that it disseminated "the essence" of its information to the local police during the initial 1965 investigation. This was not the case. Again, the best proof is what the state authorities said in their submissions to the Suffolk Superior Court and former ADA Zalkind's comments in the case at bar.

170. This situation is not remotely analogous to that in *Correllas v. Viveiros,* where the information-giver was herself involved in the crime. Viveiros was a suspect in the very same theft and the police knew that. Whatever information the police could glean from her implicating another was information that they could independently evaluate based on their knowledge of her bias. *See* 572 N.E.2d at 10.

suring the perjurer, the FBI was responsible for keeping these innocent men in jail. *See supra* Section III.D.; *infra* Section IV.C. A person "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated ... by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." *Mitchell,* 130 F.Supp.2d at 215 (internal quotations omitted); *See also Jones,* 856 F.2d at 993 ("[D]efendants systematically concealed from the prosecutors, and misrepresented to them, facts highly material to—that is, facts likely to influence—the decision whether to prosecute ... and whether (that decision having been made) to continue prosecuting ... right up to and into the trial.").

Consider what would have happened if there had been full disclosure: (1) If Suffolk County officials had had the exonerating information from the Patriarca wire and the informant reports, they would have concluded that there was substance to Barboza's recantation in 1970. Instead, they credited AUSA Harrington who claimed it was nothing more than a mob attempt to get Barboza to withdraw truthful testimony. (2) If the information had been disclosed at the time of Barboza's trial for the murder of Clay Wilson, Barboza's comments to Ambrosini (about framing Salvati) would have been investigated. Instead, Condon, Rico, and Harrington vouched for Barboza again, telling the jury what he had done to help the FBI and how threatened he was. (3) If the information had been disclosed at the time of the state Stuart investigation, *See supra* note 127, it would have revealed Barboza's perjury

with respect to all four plaintiffs, and not just Rico's belief that Jimmy Flemmi "probably" was involved. (4) If the information had accompanied the plaintiffs' myriad motions for a new trial, they might well have been successful. The evidence the state courts labeled "cumulative," combined with the Durham documents, would have been dispositive evidence of plaintiffs' innocence. (5) And finally, if the FBI had shared the exculpatory information with the parole authorities, and the Governors of Massachusetts, the plaintiffs' sentences might well have been commuted far earlier.

But apart from speculating about outcomes, one thing is certain. None of these entities could conduct an independent investigation; they did just what Zalkind, state law enforcement, and the parole authorities did: Ask the FBI. And the FBI was not talking.

### 2. *Lack of Probable Cause*

█ Under Massachusetts law, "probable cause is such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested is guilty." *Lincoln v. Shea,* 361 Mass. 1, 277 N.E.2d 699, 702 (1972) (internal quotations omitted). The burden of proving lack of probable cause rests on plaintiffs. *Lincoln,* 277 N.E.2d at 700.

To determine whether probable cause was lacking, I look to the information that the defendant had available at the time it took the actions in question.[171] A prelimi-

---

171. The government has introduced a number of exhibits dealing with plaintiffs' other alleged "bad acts." The parties hotly disputed the admissibility and relevance of these exhibits at trial. I admitted them in an effort to allow the government wide latitude to make its probable cause defense. The government has not used any of these exhibits in its Proposed Findings of Fact and Rulings of Law. Indeed, none of these exhibits, 2228–2302, relate to the Deegan murder. None of them counter plaintiffs' proof of lack of prob-

nary word about Barboza's information: Plaintiffs argue that I should exclude Barboza's information from the probable cause calculus because his testimony was perjured and the FBI suborned that perjury. I will address that claim *infra*. At this stage of the analysis, however, I consider all of the information available to the government, including Barboza's. *See Carroll v. Gillespie*, 14 Mass.App.Ct. 12, 436 N.E.2d 431, 436 (1982) (whether information amounts to probable cause includes the question of "whether it was reasonable for the defendant to have relied upon that information, given its quality, quantity, and the availability of additional information.").

### a. *Information Available to the FBI at the Time*

#### (1) *Barboza's Credibility*

As is usual, whenever law enforcement enlists a coconspirator to testify against his compatriots, officers are supposed to be skeptical of the information they receive. This was particularly the case with Barboza. As Rico described, Barboza was a "stone killer" but the "instrument [they] had." Exh. 170 at 189. They knew that he would lie about Jimmy Flemmi's participation in any murder, and in particular, the Deegan murder. *See supra* Section III.B.4.a. They had extraordinarily reliable information that Flemmi and Barboza were about to kill Deegan, *See supra* Section III.B.b.1., and later that they had followed through. *See supra* Sections III. B.4.b.2., III.B.4.c.

FBI concerns should have been heightened even further on September 8, 1967. It was not only that Barboza mentioned the plaintiffs' names for the first time, contradicting every shred of information that the FBI had from their extraordinary sources that there were five participants: Barboza, Flemmi, Cassesso, French and Martin. *See supra* Section III.B.4.b. It was also the way in which Barboza's testimony changed from debriefing to debriefing that should have alerted them to his perjury (assuming that they were not themselves responsible for it).[172]

#### (2) *Limone and Tameleo*

Suddenly, Barboza stated that Limone was the instigator of the "hit" with Tameleo approving it, although the wire indicated that Limone had expressly warned Deegan about the threats and it was Patriarca who had approved the action. In fact, the FBI knew precisely how the Deegan killing was commissioned; it had a recording of it. Jimmy Flemmi and Barboza obtained permission from Patriarca, who told them to get final approval from Angiulo. The FBI had every reason to believe that Barboza had constructed Limone's and Tameleo's participation out of whole cloth.

#### (2) *Greco*

Barboza indicated that Greco was a participant, joining the group at the Ebb Tide before Deegan's murder, wearing a brown topcoat. The FBI knew none of the witnesses had seen Greco on the scene or at the Ebb Tide. *See e.g.,* Exh. 33. In short

---

able cause. In fact, they prove the opposite. To the extent that the FBI had derogatory information about the men, it had a motive to encourage their prosecution regardless of how flimsy the basis. Relying on these "bad acts" comes close to saying that it did not matter if these men were innocent of this crime; they committed others, and that's good enough. Our system does not work that way.

172. Indeed, as I find in Section IV.B.2.b.1, the record suggests that the FBI went further, supplying Barboza with reports and other information to shore up what they knew to be false testimony. I want to make clear, however, that even if Barboza had altered the story without their aid, the FBI had no probable cause to pursue this prosecution.

order, then, Barboza's story changed, taking Greco out of the group meeting in the bar and, indicating that he could not remember what he was wearing. *Compare* Exh. 71A–2 (dated September 12, 1967) (Greco left the Ebb Tide at the same time as the others) and Exh. 71A–3, Exh. 95 (dated October 16, 1967) (Greco did not go to the Ebb Tide that night).

When Barboza claimed that Greco was in the alleyway with Deegan and shot him with a .45 caliber gun, the FBI had information that Cassesso was with Martin in the alleyway, *see* Exh. 28, and indeed, that Barboza had claimed that *he* had shot Deegan with the only .45 on the scene. *See* Exh. 34; Exh. 68; *See also* Exh. 57 at 26 (only one .45 caliber gun).

#### (4) *Salvati*

Barboza accused Salvati of being in the car with him, prepared to kill Stathopoulos. The FBI had never heard of Salvati at all when he was first mentioned—not anywhere in the FBI's files, as Rico noted, no "derogatory information" whatsoever, much less information linking him to a homicide. Rico and Condon plainly knew that Barboza was lying. Barboza's story— especially as it concerned Salvati—was preposterous.[173]

The FBI did not have probable cause to believe that the plaintiffs had been involved in the Deegan murder. Indeed, they had every reason to believe otherwise.

#### b. *Conviction is Not Conclusive Proof of Probable Cause on these Facts*

The government argues that the plaintiffs' convictions are conclusive proof of probable cause, thereby barring their malicious prosecution claims. *See Della Jacova*, 244 N.E.2d at 582 ("The general rule in the Commonwealth is that conviction in the tribunal to which complaint is made, although reversed ... is conclusive proof of probable cause.").

 The conviction rule, like the initiation requirement, was designed to insulate law enforcement from frivolous lawsuits. If there was enough evidence for a conviction, surely there was probable cause to initiate the prosecution. But there are exceptions: A conviction does not establish probable cause where the conviction "(1) was obtained solely by false testimony of the defendant in the action for malicious prosecution, or (2) is impeached on some ground recognized by the law, such as fraud, conspiracy, perjury, or subornation of perjury as its sole foundation." *Della Jacova v. Widett*, 244 N.E.2d at 582. *See also Ramos v. Gallo*, 596 F.Supp. 833, 840 (D.Mass.1984). Put simply, the conviction rule was obviously not intended to permit defendants to use their own misconduct as a shield. Two questions must then be answered in evaluating the significance of these convictions: Was there misconduct by the defendant and was that misconduct the sole cause of the conviction?

That the answer to both questions is "yes" is clear first from the history of the Durham disclosure and its seismic impact on these prosecutions. When, in 2000, Special Attorney Durham, head of the DOJ's Justice Task Force, sent the plain-

---

**173.** Barboza had specifically noted that the car he was in had been approached by a "Chelsea Police Captain," information he could only have had if law enforcement had told him about it. Kowzlowski had been off-duty on that night, not in uniform. *See* Exh. 2312 at 4680. Captain Kowzlowski reported the man in the car had a bald spot. Rico knew that that fit Flemmi's description, and Barboza would not implicate Flemmi. By his October 16, 1967 statement, Barboza explained that Salvati wore a bald wig.

tiffs' then-attorneys and Suffolk ADA Mark Lee the five Durham documents, he expressly acknowledged their significance in the plaintiffs' efforts to secure their release. And he was right: In short order, on January 5, 2001, at a hearing on Limone's Motion for a New Trial before Judge Hinkle, ADA Lee explained:

> [t]hese reports had previously been undisclosed to anyone concerned with this litigation. And when these reports, Your Honor, are read, particularly with an eye towards comparing the reports to the existing evidence which includes the trial testimony, the trial transcripts which are part of the record, the Commonwealth concludes that clearly these FBI reports *undermine material aspects of the testimony that was given at trial by the Commonwealth's chief witness. In addition, the FBI reports clearly undermine the theory of the Commonwealth's case with respect to Mr. Limone.*

Exh. 1 at 8 (italics supplied). The Commonwealth immediately moved to vacate Limone's conviction, grant him a new trial, and admit him to bail. Judge Hinkle granted the motion for a new trial "on the basis of ... the FBI records, *nothing more.*" Exh. 1 at 15 (italics supplied). Within a month, the Commonwealth entered nolle prosequis in its case against Limone and Salvati, concluding that it did not have a good faith basis "legally or ethically" to proceed with the cases. *See* Exh. 3B; Exh. 3D. Nolle prosequis were later entered posthumously as to Greco and Tameleo. *See* Exh. 3G; Exh. 3H.

The FBI documents were disclosed. The plaintiffs' cases were nolle prossed. The FBI's misconduct caused the plaintiffs' convictions; its exposure nullified them. On this record it is clear: plaintiffs' convictions do not bar their malicious prosecution claims.

In the instant bench trial, however, there was far, far more evidence than simply the Durham documents—evidence which makes the FBI's misconduct and its impact on these prosecutions even more clear. The verdict in this case was impeached by the FBI's subornation of perjury and by fundamental violations of due process.

### (1) *Subornation*

 The government argues that "even if" Agents Rico and Condon knew that Barboza's story was false—and I find that they did—plaintiffs have not established that the FBI suborned perjury. "[M]ere knowing that the person has testified or would testify unlawfully or commit perjury is not subornation of perjury." *Petite v. U.S.,* 262 F.2d 788, 796 (4th Cir. 1959). Subornation requires more, namely that the putative suborner knew and "willfully induced" or "procured" the witness to give the false testimony. *Id.* at 794.

I agree. Massachusetts, as in *Petite,* defines subornation of perjury as "procuring another person to commit perjury," M.G.L. c. 268 § 2, akin to an accessory before the fact to the crime of perjury. *See Commonwealth v. Fine,* 321 Mass. 299, 73 N.E.2d 250, 252 (1947). Procurement includes inciting, instigating, or persuading the witness to commit the crime. *See Commonwealth v. Borans,* 379 Mass. 117, 393 N.E.2d 911, 925 (1979).

*Borans* is illustrative. In *Borans,* the Supreme Judicial Court found that the defendant's course of action went beyond simply "the suggestion of a course of perjury," which may or may not be subornation, to the "inciting, instigating, or persuading" realm. The witness had told one story and then offered a different account before the grand jury. The defendant—calling it "counseling"—told the witness that if he would "stick to the story," mean-

ing the second account, he would not be in trouble, and said it repeatedly. In addition, the defendant told the witness that another witness would corroborate the false testimony. *Borans,* 393 N.E.2d at 926.

In effect, then, subornation of perjury can be found along a spectrum of behavior—with standing idly by, just knowing a witness is lying at one end (which is not enough) to expressly asking a witness to falsely implicate an innocent individual at the other (which is). Instigation, incitement, solicitation, and persuasion are points along the continuum, in which the suborner is deemed more and more responsible for the ultimate act of perjury, and the perjury is less and less a product of the witness' independent act. Thus, Rico and Condon need not have pressured Barboza to craft a story implicating the plaintiffs. Conduct short of that plainly qualifies as subornation of perjury.

When Barboza announced to Rico and Condon on March 8, 1967, that he would never let Jimmy Flemmi "fry," the government went beyond tacitly agreeing to Barboza's terms. Knowing that he would lie about Flemmi, they pressed him to move from being a source of information to being a witness, even putting him before a grand jury (on March 21, 1967), long before he had agreed to testify. And beyond words, there were deeds—negotiating immunity for Barboza, protection for his wife and family, where he would be incarcerated, rewards notwithstanding his announced intention to lie.

In September, when Barboza pulled the plaintiffs' names out of thin air, the FBI did not contradict him, confront him, question him about the change in his story, much less tell the state authorities. Instead, they joined the state authorities as Barboza's Deegan testimony was prepared, continuing to reward him, showing

again by what they said and did that adding these names was fine. They as much as told him to "stick to the September 8 story," as did the defendant in *Borans.*

Barboza was obviously not an ordinary witness. He was an extraordinarily vulnerable witness, brought forward to testify against the LCN, dependent upon the FBI for his physical protection, not to mention immunity from prosecution. Solicitation, instigation and even persuasion had a different resonance with him than it might in the usual instance.

In any case, the record supports an even more proactive role on the part of the FBI with regard to Barboza. The FBI clearly prepared Barboza for cross-examination. They either showed or told him about law enforcement reports to shore up his testimony, or condoned the state authorities' efforts to do so. As described below, Barboza's testimony managed to account for the facts that would have been in state files and/or in the possession of defense counsel: the "bald man" identification of Kowzlowki, which led to testimony about Salvati and the bald wig; the fact that no witnesses put Greco at the Ebb Tide, which led to a change in Barboza's testimony; the efforts to shape his testimony with regard to pre-murder meetings when Markham showed him his Florida ticket; accounting for the Karger testimony, right after FBI agents had visited Karger, and so on. *See supra* note 91. They even leaked defense information that the FBI had garnered.

Moreover, the FBI went beyond what the defendant in *Borans* had done—telling the perjurer that other witnesses would corroborate his account. The FBI actually provided corroborating accounts—Fitzgerald's testimony about the bribe attempt (which was not about the Deegan murder), Stathopoulos' "identification" of Greco (notwithstanding the FBI's earlier re-

ports)—leading finally to Condon's own testimony, which expressly validated Barboza's perjury.

In short, the record establishes that the FBI took actions across the entire subornation spectrum: They stood by listening, knowing that Barboza was lying; they stood by, knowing he was lying and withholding the exonerating proof; they coached him in his lying, shoring up the story they knew to be false, showing him or telling him about police reports and defense tactics; they rewarded him for his lies; they sought to corroborate his lies with other witnesses whom they controlled; they did all this and then vouched for the veracity of his lies—to the DA and to the jury.

### (2) *Due Process*

While it enumerates several types of misconduct—subornation, fraud, conspiracy—the case law simply requires that the conviction be "impeached on some ground recognized by the law." *Della Jacova*, 244 N.E.2d at 582. The convictions, therefore, are also overcome because they were procured through the egregious violation of the plaintiffs' due process rights. As the First Circuit described it, "we are unsure what due process entails if not protection against deliberate framing under color of official sanction," *Limone*, 372 F.3d at 45, "turn[ing] [Barboza] over to the Suffolk County district attorney, knowing that [his] false testimony would be used to prosecute [the plaintiffs] for a crime they did not commit," and "fail [ing] to disclose exculpatory evidence before, during, and after the trial." *See Limone*, 372 F.3d at 49.[174] *See also Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791

(1935) (due process "is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.").

Likewise, in *Napue v. Illinois*, the prosecution's star witness testified that he had not received any consideration from the state for his testimony. The prosecutor knew this testimony was false but did not correct it. *See Napue v. Illinois*, 360 U.S. 264, 265–66, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The Supreme Court held that,

> it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment ... The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

*Napue*, 360 U.S. at 269, 79 S.Ct. 1173.

The constitutional duty to intervene to correct false testimony by a government witness is not limited to the prosecutor in a given case. *See Napue*, 360 U.S. at 269, 79 S.Ct. 1173 (attributing the duty to "representatives of the State"); *Pyle*, 317 U.S. at 216, 63 S.Ct. 177 (attributing the duty to "state authorities"); *Mooney*, 294 U.S. at 112, 55 S.Ct. 340 (attributing the duty to "the State"); *Smith v. Florida*, 410 F.2d 1349, 1350–51 (5th Cir.1969) (police officers violate this duty if they suborn perjury even without the prosecutor's knowledge); *Curran v. Delaware*, 259 F.2d 707, 713 (3d Cir.1958) (adopting Pyle, and finding that

---

**174.** The Court was addressing these issues in connection with the FBI's claim of qualified immunity. The analysis is similar: The allegations if proved were so egregious that no reasonable officer could have believed his conduct was immunized. I find that they have been proved.

law enforcement officers violated their constitutional duty by suborning perjury).

The FTCA, of course, does not hold the government liable for constitutional torts. The issue here is the impact of these constitutional defects on whether the plaintiffs' convictions were impeached and thus whether they are "conclusive proof" of probable cause.

The plaintiffs' convictions were the direct result of constitutional violations laid at the doorstep of the FBI. As such, they pose no obstacle to the plaintiffs' showing of lack of probable cause.

### (3) *FBI's Misconduct/Barboza's Testimony—The Sole Foundation*

Barboza's testimony was the only trial evidence against two of the plaintiffs, Limone and Salvati. *See generally* Exh. 2312. Without it, there would have been no conviction. Indeed, there would have been no charges.

There was some evidence against Tameleo and Greco, but upon closer inspection it was inconsequential.

### (a) *The Fitzgerald Bribe Testimony*

John Fitzgerald, Barboza's attorney, testified that Tameleo and Greco attempted to bribe Barboza into not cooperating with the authorities in the Deegan case.[175] This was not independent evidence that could have supported their convictions, however, because the FBI knew this testimony to be false to the extent that it implied that Barboza's testimony in the Deegan case was involved. The bribe offer predated any mention by Barboza of the plaintiffs as participants in the Deegan murder.[176] Indeed, the purported bribers

indicated that *they did not care* if Barboza testified in other Boston cases. *See* Exh. 287; Exh. 288; Exh. 71B–64; Exh. 71B–19.

The FBI was responsible for developing Fitzgerald as a witness and, again, did not disclose the FBI reports that undermined his testimony. *See* Ex. 51G at 1 (recommending an incentive award for Rico based in part on his "instrumental" work in developing Fitzgerald for the Deegan matter). Fitzgerald's testimony therefore comes under the umbrella of FBI misconduct.

### (b) *The Stathopolous Identification*

The other evidence implicating Greco was Stathopolous's purported "identification" of Greco as one of the shooters. All Stathopolous said, however, was that Greco "look[ed] like" the man he had seen in the alley. *See* Exh. 105F at 4961, 5027–28. Resemblance identification alone cannot support a conviction. *See e.g., Commonwealth v. Bishop,* 9 Mass.App.Ct. 468, 401 N.E.2d 895, 898 (1980) (accepting the principle that resemblance identification is insufficient without corroborating evidence). This is especially so where it had been expressly contradicted by Stathopolous' prior statements, and where the witness was unable to identify the defendant at any other time. *See supra* Section II.C.2.

### c. *No Other Evidence*

The government attempts to throw up a smokescreen, suggesting that the convictions came about not because of FBI misconduct, but because of the failures of defense counsel, or their conflicts of interest. The defense really had all the information it needed, the government sug-

---

175. *See supra* Section III.C.2.

176. Information with respect to the bribe was uncovered by the FBI in July of 1967. Documents generated at the time suggest that the

bribe involved the Marfeo prosecution and Barboza's testimony against Patriarca and Tameleo. *See* Exh. 287.

gests, as did the state authorities. If there was a conviction, it was their fault, not the FBI's. The FBI's defaults were not the "sole cause" of the conviction.

Every single witness denies ever seeing the Durham documents before—including the Deegan information on the Patriarca wire, and the informant reports—from the present Suffolk County ADA who nolle prossed the charges against the plaintiffs, to the former ADA Zalkind, to defense counsel who testified in the instant trial, Attorneys Chisholm and Balliro. While the fact of the Patriarca wire had become public in the Marfeo case, *See supra* note 102, as had some of its content, there is no doubt that nothing about the Deegan case was disclosed. Indeed, Condon was scrupulous about withholding any federal memos, notwithstanding their relevance to his testimony (and to the plaintiffs' innocence). Finally, whatever conflicts of interest Balliro had, as counsel for both Tameleo and Jimmy Flemmi, they do not excuse the government of responsibility for its misconduct.

### 3. *Malice and Termination*

█ Actions taken in good faith insulate the actor from malicious prosecution liability. *See Beecy v. Pucciarelli,* 387 Mass. 589, 441 N.E.2d 1035, 1039 n. 9 (1982).

> [T]he malice necessary to be shown in order to maintain this [malicious prosecution] action, is not necessarily revenge or other base and malignant passion. What ever is done *wilfully and purposely,* if it be at the same time *wrong and unlawful,* and that known to the party, is in legal contemplation malicious. That which is done contrary to one's own conviction of duty, or with a wilful disregard of the rights of others, *whether it be to compass some unlawful end, or some lawful end by unlawful means,* or, in the language of the charge, *to do a wrong and unlawful act knowing it to be such,* constitutes legal malice.

*Wills v. Noyes,* 29 Mass. 324, 12 Pick. 324, 328 (1832) (quoted in *Beecy,* 441 N.E.2d at 1039 n. 9). *See also Seelig v. Harvard Coop. Soc'y,* 355 Mass. 532, 246 N.E.2d 642, 646 (1969) (finding of want of probable cause is a sufficient basis from which to infer malice).

█ Malice has plainly been shown in this record. The FBI wanted LCN members taken down for Deegan's murder; they congratulated themselves when Limone and Tameleo were initially sent to their deaths, with Greco and Salvati as collateral damage. And in the evidence introduced at this bench trial, Rico and Condon lied about what they knew and when they knew it. They were indifferent to the outcome of the Deegan case. Either way, they threw away the liberty of these four men with wilful disregard for their rights. Their actions were purposeful and unlawful. If anything shocks the conscience, it is this behavior.

When asked by a member of the House Committee if he had any remorse for the part he played in the Deegan affair, Rico responded "Would you like tears or something?" Exh. 170 at 186. That statement encapsulates the utter disregard the FBI displayed for the lives and families they sacrificed at the alter of their war against organized crime.[177]

Each of the plaintiffs' prosecutions has been nolle prossed by the State of Massa-

---

177. One Congressman asked how these men could have gone to death row on the basis of Barboza's testimony, adding: "As an experienced law enforcement officer, isn't that shaky, even by confidential informant standards?" Rico answered, "Well, there isn't any good answer to that." Exh. 170 at 199.

chusetts: Peter Limone and Joseph Salvati's on January 30, 2001, Louis Greco and Henry Tameleo's posthumously on September 23, 2004 and January 25, 2007, respectively. *See* Exh. 3B; Exh. 3D; Exh. 3G; Exh. 3H. *See also Wynne v. Rosen,* 391 Mass. 797, 464 N.E.2d 1348, 1351 (1984) (holding that a nolle prosequi is favorable termination where the circumstances "compel an inference that there existed a lack of reasonable grounds to pursue the prosecution"). The District Attorney's office concluded in each case that they could neither legally nor ethically pursue the cases against plaintiffs in light of the Durham documents. *See* Exh. 3B; Exh. 3D; Exh. 3G; Exh. 3H.

#### 4. *Not a "Failure to Disclose" Claim*

■ In its concluding papers to this bench trial, just as it has done throughout the litigation, the government again attempts to reduce these allegations to the "failure to disclose exculpatory evidence." Since FTCA liability can only be imposed in instances where a private individual can be held liable under analogous circumstances, and since the disclosure of exculpatory evidence has no private analog, the government argues, plaintiffs have no case. See 28 U.S.C. §§ 1346(b)(1), 2674; *Bolduc v. United States,* 402 F.3d 50, 58 (1st Cir. 2005) ("Under the FTCA, the relevant inquiry is not whether state law *might* as-

sign a duty to a private person in the same or similar circumstances, but, rather, whether state law *would* impose liability on a private person in the same or similar circumstances.") (italics supplied).

They remind the Court that constitutional tort claims cannot be brought under the FTCA: In *Bolduc,* the First Circuit held that jurisdiction under the FTCA cannot be premised on a *Brady v. Maryland* claim; rather, it must be premised on a common law tort. *See Bolduc,* 402 F.3d at 56; *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[178] The First Circuit affirmed the district court's rejection of plaintiffs' negligence and negligent supervision claims. Plaintiffs argued that a negligence claim consists of a duty of care, a breach of that duty, causation, and damage—and that the FBI breached its duty to disclose exculpatory evidence. The First Circuit described their argument as "unconvincing."

> The appellants have not pointed to any instance in which Wisconsin has imposed *private* liability on a prosecutor or other state agent for a failure to disclose exculpatory evidence. That is a fatal flaw, for the federal government does not yield its immunity with respect to obligations that are peculiar to governments or official-capacity state actors and which have no private counterpart in state law ... Because Wisconsin's rec-

---

**178.** In that case, plaintiffs brought a negligence claim against the government (standing in the shoes of employee FBI agents) for the FBI's failure to turn over *Brady* documents. FBI Agents Craft and Craig investigated a bank robbery at the Southgate mall in Wisconsin. The agents gathered eyewitness and showed them photographs of potential perpetrators; the photos did not include pictures of the men eventually prosecuted and convicted for the crime. One 302 report, written by Craft, recorded that the witnesses found two of the photos "similar" to the robbers. Another 302, written by Craig, described the identification as "identical." *See Bolduc,* 402

F.3d at 52. Craft was responsible for reviewing the reports and correcting any errors, after which he was to put them in the case file. Craft, however, excluded the reports from the file. Later, two other men—Bolduc and Larken—were arrested, charged, and convicted. The witnesses who had made the prior "similar" or "identical" IDs, now fingered Bolduc and Larken for the crime. The prosecution never mentioned the previous contradictory identifications. Eventually, the exculpatory reports were made known, someone else confessed to the crime, and Bolduc and Larken filed a suit under the FTCA.

ognition of a governmental duty to disclose exculpatory evidence does not ground private liability under that state's law, it cannot serve as a hook on which to hang federal jurisdiction here. *Bolduc,* 402 F.3d at 57.[179]

The case at bar is completely different. In *Bolduc,* the plaintiffs were attempting to use *Brady's* constitutional duty to meet a legal requirement: negligence claims require a duty; the duty in question was spelled out under *Brady;* defendants breached that duty, therefore liability. By contrast, plaintiffs' claims in the case at bar do not rest on violation of *Brady* as a legal premise. The FBI's non-disclosure of those documents is a *factual* issue; it was part of a broader scheme to put Barboza forward as a witness no matter the cost, even if it meant framing the plaintiffs. A private citizen who framed another for murder would be in the same position. The First Circuit said it best:

> The [defendant's] argument has an even deeper flaw: it rests on a self-serving mischaracterization of the factual allegations set out in the amended complaints. The plaintiffs have not pleaded a *separate* claim that their rights were violated merely by the appellants' failure to divulge some discrete piece of *Brady* evidence. Rather, they have eschewed

such a course in favor of a more sweeping accusation that the appellants actively participated in a plot to secure and sustain unjust convictions against innocent men. Though this scheme includes suballegations that occasionally involve Brady violations (e.g., suppression of exculpatory information), the overall charge cannot be shoehorned into the relatively narrow confines of the *Brady* rubric. As the district court put it, the 'individual allegations of non-disclosure' are not meant to be self-sustaining, but, rather, 'are an integral part of the overall story.'

*Limone,* 372 F.3d at 46–47.[180]

### 5. *Massachusetts Survival Statute*

██ The United States previously argued that the Greco and Tameleo plaintiffs' malicious prosecution claims must fail on the ground that such claims do not survive the death of the victim, pursuant to the Massachusetts Survival Statute, G.L. c. 228 § . 1. The United States relies on an 1850 Massachusetts case, *Nettleton v. Dinehart,* 59 Mass. 543 (1850). *Nettleton* was effectively overruled by the SJC's decision in *Harrison v. Loyal Protective Life Ins. Co.,* 379 Mass. 212, 396 N.E.2d 987 (1979). In *Harrison,* the court rejected *Nettleton's* limitation of the Survival Stat-

---

179. Of course, a plaintiff may bring a claim under the FTCA if the state would impose tort liability on a private person in sufficiently similar circumstances. Therefore, in *Bolduc,* the court next asked whether Wisconsin would impose tort liability on "a person who comes into possession of exculpatory evidence as part of an official investigation and carelessly fails to disclose that evidence to prosecutors (and, ultimately, to the accused)." *Bolduc,* 402 F.3d at 57. In a like case, the Wisconsin Supreme Court determined that where a doctor's negligent performance of an autopsy resulted in the plaintiff's wrongful prosecution, "he is still not held liable to the person who has been subjected to unjustifiable prosecution in the absence of malice." *Bolduc,* 402 F.3d at 59 (quoting *Bromund v.*

*Holt,* 24 Wis.2d 336, 129 N.W.2d 149, 153 (1964)). The First Circuit concluded that Wisconsin law would not impose tort liability for the *negligent* failure to disclose exculpatory evidence, and so the FTCA claim necessarily failed.

180. The government also tries to use *Bolduc* to argue that because plaintiffs have not cited a Massachusetts case imposing private tort liability for "failure to disclose exculpatory evidence," the plaintiffs have no FTCA standing. Again, the government misstates the plaintiffs' claims, which sound in malicious prosecution. There is ample Massachusetts precedent for imposing liability on these facts, fully discussed in Section IV.B.1.

ute's language, "other damage to the person," as pertaining exclusively to physical damage. The court held that the tort of intentional infliction of emotional distress survived the death of the victim, reasoning that "the statute is sufficiently dynamic to allow for a change in judicial conceptions of what types of harm constitute legally redressable 'damage to the person.' " *Harrison* 396 N.E.2d at 989.[181]

## C. *Civil Conspiracy*

█ Plaintiffs' civil conspiracy claim sounds in the coercion theory of liability.[182]

This type of conspiracy, dubbed a "true conspiracy ... occurs when the conspirators, acting in unison, exercise a peculiar power of coercion over the plaintiff[s] that they would not have had if they had acted alone." *Robinson v. Bodoff,* 355 F.Supp.2d 578, 585 (D.Mass.2005) (internal quotations omitted); *see also Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1564 (1st Cir.1994).[183] The salient factors in this claim are the "peculiar power of coercion" involved and relatedly, "that the conspiracy achieved what individuals could not achieve." *Kurker v. Hill,* 44 Mass.App.Ct.

---

**181.** It is within my authority to predict the course of the Supreme Judicial Court if "state law is sufficiently clear" to allow such a prediction. *See Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP,* 175 F.3d 14, 18 (1st Cir.1999). *See also Fischer v. Bar Harbor Banking & Trust Co.,* 857 F.2d 4, 7 (1st Cir. 1988) (citing *Michelin Tires, etc. v. First National Bank of Boston,* 666 F.2d 673, 682 (1st Cir.1981)) (Even in the absence of a "definitive ruling" by the highest state court, federal courts may draw on "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."). In fact, if I am able to predict their course, I am bound to. *See Bi–Rite Enterprises, Inc. v. Bruce Miner Co.,* 757 F.2d 440, 443 n. 3 (1st Cir.1985) ("Although Massachusetts allows certification of difficult questions of state law to the Supreme Judicial Court, it is inappropriate for a federal court to use such a procedure when the course state courts would take is reasonably clear."). In this instance it is clear. I conclude that in the case at bar, the SJC—if presented with the question of the survival of a malicious prosecution action—would rule as it did in *Harrison,* and find that the tort survives.

**182.** Plaintiffs also bring a claim for tort-based civil conspiracy, which requires a predicate tort, and is essentially another vehicle for imposing joint or vicarious liability. *See Robinson v. Bodoff,* 355 F.Supp.2d 578, 585 ("ascrib[ing] liability to those who substantially assist or encourage others to commit torts"); *Aetna Cas. Sur. Co.* 43 F.3d at 1564 (requiring "a common design or agreement," express or implied, "and second, proof of some tortious

act done in furtherance of the agreement"); *Stock v. Fife,* 13 Mass.App.Ct. 75, 430 N.E.2d 845, 849 n. 10 (1982) (referring to "a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result"); *Zereski v. American Postal Workers Union,* 1998 WL 1181769, 1998 Mass.Super. LEXIS 507, 27–28 (Mass.Super.Ct.1998).

The predicate tort in this case could be either malicious prosecution or intentional infliction of emotional distress—I find for the plaintiffs on each of those claims. This version of conspiracy, however, is superfluous. I find the *United States* liable for those two claims—both in that the *government* is the defendant here *and* because Rico and Condon were not renegade actors. Kehoe, Handley, and the entire FBI supervisory structure was in on the wrongdoing. Because all of those actors played a part in the commission of the underlying tortious conduct during the entire period challenged, the conspiracy claim is redundant.

**183.** The FBI did not bother to argue this claim in their closing papers, resting on the erroneous conclusion that it rises and falls on the fate of the malicious prosecution claim.

In a true conspiracy, "coercion" substitutes for an underlying tort. *See Kurker v. Hill,* 44 Mass.App.Ct. 184, 689 N.E.2d 833, 836 (1998) ("The element of coercion has been required only if there was no independent basis for imposing tort liability—where the wrong was in the particular combination of the defendants rather than in the tortious nature of the underlying conduct."); *Massachusetts Labor-*

184, 689 N.E.2d 833, 836–37. It is most often used in connection with combinations of employers or employees, working together in "concerted refusals to deal." *Mass. Laborer's Health & Welfare Fund*, 62 F.Supp.2d 236, 244 (D.Mass.1999).

■ There is no better example of the "peculiar power of coercion" than the FBI's actions here. Together with Barboza and the Flemmi brothers, the FBI created a trap that was impossible for the plaintiffs to escape. They used their law enforcement powers—to reward, protect, and immunize Barboza—to keep him from changing his story. They used their unique status as federal officers, to keep federal memoranda from state authorities, memoranda which would have disclosed the truth. They created the perfect lie—not bothering to tell the state that it was an unwitting pawn in their end game. Only the FBI and Barboza (and the Flemmis) had the information to disprove Barboza's perjured testimony.

Courts deny coercion-based conspiracy claims when there is nothing unusual about the power wielded by the defendants. *See Fleming v. Dane*, 304 Mass. 46, 22 N.E.2d 609, 611.[184] But unusual—or rather, substantial—power was the order of the day here. Unseasoned prosecutor that he was, Zalkind made efforts to corroborate Barboza's story; but he was only able to corroborate around the edges—to verify the parts that were not fabricated with the FBI's complicity. This pattern was repeated each time the plaintiffs filed a motion for new trial or commutation petition. The FBI's stonewalling prevented each of those decision makers from uncovering the truth.

It is also necessary to show that the conspiracy achieved something different in *kind*, rather than merely degree, from what any individual could do.[185] Plaintiffs have done so. Without Barboza, Rico and Condon obviously could not have influenced the outcome of the Deegan trial. Without Rico and Condon, Barboza could not have been as effective. If they had not

---

ers' *Health and Welfare Funds v. Philip Morris*, 62 F.Supp.2d 236, 244 (1999) ("The exercise of this 'peculiar power of coercion' is itself the wrong, and no other tortious act need be shown."); *Massachusetts Laborers' Health and Welfare Funds v. Philip Morris*, 62 F.Supp.2d 236, 244 (1999); *Wajda v. R.J. Reynolds Tobacco Co.*, 103 F.Supp.2d 29, 37 (D.Mass.2000).

In addition to coercion, the tort requires that the conspirators have combined to accomplish an unlawful purpose or other purpose by unlawful means, and that the plaintiff suffer damage. *See Carew v. Rutherford*, 106 Mass. 1 (1870). "It is fundamental that a conspiracy may be unlawful in its purpose or in the means employed to carry it on." *Willett v. Herrick*, 242 Mass. 471, 136 N.E. 366, 369 (1922).

**184.** In *Fleming*, the Court concluded that the exercise of normal business prerogatives could not create the "coercion" necessary to cross the line into tortious behavior. "That power consisted in nothing more than the power to make decisions as to foreclosures by

a bank (a power which must be exercised by someone in behalf of every bank) and the power to exercise in some manner not stated 'a commanding influence' in the decisions of the selectmen as to granting permits. We see nothing in the exercise of these powers by Dane and Cousens in association with each other and with the other defendants as alleged which gives to their acts in combination any greater or different tortious quality than would be ascribed to the same acts if performed by separate individuals only." *Fleming*, 22 N.E.2d at 611–12. *Compare Willett*, 136 N.E. at 370 (holding that it is tortious for "a combination of bankers to inflict injury upon the business or credit of an individual by acts which become illegal because of the influence and power they wield").

**185.** *See, e.g., Kurker*, 689 N.E.2d at 836 (wrong is in the particular combination of defendants achieving what individuals could not).

vouched for him, if they had not coached him, if they had not shored up his testimony—there would have been no peculiar coercive effect. Had they shared even some of their information with Suffolk County, the prosecution would not have gone forward. Had their supervisors—Kehoe, Handley, FBI officials in Washington to whom all the relevant information was being forwarded—refused to be complicit in the subornation and decades-long cover-up, had they intervened to prevent the ongoing wrongdoing they knew was occurring, the plaintiffs would have been spared this ordeal.

To be sure, coercion-based civil conspiracy is a rare tort; in fact, it is specific to Massachusetts. The First Circuit has described it as a "very limited" cause of action. *Aetna*, 43 F.3d at 1563. For the most part, courts find that its elements are not met. *But see Aetna*, 43 F.3d at 1564. For example, in *Wajda v. R.J. Reynolds Tobacco Co, et al.*, a plaintiff brought suit against tobacco companies, alleging that members of the industry conspired to deceive "the public about the health risks of smoking." *Wajda*, 103 F.Supp.2d at 32. In particular, the plaintiff claimed that the defendants agreed to conceal accurate information about the dangers of cigarettes, and suppress the development of safer cigarettes. *Wajda*, 103 F.Supp.2d at 37.

The Court, however, concluded that her complaint failed to plead that she was "coerced" into accepting the tobacco industry's propaganda. *Wajda*, 103 F.Supp.2d at 37.[186] By contrast, the plaintiffs in the instant case clearly suffered the coercive power of the defendant and its co-conspirators.

What is more, comparing the FBI's actions—fully and specifically proved—to that of tobacco companies brings the uniqueness of plaintiffs' claims into stark relief. Assuming that the tobacco industry did collude to suppress the truth about the ravages of smoking, they were not the *only* actors in possession of accurate knowledge. They could not prevent other actors—scientists, doctors, public health officials—from exposing the danger of their product.

By contrast, the FBI and its co-conspirators had a complete monopoly on the truth and the means to prove it. Their concealment actively prevented others from uncovering their secrets. Whenever Barboza's story was questioned—by Zalkind during the initial prosecution, by Suffolk investigators following up on Detective Stuart's claims or Southwood's information, by Barboza's attempted recantation, in all the various motions for new trial and commutation petitions—the FBI

---

**186.** The plaintiff in *Wajda* did allege that the defendants inflicted nicotine addiction on her—a claim which could be construed as coercive. But the Court determined there was no peculiar power at play—that each tobacco company, acting alone, could have done just the same. *Wajda*, 103 F.Supp.2d at 37.

In related litigation, the Massachusetts Laborers' Health & Welfare Fund claimed that the defendant tobacco manufacturers, trade associations, and distributors, conspired to "manipulate their own scientific research, conceal unfavorable facts, and disseminate their own disinformation about cigarettes."

*Mass Laborers'*, 62 F.Supp.2d at 244. The Court dismissed the Fund's claim, holding that an allegation of "generally exerted and generally felt power of coercion" was insufficient to make out the tort of coercive conspiracy, construing the tort to require not only a peculiar power created by a particular combination of actors, but also a particularized target. *Mass Laborers'*, 62 F.Supp.2d at 245 ("complaint does not allege that the defendants had any power of coercion peculiarly focused against the Fund"). Again, the targets in the instant case were certainly particular.

was the wall the questioner would run into.

On these facts, malicious prosecution and coercive conspiracy may appear to be two sides of the same coin, but the claims are distinct. Malicious prosecution is grounded in the defendant's manipulation of the prosecutorial process (which in this case extended to all subsequent proceedings.) The coerciveness at play in this civil conspiracy is rooted in defendant's monopoly on information over a long span of time.

The "common designs"—to use conspiracy parlance—of the defendant and its co-conspirators can be described on multiple levels.[187] The FBI, Barboza, and Flemmi conspired to suborn Barboza's perjury. The FBI, Barboza, and Flemmi conspired to put four innocent men behind bars. The FBI, Barboza, and Flemmi conspired to keep them there—thwarting plaintiffs' attempts to win appeals and pardons. The FBI, Barboza, and Flemmi conspired to take down La Cosa Nostra—by whatever unlawful means necessary. The FBI, Barboza, and Flemmi conspired to keep their web of underworld relationships a secret. On any of these theories, the FBI is liable. In fact, their conspiracy consisted of many acts over many decades, designed to accomplish each of these goals, most importantly to keep their initiatives intact and hidden from public view and scrutiny.

As described in Section III.D.10, the FBI needed to keep its skein of lies from unraveling. That is, exposure of one piece threatened to expose the entire enterprise. If Barboza came forward about his Deegan testimony, he would undermine the LCN prosecutions and expose the Top Echelon program and the wire. And so the FBI

protected him, supported him, intervened when he seemed poised to recant, even intervened when the State of California wished to punish him for Wilson's murder. Had Stephen Flemmi come forward, either about his role in the Deegan case, or his relationship with the FBI in general, all the secrets would have come spilling out, undermining his usefulness. And so the FBI protected him as well. By the time the plaintiffs were filing commutation petitions, the FBI was in so deep there was no way to right the wrong without exposing themselves and the secret initiatives they had worked so hard to build at risk. Barboza and Flemmi, likewise, were obedient partners in the FBI's programs. They continued to commit crimes, for sure, but they refrained from exposing the FBI's secrets.

### D. *Intentional Infliction of Emotional Distress*

Limone, Greco, Tameleo and Salvati raise claims of intentional infliction of emotional distress ("IIED") by FBI agents who were involved in the events leading up to their convictions and who participated in efforts to prolong their imprisonment by silencing Barboza and meddling in their commutation petitions. Likewise, the family members of all four men claim that those agents committed IIED against them as bystanders. I find that the plaintiffs have proven the elements of all of their IIED claims, both bystander and direct.

#### 1. *Deegan Defendants' Claims*

■■■ To make out a claim of IIED, plaintiffs must show

---

187. The plaintiffs characterize the conspiracy as a conspiracy "to procure the testimony of Joseph Barboza in the Deegan murder case knowing that Barboza would not truthfully

relate the details of the Deegan murder to Suffolk County investigators," Tr. vol. 22, 36–37, or as a conspiracy to provide continued high quality LCN information to the FBI.

(1)that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.

*Tetrault v. Mahoney, Hawkes & Goldings,* 425 Mass. 456, 681 N.E.2d 1189, 1197 (1997) (quoting *Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171, 180 (1982)).

Plaintiffs have met these standards. Framing innocent men for a capital crime, prolonging their suffering for decades while they made futile attempt after attempt to win their freedom, thwarted at every turn—these are acts beyond all bounds of decency. Perverting the system of justice they had sworn to uphold—that has no place in a civilized community. The plaintiffs—who knew themselves to be innocent—were wrongfully convicted. Three were told that they were to be executed, another that he would live the rest of his natural born life behind bars.[188] There is no way to describe that kind of horror than as so severe and of such a nature that no reasonable person could be expected to endure it. The FBI's conduct was intentional, it was outrageous, it caused plaintiffs immeasurable and unbearable pain, and the FBI must be held accountable.

The government makes no argument on the elements of IIED. Rather, they argue that plaintiffs' IIED claims fail as a matter of law because the IIED claims "arise out of" the same conduct as the malicious prosecution claims, which the government argues are barred under 28 U.S.C. § 2680(h). This argument is erroneous on all fronts. First, I have found the government liable for malicious prosecution. *See supra* Section IV.B.

Second, even had the malicious prosecution claims failed, that would not bar the IIED claims. The government's reliance on *Metz v. United States,* 788 F.2d 1528 (11th Cir.1986), is misplaced. *Metz* held that "a cause of action which is distinct from one of those excepted under § 2860(h) will nevertheless be deemed to 'arise out of' an excepted cause of action when the underlying governmental conduct which constitutes an excepted cause of action is *essential* to the plaintiff's claim." 788 F.2d at 1534 (emphasis in original). The Eleventh Circuit reasoned that because the plaintiff's only injury in that case was his false arrest, and false arrest was barred as a cause of action under § 2680(h), his IIED claim was barred as well. *See Metz,* 788 F.2d at 1535. The government argues that I must conclude the same here. But *Metz* is not the law of the First Circuit, which has in fact taken the opposite position.

In *Santiago–Ramirez v. Secretary of the Department of Defense,* 984 F.2d 16, 20 (1st Cir.1993), the First Circuit held that, although the plaintiff's false imprisonment/arrest claims were barred by § 2860(h), her complaint could still be read to plead intentional or negligent infliction of emotional distress. The Circuit reasoned that "although appellant's claim for intentional infliction of emotional distress

---

188. Section V, Damages, describes the myriad of other emotional harms inflicted on the plaintiffs by virtue of their wrongful imprisonment—their loss of years with their spouses, the loss of watching their children grow, the heartbreak of watching the effects of suffering on their families.

may overlap with a claim for false imprisonment, which is excepted, it does not follow that the first claim is also excepted." *Id.* at 21 (citing *Block v. Neal,* 460 U.S. 289, 298, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983) ("the partial overlap between … two tort actions does not support the conclusion that if one is excepted under the Tort Claims Act the other must be as well")). The First Circuit grounded its reasoning in the Supreme Court's admonition that the exemptions in the FTCA be strictly construed. *See Rayonier, Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

The First Circuit in *Santiago–Ramirez,* not the Eleventh Circuit in *Metz,* controls my reading of § 2680(h). Accordingly, I find that the overlap between plaintiffs' malicious prosecution claims and their IIED claims is not fatal to their case.

### 2. *Family Members' Claims*

■ Under certain circumstances, tortfeasors may be liable not only for the emotional distress they intentionally inflict directly on the immediate targets of their outrageous conduct, but also for the resulting emotional distress of bystanders. "[E]very injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit legal consequences of wrongs to a controllable degree." *Migliori v. Airborne Freight Corp.,* 426 Mass. 629, 690 N.E.2d 413, 414 (1998) (quoting *Tobin v. Grossman,* 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419, 424 (1969)). To curb the ever expanding circle of liability, the Massachusetts SJC has placed restrictions on which bystanders may claim intentional infliction of emotional distress. Bystander plaintiffs must show that they had "both (a) substantially contemporaneous knowledge of the outrageous conduct and (b) a severe

emotional response." *Anthony H. v. John G.,* 415 Mass. 196, 612 N.E.2d 663, 665 (1993). Defendant argues that the family members have failed to show the first element. I find otherwise.

#### a. *Substantially Contemporaneous Knowledge*

The central question is *what* the family members needed to contemporaneously know. As I wrote previously, "[w]as it enough to suffer distress because of the *conviction itself,* or did [plaintiffs] need to know it was a *wrongful* conviction (because [they] in fact knew [their fathers and husbands] to be innocent), or a *wrongful conviction for which the FBI was the likely culprit,* or did [they] need to know that it was a *wrongful conviction actually caused by FBI misconduct?"* *Limone II,* 336 F.Supp.2d at 44–45.

I previously held, and continue to hold, that the law does not require that the family members had contemporaneous knowledge of the FBI's misconduct. *See Limone II,* 336 F.Supp.2d 18. Massachusetts case law, including those cases cited by defendant, do not support such a high burden.[189] *See Nancy P. v. D'Amato,* 401 Mass. 516, 517 N.E.2d 824 (1988); *Zachary v. Centrus Premier Home Care, Inc.,* 10 Mass. L. Rep. 738, 1999 WL 1295110 (Mass.Super.Oct.15, 1999); *Heinrich ex rel. Heinrich v. Sweet,* 49 F.Supp.2d 27 (D.Mass.1999). In those cases, courts concentrated on whether bystanders had contemporaneous knowledge only of the harm suffered by the target of the defendants's outrageous conduct. They dismissed bystander IIED claims only where plaintiffs did not learn of the harm to the outrageous conduct's target until a substantial time after it occurred

---

**189.** Defendant cites no case on this point in its final brief.

I find that the family member plaintiffs had substantially contemporaneous knowledge of the harm caused to the targets of the defendant's outrageous conduct: the wrongful convictions of the Deegan defendants.[190]

Even if plaintiffs had not shown that they had the required knowledge—which they have done many times over [191]—I find that the substantially contemporaneous knowledge requirement is waived by the defendant's misconduct. "The courts' goal of limiting fraudulent claims and an expansive plaintiff class does not comport with denying rightful claims for outrageous behavior that was concealed intentionally from the plaintiff." *Limone II,* 336 F.Supp.2d at 45 n. 39. *See also Nancy P.,* 517 N.E.2d at 828 (where the defendant, as part of the conduct at issue, acted to keep the conduct secret from the plaintiff "we lay little stress on the absence of substantially contemporaneous knowledge in deciding this issue."); *Quinn v. Walsh,* 49 Mass.App.Ct. 696, 732 N.E.2d 330, 333 (2000) (arguing, in dicta, that situations where "the circumstances are such that the resulting damage is 'inherently unknowable'" are excepted from the contemporaneous knowledge requirement). The SJC, in creating the contemporaneous knowledge requirement, never intended it to encourage and benefit the concealment of wrongdoing, *See Nancy P.,* 517 N.E.2d

at 828, and I will not pervert it so that defendant may continue to profit from its coverup here.

### b. *Severe Emotional Response*

As with the Deegan defendants themselves, there is no question but that the emotional distress suffered by their family members was severe and of a nature "that no reasonable [person] could be expected to endure it." *Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315, 319 (1976). To be told that a husband or father will be executed or imprisoned for the rest of his—and your—life; to listen while the date of his death is set; to have him publicly branded a murderer when you know that he is not—the feelings of this are beyond imagining. It is to defendant's credit that it does not attempt to argue that such distress was insufficiently severe.

In summary, I find that the defendant is liable to the Deegan defendants and their family members for intentional infliction of emotional distress.

### E. *Negligence*

Even had plaintiffs failed to prove their claim of malicious prosecution, the defendant would still be liable for negligence in failing to intervene to prevent Barboza's perjury at the Deegan murder trial, failing

190. In *Limone II,* I made a separate ruling on an independent issue based on plaintiffs' knowledge. There, I held that the statute of limitations for claims based on the FBI's conduct during the Deegan trial was tolled because plaintiffs could not have known of that conduct until years later. *Limone II,* 336 F.Supp.2d at 46. As I wrote in that decision, "Greco's argument that he knew enough to maintain his emotional distress claim and did not know enough to bring suit" are not mutually exclusive. *Id.*

The statute of limitations was tolled because defendant's coverup prevented plaintiffs from

discovering the necessary facts to make out claims that could have survived in court. But that does not mean that the family members were not fully aware that something unjust was happening to their husbands and fathers. Emotions do not wait on the same burdens of proof as courts of law. Plaintiffs knew enough to suffer the mens' wrongful convictions, but not enough to compel a court to act—which is exactly where the defendant knew they would be and made sure to keep them.

191. Discussed more fully in Part V.

230

to adequately supervise front-line FBI agents, and continuing to sit on the truth for years after.

### 1. *The Government Was Directly Negligent*

In order to prove negligence under Massachusetts law, plaintiffs must show (1) that defendant owed them a duty of care; (2) that defendant breached that duty; (3) that plaintiffs suffered damage; and (4) that defendant's breach was the proximate cause of plaintiffs' damage. *See Bennett v. Eagle Brook Country Store*, 408 Mass. 355, 557 N.E.2d 1166, 1168 (1990). Defendant contests the first element, arguing, as has been its theme throughout this case, that the FBI had no duty to intervene in a state prosecution. The facts are otherwise.

### a. *The Government Owed a Duty of Care to Plaintiffs*

■ Though Barboza was not an agent or employee per se of the FBI, their actions and relationship with him as a cooperating witness created a duty on their part to take affirmative steps to prevent his perjury. The Restatement (Second) of Torts § 321(1) (1965) provides that "if the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." Section 321(1) was adopted by the Massachusetts Supreme Judicial Court in substance in *Commonwealth v. Levesque*, 436 Mass. 443, 766 N.E.2d 50, 56–57 (2002).

> It is true that, in general, one does not have a duty to take affirmative action, however, a duty to prevent harm to others arises when one creates a dangerous situation, whether that situation was created intentionally or negligently.

*Id.* (citing *State ex rel. Kuntz v. Montana Thirteenth Judicial Dist. Court*, 298 Mont. 146, 995 P.2d 951, 957 (2000)) (A person may be criminally liable when he "places another in a position of danger, and then fails to safeguard or rescue that person"). In *Onofrio v. Department of Mental Health*, the SJC likewise held that where one's actions create a life-threatening risk to another, there is a duty to take reasonable steps to alleviate the risk. 408 Mass. 605, 562 N.E.2d 1341, 1344–45 (1990) (defendants who placed client into plaintiff's rooming house and failed to warn plaintiff of client's mental health history were liable when client set fire to plaintiff's rooming house).

■ Striking even closer to the heart of this case, Judge Lindsay recently held that § 321(1) and *Levesque* could apply to FBI agent John Connolly Jr.'s handler/informant relationship with James ("Whitey") Bulger and Stephen Flemmi. *Estate of Davis v. United States*, 340 F.Supp.2d 79, 90 (D.Mass.2004). In denying the government's motion to dismiss in that case, Judge Lindsay held that if Connolly contributed, with the FBI's knowledge, to Flemmi's and Bulger's intentions or ability to commit a murder, then the government had a duty to intervene to prevent the murder. *Id.* at 90–91.

### b. *Breach*

■ Here, Rico and Condon set in motion Barboza's testimony in the Deegan murder trial. They used machinations and offers of compensation to turn him into a cooperating witness and to push him to testify in the Deegan murder trial. *See supra* Sections III.B.3, III.B.4. By the time they introduced him to state prosecutors in June 1967, they knew that they had on their hands a star witness whose testimony would carry great weight in prosecutors' decisions, *and who was likely to com-*

*mit perjury.* *See supra* Section III. B.4.a.1. What is more, they knew that he was likely to commit perjury *in the Deegan case.* *See supra* Section III.B.4.b.1.e. They then sat by and watched the perjury duly occur, just as they knew it would.

I emphasize that this is not liability based merely on failure to act; it is affirmative action exacerbated by later inaction. This is not "the situation of a mere passerby who observes a fire and fails to alert authorities; the defendant started the fire and then increased the risk of harm from that fire by allowing it to burn without taking adequate steps either to control it or to report it to the proper authorities." *Levesque,* 436 Mass. at 457, 766 N.E.2d 50. I reject defendant's argument that, having labored so intensively to bring together spark and kindling, it had no duty to intervene in the resulting fire. Indeed, this fire, if the metaphor can be so extended, was to burn for many years. Each time an imprisoned man petitioned for commutation, the FBI did not merely fail to go to the authorities with what they knew—the state authorities *came to them,* and they actively renewed their commitment to keeping the fire burning. *See supra* Section III.D.9.

I emphasize again that the government's course of conduct in this case cannot be understood by atomizing it into separate instances of failure to disclose. The FBI's select withholding of vital, relevant, and exculpatory evidence was not a separate act from putting Barboza forward as a witness; it was *the means* by which the government put him forward and supported him.

Nor do I mean to imply that law enforcement agents are negligent every time they develop a cooperating witness who later commits perjury. The FBI exposed the Deegan defendants to far more than the ever-present risk that a witness will lie. Rico and Condon did just the opposite of what a reasonable person would do: They knew that Barboza planned to perjure himself, both because he had communicated it to them in their interviews, because they had independent evidence contradicting his planned testimony, and because they helped perfect his testimony. It was with reckless disregard for the safety of the men he planned to testify against that they turned him over anyway. *That* is why they are liable.[192]

### c. *Damage and Proximate Cause*

 As to the other elements of negligence, it is undisputed that, at the minimum, defendant did not intervene to prevent Barboza's perjury. Insofar as it had a duty to do so, it breached it, in fulfillment of the second element. (Indeed, elsewhere I find that the defendant was proactive in securing that perjurous testimony.)

---

**192.** It is also important to distinguish the First Circuit's rejection in *Bolduc* of a claim based on the negligent failure to disclose exculpatory evidence. *See supra* Section IV. B.4. First, that decision was based on Wisconsin law, not Massachusetts law. Second, and more to the point, the First Circuit in *Bolduc* was referring to the negligent failure of a private person to realize that they were holding exculpatory evidence at all, which is exactly the opposite of what the FBI did in this case. Specifically, the First Circuit cited *Bromund v. Holt,* 24 Wis.2d 336, 129 N.W.2d 149, 153 (1964), in which a private doctor negligently performed an autopsy, *failing to notice* what should have been exculpatory physical evidence. The doctor in *Bromund did not know* that he was withholding exculpatory evidence. In stark contrast, Rico and Condon were scrupulous in their gathering and analysis of information. Unlike the doctor in *Bromund,* they knew exactly what they had. Their negligence was of an entirely different sort: recklessly putting Barboza into position as a cooperating witness despite their knowledge.

Finally, as necessary under Massachusetts law, plaintiffs have shown that defendant's breach was the proximate cause of the harm they suffered. Proximate cause is that cause which, "in continuous sequence, unbroken by a new cause, produces an event, and without which the event would not have occurred." *Roberts v. Southwick*, 415 Mass. 465, 614 N.E.2d 659, 663 (1993). Had the FBI notified the proper authorities of Barboza's intent to commit perjury, handed over the evidence it possessed indicating plaintiffs' innocence of the Deegan murder, or withdrawn the deal it had offered to Barboza in exchange for his cooperation, Barboza's perjury either would not have occurred or would not have been credited.

The actions of the state prosecutor, the convicting jury, and the parole board do not break the chain of causation here, because those intervening events were foreseeable to the FBI supervisors as a result of their failure to act.

> Where . . . the original negligence of the defendant is followed by the independent act of third persons . . . the defendant's earlier negligence may be found to be the direct and proximate cause of [plaintiffs' injuries] if according to human experience and in the natural and ordinary course of events the defendant ought to have seen that the intervening act was likely to happen.

*Horan v. Watertown*, 217 Mass. 185, 104 N.E. 464 (1914). The FBI knew that Zalkind intended to use Barboza's testimony to prosecute plaintiffs; they knew that his testimony would carry a great deal of weight at trial. Defendant knew that its inaction would likely lead, "in the natural and ordinary course of events," to plaintiffs' injury, and that its intervention could prevent that injury. Its negligence was thus the proximate cause of plaintiffs' injuries, and it is liable for it.

### 2. *Negligent Supervision*

### a. *Discretionary Function Exception: Considerations Unique to Negligent Supervision*

 In addition to the FBI rules and regulations violated by agents in the course of committing malicious prosecution, subornation of perjury, IIED, and direct negligence, *See supra* Section IV. A.1, FBI supervisors broke additional rules and exceeded their discretion when they failed to control or discipline their employees as they were committing those torts. These violations provide additional reasons why supervisory negligence is not protected by the discretionary function exception, even though supervisory decisions are ordinarily considered to be at the heart of that exception. *See, e.g., K.W. Thompson Tool Co. v. United States*, 836 F.2d 721 (1st Cir.1988).

First, it is not within the discretion of government supervisors to stand by and allow their employees to commit crimes such as subornation of perjury. "Failure to act after notice of illegal action does not represent a choice based on plausible policy considerations." *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir.1995).

Second, it is inaccurate to characterize what happened here as an exercise of supervisory judgment at all. Rather, it was a total abdication of the supervisory role. Ordinarily, it is within the supervisor's discretion—barring the existence of specific mandates—to decide how and when to respond to employee misconduct. Supervisors may decide to apply a soft touch or even to overlook instances of misconduct in the interest of workplace harmony or efficient allocation of their scarce managerial attention. But to characterize FBI supervisors' behavior as that kind of supervisory judgment misses the point. In the face of blatant, ongoing, horrific misconduct that

crossed the line into illegality, they did not merely take insufficient or incompetent action; they did not take delayed or selective action; they did not overlook particular instances of misconduct; they simply walked away from their responsibilities altogether. No stretch of supervisory discretion allows the complete abandonment of the supervisory role.

Further, beginning in 1977, FBI rules mandated specific disciplinary actions by supervisors in the event of "criminal, dishonest, immoral, infamous or notoriously disgraceful conduct" by agents. As discussed below, FBI agents continued their misconduct in relation to plaintiffs' post-conviction proceedings well after 1977, and FBI supervisors, exceeding their limited discretion under this rule, did nothing.

### b. *FBI Supervisors Were Negligent in Their Supervision of Agents*

▮ In order to prove their claim of negligent supervision, plaintiffs must show (1) that the persons whose actions form the basis of the claim were agents and/or employees of the defendant employer; (2) that the agents and employees came into contact with members of the public in the course of their employer's business; (3) that the employer failed to use reasonable care in the selection, supervision and retention of the agents and employees; and (4) that the failure to use such reasonable care was the proximate cause of harm to the plaintiffs. *See Carson v. Canning,* 180 Mass. 461, 62 N.E. 964, 964 (1902); *Foster v. The Loft, Inc.,* 26 Mass.App.Ct. 289, 526 N.E.2d 1309, 1310 (1988). Plaintiffs have carried this burden.

▮ The first two elements are undisputed. Front-line FBI agents are of course employees of the FBI who regularly come into contact with members of the public as they do the FBI's business. The fourth element is likewise easily proven here. Any number of actions by FBI supervisors—reprimand or disciplinary actions, orders to change course, transfer or removal of agents from duty—could have prevented Rico and Condon from handing Barboza over to commit perjury or compelled them to disclose the critical information they possessed, preventing the harm that befell the plaintiffs. The meat of this claim is the third element—the failure by supervisors to use reasonable care in their supervision.

Complex as the FBI hierarchy and protocols may have been, the facts here are relatively simple. The supervisors were completely informed of their employees' impending misconduct before and during the Deegan trial, *see supra* Sections III. D.2, III.D.4, during post-trial efforts to keep Barboza quiet, *See supra* Sections III.D.3, III.D.5. Despite this information, they did absolutely nothing. Total inaction cannot be reasonable care in the face of certain misconduct. Once an employer knows or should know that an employee is committing torts against a third person, the employer has a duty to take *some* action such as investigation, discharge, or reassignment. *See Foster,* 526 N.E.2d at 1310.

As with the rest of the torts committed by defendant, its negligent supervision continued for decades. FBI supervisors preserved their perfect record of total inaction through the entire period of imprisonment, post-conviction proceedings, and attendant coverup by FBI agents. *See supra* Section III.D.3, 5, 7, 8, & 9. Even if the record did not conclusively establish that FBI supervisors beyond the Boston office were aware of every single action taken by agents to influence commutation petitions, a lack of actual knowledge further supports a finding of negligence. The supervisors knew of the agents' prior misconduct. *See supra* Section III.D, III. B.4.b.1; III.B.4.b.1; III.D.2. As law-en-

forcement officers, they certainly knew that commutation petitions would be an ordinary and foreseeable course for prisoners serving life sentences, especially those who vigorously and publicly challenged their convictions and maintained their innocence. They knew that it was typical for state parole authorities to request information from the FBI when considering petitions for commutation. *See supra* Section III.D.9; Exh. 178 at LIM007–1567–68, MRR Part II, Section 5. A reasonable supervisor would have come to the inevitable conclusion that his agents would have further opportunities to continue their misconduct, and that, given that opportunity, they would do so. Either FBI supervisors knew of their agents' misconduct with regard to the commutation petitions, or they remained willfully, recklessly ignorant of foreseeable events.

Further, FBI rules after 1963 required that, in addition to taking disciplinary steps on their own, Special Agents in Charge were required by FBI rules to "report immediately any improper conduct of employees in their territory." Exh. 178 at LIM007–1501, MRR Part I, Section 1.A.1. If the Boston SAC at any time failed to report the misconduct of front-line agents under his supervision to Washington, that would itself be an instance of negligent supervision by the SAC.

It is difficult to imagine a more complete breakdown in supervision. FBI higher-ups sat by and watched their employees break laws, violate rules, and ruin lives, interrupting only with the occasional burst of applause. They nurtured the situation in which criminal agents were free to do as they pleased.

## V. DAMAGES

The surviving plaintiffs, Limone and Salvati, and the estates of the deceased plaintiffs, Greco and Tameleo, seek damages for their imprisonment. Their families seek damages for loss of consortium, and intentional infliction of emotional distress.[193]

The FTCA allows a successful plaintiff to collect compensatory damages as would be allowed against a private defendant under the applicable state law.[194] In the usual tort case, damages are left to the considered judgment of a jury, the representatives of the community. The jury arrives at a figure; it does not have to explain its basis. With few exceptions, the jury's decision is entitled to considerable deference.

Under the FTCA, I am the decisionmaker. And a judge, unlike a jury, must not only determine the appropriate figure, I must explain it.

There is no scientific formula or measuring device for awarding damages for the incommensurable—loss of liberty, loss of consortium, emotional distress. *See Muniz v. Rovira*, 373 F.3d 1, 8 (1st Cir.2004). The case law suggests that the amount awarded must be the product of "a process of rational appraisal" and based upon "the evidence adduced at trial." *Ruiz v. Gonzalez Caraballo*, 929 F.2d 31, 35 (1st Cir. 1991). Candidly, the task is a staggering one.

The government made no argument as to damages; the plaintiffs provided detailed fact findings and benchmarks of damages in ostensibly comparable cases.

---

**193.** The family member plaintiffs did not originally bring identical claims, however, conforming the pleadings to the evidence, I treat them uniformly. *See supra* note 19.

**194.** There is one exception: The United States may not be held liable for punitive damages or pre- or post-judgment interest. *See* 28 U.S.C. § 2764; *Richards v. United States*, 369 U.S. 1, 14, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

I begin with a description of the facts on which these awards are based,[195] the framework for evaluating damages, and then the award.

## A. Facts

### 1. Limone Plaintiffs

#### a. Peter Limone Sr.

Limone felt "scared to death" when his sentence was handed down, as any man would when told he was scheduled to be executed. For five years he lived under the threat of the death penalty, until it was abolished by the Supreme Judicial Court.[196]

On one level, prison is a place—a physical space often sparse, barely maintained, squalid. Death row conditions were even more severe than those of the general population. Each cell contained only a toilet, sink, steel slab for a mattress, and a small table. *See* Exh. 308RRR; Exh. 308SSS. Inmates had to remain in those cells twenty-three and a half hours a day; they left only for thirty minutes to shower, mop their cell, or exercise in twenty by ten foot pens referred to as "dog kennels." *See* Tr. vol. 15, 183. On the floor above death row was the segregation block; the prisoners housed there would often protest by flooding their toilets and sinks, which would flood the cells below. Limone remembers the screams of prisoners being beaten by the guards. He did not leave death row until November 1971.[197]

On another level, prison is also a way of living—apart from your loved ones, apart from your former existence as a productive member of your community. At first, Limone's children were not able to visit him often because he did not want to expose them to a place like death row. After he was moved to general population, the children came more frequently. But all their visits were framed by sadness. Prisoners were strip searched afterwards, compounding Limone's distress over his family's departure with humiliation.

During his thirty-three years behind bars, Limone missed almost every important event in his family's lives-birthdays, first communions, confirmations, graduations, weddings, funerals, births. But in the face of the considerable obstacles posed by incarceration, the Limone family maintained some sense of togetherness. Olympia had her daughters wear their communion dresses to visit their father in prison to approximate the experience. She would give Limone clippings from local newspapers about his sons' sporting events so he could talk knowledgeably about them.

Limone tried to keep himself productive during his many years in prison. He was a clerk to the prison priest. He learned woodworking, beginning with dollhouses and eventually making custom furniture. And he was a model prisoner. On March 6, 1974, Limone disarmed an inmate who had shot two guards, ending a dangerous standoff. He was commended by several corrections officers and the governor. *See* Exh. 313D; Exh. 313H; Exh. 313I; Exh. 313J; Exh. 313K. From 1977–1979 he worked with geriatric patients at Medfield State Hospital. After he was transferred, the hospital staff pleaded for his return,

---

**195.** My findings are primarily drawn from the testimony of the surviving plaintiffs and their families. *See* Tr. vol. 11–Tr. vol. 17; Exh. 312 (video deposition of Saverio Tameleo).

**196.** *Limone v. Massachusetts,* 408 U.S. 936, 92 S.Ct. 2846, .

**197.** In November 1971, Limone was transferred to general population at Walpole after another inmate won a lawsuit limiting stays on death row to the period immediately proceeding executions.

but all requests were denied. *See* Exh. 314G; Exh. 314H; Exh. 314I; Exh. 314J; Exh. 314K. In 1986, Limone was put in charge of the vending machines at Boston Pre–Release, where he had been housed since 1980.

Until early 1988,[198] the pain of prison was mitigated to a limited degree by the Massachusetts furlough program, a program which enabled "lifers" to be released for a time. Limone completed over 170 furloughs before the program was cancelled.

Coinciding with the end of the furlough program, and despite his exemplary record, Limone was transferred to a high security facility. A new and punitive policy was implemented requiring that all inmates serving life sentences must be incarcerated at such facilities. Limone remained in high security facilities until he was finally released in 2001, after serving 33 years.

### b. *The Family*

Peter and Olympia Limone were married on October 27, 1957. Together they had four children—Peter Jr., Paul, Carolyn, and Janine. Limone was overjoyed when his children were born; family was at the center of their lives. The Limones had breakfast together every morning and dinner together every night. On the weekends Limone would watch the children, play with them in the yard, and take them swimming. Birthdays were always a major celebration. Limone would bring home large, fancy birthday cakes and invite over all their extended family and friends.

When Peter Jr. was young, he was hospitalized for several weeks due to kidney problems. His father visited him twice a day without fail, and carried him everywhere he needed to go throughout his recovery.

In addition to spending countless hours playing with and caring for their children, the Limones also spent time alone as a couple. They would go out on dates to dinner or to the Shubert Theater. They had an active sex life.

On the Limones' tenth wedding anniversary, on October 27, 1967, everything changed. Olympia Limone waited for her husband. They were scheduled to attend a parents' meeting together at their sons' school. He never returned. Later, Limone's brother told her he had been arrested.

Peter Limone and the other Deegan defendants were housed at Charles Street Jail awaiting the outcome of their trial. Olympia visited twice a week but aside from those visits rarely left the house. She stopped being a Cub Scout den mother and stopped going to church. She cried night and day, imagining what life would be like without her husband. The children asked repeatedly why their father could not come home; Olympia had no answer. The boys were tormented at school by children calling their father a murderer.

When Olympia left for court on the morning the verdict was to be announced, she told her son Peter Jr. that his father would be coming home at the end of the day. When the death sentence was announced, Olympia fainted. Limone heard a scream and knew it was his wife. After she came to, Olympia was so distraught that she needed help walking.

The children were eight, six, four, and one when their father was convicted.

---

**198.** Despite its initial success, the prisoner furlough program was discontinued by the Massachusetts Legislature in April 1988.

When Limone was finally released, they were forty-one, forty, thirty-seven and thirty-four with children of their own.

Olympia told her children about their father's situation at different times, given their different ages. She told Peter Jr., her oldest, first, before he went with her to visit Limone at Charles Street Jail during the trial. She told Paul just before the first time he went to visit his father at Walpole. Carolyn thought that her father was in the hospital until she was old enough to read the signs on the front of the prison. And Janine, the youngest, found out from a boy down the street who called her father a murderer. But she did not know that he had been sentenced to death until she researched her father's case in junior high school.

Olympia began visiting Limone on death row twice a week. At first, the children did not visit their father often. Death row was too frightening an experience. Later, Limone was able to arrange for the children to visit in a room in the general population area. The children would visit on school vacations, near the holidays, and over the summer. Prison played an integral part in their childhoods. They remember seeing their father degraded by the guards, having to sit across from him, seeing how thin he was becoming, and being frightened of the metal detector. But these were the moments when the Limone children could have "normal" parent-child conversations; the boys talked about their sports games, Carolyn about her piano playing and dancing.

Some of Peter Jr., Paul, Carolyn, and Janine's favorite memories derive from their father's furloughs. The family tried as best they could to schedule the furloughs for holidays or other family events; Carolyn and Janine took turns having their father come home for their birthdays.

Losing the furloughs suddenly in 1988 was a shock to the family.

Each of the Limone children was dramatically affected in different ways by their father's incarceration. Peter Jr. was plagued by nightmares of his father's electrocution. After the death sentence was lifted, he continued to worry about his father's safety in prison. Peter Jr. longed for one-on-one time with his father; he was not able to have those visits until he got his driver's license—over seven years after his father was incarcerated. Peter Jr. and Paul missed having their father at their hockey games, and Paul at his basketball and baseball games. What Carolyn remembers most is feeling alone at the holidays—the only child without her father.

All of the children were taunted by the other kids in the neighborhood and at school. It was worse each time Limone filed a commutation petition or an appeal and the story was in the papers. For Paul, these incidents often developed into physical fights. For Janine, they shaped her sense of self worth; she felt as if she had to overcome being labeled the daughter of a murderer. And that label continued to affect her into her adult life, in relationships with college professors and with a former fiancé.

Each time Limone filed a commutation petition, the family's hopes would be raised. Each time one was denied, they would be dashed. When Tameleo and Greco died in prison, the family worried that their father would suffer the same fate.

### 2. *Salvati Plaintiffs*

#### a. *Joseph Salvati*

When Salvati was arrested for the murder of Teddy Deegan in October 1967, he asked the officers "Who the heck is Teddy

Deegan?" Tr. vol. 16, 71. For weeks after the arrest, Salvati had no lawyer until his friends ran a raffle to raise money for his defense. According to Salvati, he did not even know exactly what he was accused of doing until he heard Barboza's testimony. He was thirty-four when he entered prison, and sixty-four when he was released.

On the day of the verdict, he was numb. He did not understand what the Judge said when he imposed a life sentence without parole. He was then shackled and driven to Walpole State Prison with the other defendants. He spent the first night just sitting there, "thinking of my children and my wife and what am I going to tell [them]." Tr. vol. 16, 90. Even though no one was executed during Salvati's stay at Walpole, when the electric chair was tested the lights in the facility would dim, no one would speak.

Salvati kept busy in prison by becoming a clerk for the prison's Catholic Chaplain. He also helped form a Christian Action Group; he started a choir, suggested that the priest say mass at a time when more prisoners could attend, and encouraged the priest to bring younger clergy to work at the prison. He worked in a print shop, as a cadre cook, and operated a commissary.

Salvati received visits from his family approximately once a week; he saw his children grow in weekly installments. But that could hardly substitute for the daily joys of parenting. Salvati felt he missed out on his children's childhoods, not to mention the critical events of the rest of his family. His father died while he was in prison and his mother developed Alzheimer's Disease. He was finally freed in 1997, after serving twenty-nine years.

### b. *The Family*

Marie Salvati described the impact of Salvati's imprisonment on their family: Salvati did the time on the inside, she and the children on the outside.

Joseph and Marie Salvati met in their late teens and married three years later on August 23, 1953. Together they had four children: Maria, Sharon, Gail, and Anthony. According to Marie, Salvati was a devoted husband and father. Salvati and Marie had a close, intimate relationship as husband and wife. Most of their time was spent with their children, but they managed to find time alone when they could.

Salvati provided for the family both financially and emotionally. The family had dinner together nightly. Salvati was also very involved in his children's education, seeing the kids off to school in the mornings, making sure they did their homework, and attending PTA meetings. On Sundays the extended Salvati family would get together at Salvati's parents' house. Each of the Salvati children—now with children of their own—testified to a close and loving relationship with their father. Anthony, only five when his father was taken away, does not remember much of the pre-incarceration years.

On October 25, 1967, their lives were torn apart. Marie heard from someone on the street that Salvati had been arrested. Gail, nine when her father was arrested, was told that her father worked in jail which was why he was not home—but even she knew that something was wrong. Taunted and teased by the other children in the neighborhood, Gail learned that her father had been convicted of murder.

Over the next twenty-nine years, the family regularly visited Salvati in prison. The prison trips were an ordeal for Marie and her kids; prison was a terrifying place for adults, let alone children, who were frisked and patted down by the guards each time. Maria remembers that the first time she went to visit her father in

jail—she was so scared that she vomited and cried. Once she was a parent herself, the prison guards made her open her daughter's diaper before she could take her in to visit. Degradation and humiliation were a regular part of the experience. And each time Salvati was transferred to a different prison, the family would have to learn a new routine.

The furlough program was a blessing to the family; Salvati completed over 150 furloughs over the duration of the program. When the furlough program was cancelled for inmates serving life terms, the family had to readjust suddenly to a relationship with Salvati that could only take place within the prison walls.

Salvati and Marie kept their relationship going through cards and letters. Marie poignantly described her life as existing in a shoebox. Three generations of Salvati children visited Salvati in jail; all the while he missed milestone after milestone—weddings, births, christenings, graduations.[199] The children were thirteen, eleven, nine and five when he entered prison; forty-two, forty, thirty-nine and thirty-five when he was released. Through it all, the Salvatis maintained their belief in his innocence.

### 3. *Tameleo Plaintiffs*

#### a. *Henry Tameleo*

Henry Tameleo's age and poor health made prison—particularly death row—all the more difficult for him. (He was sixty-six years old when he was imprisoned). On May 6, 1970, the prison board determined that he was suitable to be transferred out of Walpole due to his ailing health. "The atmosphere in Walpole is causing him much physical pain and discomfort. The subject cannot undergo an-

other gas barrage." Exh. 197. But he was not transferred. On September 9, 1973, a senior physician at Walpole pled his case, explaining that he needed to be transferred because of his health. Dr. Pastorelli wrote that the rioting and tumultuous conditions at Walpole, while difficult for all defendants, was "serious and deleterious" for Tameleo, wreaking "havoc" on his health. *See* Exh. 198. He was a "sick, lonely old man" who was "depressed and discouraged," but remained a model inmate. *Id.* Eventually he was transferred.

By 1979, Tameleo's wife died. Tameleo's own health continued to worsen. He had three heart attacks, a prostatectomy, was treated for a chronic vascular problem, and suffered other medical problems such as cardiac abnormalities, diverticulosis, diabetes, and bells palsy. *See* Exh. 199; Exh. 197; Exh. 200. On February 22, 1985, Dr. Baker concluded

His constellation of disease processes and his constellation of symptomatology referrible [sic.] to those underlying disease processes, represent a life threatening situation. In my medical opinion, the institutional setting in which Mr. Tameleo exists is insufficient for proper monitoring and care of an individual with such severe life threatening underlying disease processes.

Exh. 199. The doctor predicted that Tameleo had two to three years left, and recommended that he be released from prison so that he could be properly cared for. He was never released. He died six months later, on August 18, 1985. His son Saverio, then 65, was by his side.

#### b. *The Family*

Henry and Giovannina ("Jeannete") Tameleo were married on October 21, 1919.

---

**199.** Eight grandchildren and one great-grandchild were born into the Salvati family while Salvati was in prison.

240

*See* Exh. 326A. In October 1967, Tameleo was indicted and arrested. Tameleo told his wife and his adult son Saverio that he was innocent, and they believed him. In addition to the obvious emotional consequences, this ordeal had serious financial consequences for Saverio. He sold his house and used most of his life savings to pay for his father's legal costs.

The toll the conviction and incarceration took on Jeannette was visible to Saverio, and grew each day. As her health deteriorated, it became impossible for her to visit Henry in prison. In 1973 she underwent open heart surgery, and two years later she had another surgery for a blood clot. She died on May 22, 1979 of respiratory failure secondary to liver cancer. Her husband was unable to be there to take care of her, ease her pain, say goodbye.

### 4. *Greco and Werner Plaintiffs*

#### a. *Louis Greco Sr.*

Louis Greco surrendered to Agent Farrell of the Miami FBI on December 29, 1967. Greco was extradited to Massachusetts in February 1968. He spent twenty-eight years in prison, like Tameleo and Limone, the first six under a death sentence.[200] He was fifty when he began serving his sentence and seventy-eight when he died in prison.

A November 1971 prison psychiatric report describes Greco's mood as "that of a 'wronged' man, who had suffered much but wished to carry on despite adversity." Exh. 216A. Another described him as "very bitter, not at any of the personnel or inmates here, but at being here on the word of one man and at the authorities on the outside who he feels are responsible for his being here." Exh. 216B.

The prison conditions Greco endured were substantially similar to those described by Peter Limone. The two were housed together on death row at MCI Walpole, and then later at MCI Norfolk, albeit in different units.[201] Greco was transferred throughout the prison system many times—to Norfolk Pre–Release Center, MCI Shirley, MCI Lancaster, MCI Concord, MCI Bridgewater. He spent the last three years of his life being shuttled among Baystate Correction Center, MCI Shirley, Lemuel Shattuck Hospital, and outside hospitals in an effort to cope with his failing health. *See* Exh. 226B.

Greco tried to maintain his sense of self by tending flowers in the prison greenhouse, and rescuing and caring for an injured cat. When Greco became too ill to be able to work in the gardens that he had so dutifully tended, he taught younger inmates how to garden.

Greco's health deteriorated significantly in prison. He suffered from diabetes mellitus, artiosclerotic heart disease, hypertension, degenerative arthritis, as well as the leg injury he had sustained during World War II. In 1990 he had a total hip replacement, and in 1991 he underwent bowel surgery to remove a malignancy. Eventually, Greco was unable to walk, dress, or bathe himself without assistance. *See* Exh. 220G. During the last three months of his life, Joseph Salvati helped care for him, cleaning him up after he could no longer control his bowels. Greco had his right leg amputated below the knee due to gangrene in September 1995. *See* Exh. 220R.

200. His death sentence was vacated on May 20, 1975. *See* Exh. 218.

201. It appears that starting in 1977 the two were in different prisons. However, this Court is well aware of the conditions in the state prisons now and in the last several decades.

Greco's prison stay was undoubtedly made all the more difficult by the knowledge that his family had fallen apart, as described below, and that his children were abandoned and suffering. His anguish is evidenced by a letter he wrote to the Veteran's Administration, pleading for them to send his benefits check to his sister Marie so that his children could be cared for. He explained that Roberta, his then-wife, just took off "and left my boys like dogs in the street." Exh.2030.

Throughout his incarceration, Greco never stopped trying to prove his innocence. Michael Albano, a member of the Massachusetts Parole Board from 1982–1994, recalls that Greco would tell him on his visits to prison "that he was an innocent man and that he wanted to live one day as a free man, just one day." Tr. vol. 10, 36. He filed at least eight motions for a new trial, three appeals, two *pro se* motions for a new trial, and a writ of habeas corpus. Everything was denied. *See* Exh. 240. Greco also took two lie detector tests—one on July 1, 1978 that he submitted to the Parole Board, and another in 1984 as part of the short-lived television show Lie Detector. *See* Exh. 225A–1J; Exh. 245. Greco filed three commutation petitions. The Parole Board voted in favor of the first petition. It was denied by Governor Dukakis. The Parole Board voted in favor of the second petition. It was denied by Governor Weld. Greco filed his third petition in November 1995; a month or so later it was administratively closed due to his death. *See* Exh. 228B; Exh. 228C.

### b. *The Family*

### (1) *The Children*

By all indications, Edward ("Eddie") Greco, born May 15, 1957, and his brother Louis Jr., born January 25, 1955, had a happy, "normal" childhood. Eddie re-

members spending as much time with his father as he could—playing with him and their dog, helping him with the chickens on their chicken farm, reading, and watching TV. The boys played in a fort that their father built for them and visited their Aunt Marie's home with the entire family every Sunday. Greco would take them to the movies, baseball games, and on vacation. He also helped with the more routine fathering tasks—taking the boys to get their hair cut, to buy shoes, or to dental appointments. When Eddie started school, his father helped him with his homework. Eddie believed that he would someday go to college to become a pharmacist.

When Eddie was ten, Greco was indicted and taken away. Eddie's mother told him that his father was in Florida when the crime took place, that he was innocent, and that he would be coming home soon. When he learned that his father had been sentenced to death by electrocution, Eddie went into shock. He became suicidal—"I wanted to take a plastic bag and kill myself. It was just a shock. I didn't know what to do. You know, I was banging my head against walls. I was putting plastic bags around my head. I was beating myself with my fist, I did all kinds of stupid things." Tr. vol. 13, 36–37.

After the conviction, Eddie and Louis Jr.'s home life disintegrated. The family suffered financial hardship; their only source of income was Greco's veteran disability checks. Eventually they started to receive welfare. Their mother, Roberta, started to drink more and more heavily. According to Eddie, she stopped doing laundry or cooking food. Eddie took over the household duties and cared for his older brother, who was a troubled young man. Eddie ate other children's leftovers at school; any lunch money he had he would give to Louis Jr. Roberta turned to physical violence, taking out her pain and

frustrations on Eddie. "She would have rings on her fingers, and she would pound the hell out of me, and I would try to curl up in a ball to protect myself, and then she would start kicking me viciously." Tr. vol. 13, 41.

Louis Jr., already emotionally fragile, completely dissolved after his father was incarcerated. Eddie did the best he could to protect him, often getting into fights at school on his brother's behalf. Both of their grades dropped precipitously, Louis Jr.'s more so.

In 1970, Roberta abandoned Eddie and Louis Jr. She left and made no provisions for their care. The boys only discovered her departure when Eddie returned home one day and the house was empty. The boys went to live with their Aunt Marie and Uncle Sam, Louis Sr.'s sister and brother-in-law. The boys had to pay twenty-five dollars a week in rent, and his uncle resented their presence in his home. Eddie was thirteen years old, Louis Jr. fifteen. When Eddie was sixteen, Aunt Marie became critically ill with kidney disease. She died in 1974, and Uncle Sam threw both boys out of the house. Soon thereafter, Eddie was arrested on drug charges and went to prison himself. The brothers lost touch.

Louis Greco Sr. died in prison on December 30, 1995. His friend Vincent Maria made the funeral arrangements because Louis Jr. was too distraught. On December 27, 1997, Louis Jr. took his own life by ingesting sodium hydroxide. *See* Exh. 231. Eddie blamed himself, and went into another downward spiral, living on the streets for a time. He subsequently obtained a job as a handyman in New Orleans, but continued drug use led to another conviction and one year of incarceration in Louisiana in 2003. Eddie recently was diagnosed with cancer. He had surgery to remove one lung and he is currently single, without work, and is living in a nursing care facility in New Orleans. He never married or had children.

### (2) *The Marriage*

Roberta and Louis Greco were married in 1955. The marriage was a troubled one.

In the early 1960s, the Grecos moved to Florida and Greco opened a bar. After that job failed, he worked at a state hospital until he was terminated. Eventually, when Greco could not find work in Florida, he returned to Massachusetts while his family remained down south. The Grecos' marriage began to deteriorate. Roberta hired a lawyer and filed for divorce in January 1965. The divorce papers accused Louis Greco of extreme cruelty toward Roberta. *See* Exh.2023. Sometime after that, Louis attempted to strangle his wife with a telephone cord.

According to Roberta, the couple quickly made amends, and Louis moved back to Florida to live with his family in February 1965.[202] Roberta and Louis had a second marriage ceremony in the spring of 1965 in Florida. The family returned to Massachusetts that summer.

Roberta testified at the Deegan trial that Greco was with her at the time of the Deegan murder. She was vigorously cross-examined; evidence of their domestic disputes were introduced before the jury. Roberta blamed herself and the telephone cord incident for Louis's conviction. "I felt terrible. I felt so terrible that I had called the police because they made such an issue of that at the trial. I felt that I was to blame for his conviction." Tr. vol. 11, 50. Roberta testified that after

202. The government points out that Louis Greco filed his answer to Roberta's divorce complaint on March 12, 1965–casting doubt on how reconciled they really were.

Louis's conviction, she stopped spending time with her neighbors and with Louis's family.

Roberta testified that Greco thought she and the boys should move in with Marie, in the first year following the conviction. She refused. According to Roberta, Greco also urged her to divorce him but she again refused. In 1969 Greco requested that his veteran benefits be sent to Marie instead of Roberta. Roberta contacted the VA and had the checks rerouted back to her. Greco was infuriated. Roberta stopped visiting Greco that summer.

The next summer—1970—Roberta ran off to Las Vegas without ever warning her children. According to Eddie, she took off with the money he had saved from his paper route. On November 9, 1970, she filed for divorce. Less than a year later Roberta moved back to Massachusetts but had almost no contact with her sons for at least six years.

In 1976, Roberta married Jerome Werner. Roberta testified that she and Greco eventually reconciled and maintained a close friendship. She and her new husband even visited Greco in 1980 or 1981. Shortly thereafter, Roberta reconnected with her sons. For the next several years, Roberta sponsored Greco on his furloughs.

## B. *Law*

### 1. *Damages for the Deegan Defendants: Limone, Tameleo, Greco and Salvati*

Peter Limone, Henry Tameleo, and Edward Greco were originally sentenced to death by electrocution. Joseph Salvati was sentenced to life in prison. And though two were finally released in recent years, it is fair to say that all of them literally lost a lifetime. I find that their losses were proximately caused by the malicious prosecution, negligence, and conspiracies engaged in by the government.

Losses of this magnitude are almost impossible to catalogue. The loss of liberty. The loss of the enjoyment of their families. The loss of the ability to care for and nurture their children. The loss of intimacy and closeness with their spouses. Indeed, the task of quantifying these losses—which I am obliged to do—is among the most difficult this Court has ever had to undertake.

Where triers of fact must assign values to the intangible and invaluable, they may look to the values assigned by other factfinders in the past. I do not blindly follow other awards, but I do look to them for perspective and as an indication of how society has valued these harms. I note also that damage and suffering do not accrue smoothly and proportionally on a monthly or annual basis. Some injury occurs all in a rush at the start—the shock and horror of arrest and conviction—while other injury only begins to compound after a significant period of time has passed—the setting in of despair, or the withering of relationships. I consider the particular story of this case and these plaintiffs' suffering.

In recent years both juries and courts sitting without juries have found that wrongfully imprisoned plaintiffs were entitled to compensation of at least $1 million per year of imprisonment. *See, e.g., Ramirez v. Los Angeles County Sheriff's Office,* 2:04–cv–06102–GAF–FMO, 2006 WL 1428310 (C.D.Cal. Feb.16, 2006) ($18 million in compensatory damages for malicious prosecution that resulted in ten months' incarceration); *Mark Diaz Bravo v. Giblin,* 2002 WL 31547001, *24, 2002 Cal.App. Unpub. LEXIS 10494 at *74 (Cal. App. 2 Dist.2002) ("$3,537,000 to compensate [plaintiff] for 1,179 days of incarceration at the rate of $ 3,000 per day" or

$1,095,000 per year, in addition to $1 million for emotional damages suffered prior to sentencing); *Newsome v. McCabe,* 319 F.3d 301 (7th Cir.2003), cert. denied, 539 U.S. 943, 123 S.Ct. 2621, 156 L.Ed.2d 630 (2003) ($15 million in compensatory damages for malicious prosecution that resulted in 15 years' imprisonment, or $1 million per year); *Jones v. City of Chicago,* 1987 WL 19800, *1, 1987 U.S. Dist. LEXIS 10510 at *1 (N.D.Ill, Nov. 10, 1987) aff'd, 856 F.2d 985 (7th Cir.1988) ("$71,100 for false arrest; $71,100 for intentional infliction of emotional distress; $355,500 for false imprisonment; and $213,300 for malicious prosecution" resulting in one month's imprisonment, or $8,532,000 per year); *Pitt v. District of Columbia,* 404 F.Supp.2d 351 (D.D.C. Dec.23, 2005) ($100,000 in compensatory damages for malicious prosecution, and intentional infliction of emotional distress suffered from six days' imprisonment).[203]

One issue complicates calculating the damages for Tameleo and Limone: both men were serving federal sentences coterminously with their Deegan sentences.

Tameleo was sentenced to three terms of five years (to run concurrently) in *United States v. Patriarca,* imposed on March 25, 1968.[204] Limone was sentenced to 7 years for aiding and abetting violation of 18 U.S.C. 2314 and 18 U.S.C. 2. *See* Exh. 2334 (*U.S. v. Strauss,* 443 F.2d 986, 990–991 (1st Cir.1971) (affirming Limone's sentence)). The question is the impact, if any, of these sentences on their damage awards.[205]

The First Circuit addressed an analogous issue in *Olsen v. Correiro,* 189 F.3d 52 (1st Cir.1999). Olsen was convicted of first degree murder and sentenced to life without parole. Five years later, his conviction was overturned based on police misconduct. A new trial was ordered; Olsen entered a plea of nolo contendere to manslaughter, and was sentenced to time served on the original conviction, with the balance of a ten to fifteen year manslaughter sentence suspended. *See Olsen,* 189 F.3d at 55. When Olsen sued the city and officers under 42 U.S.C. § 1983, the City argued that the manslaughter sentence for "time served" barred incarceration-based

---

**203.** Wrongful death suits have also resulted in similarly large awards. In 2004 a jury awarded a woman $122 million dollars (reduced to $70 million on appeal) after she was paralyzed when the roof of her Ford Explorer collapsed when the vehicle rolled over, leaving her paralyzed from the waist down. *Buell–Wilson v. Ford Motor Co.,* 141 Cal. App.4th 525, 46 Cal.Rptr.3d 147 (Cal.Ct.App. 2006). As have cases involving great injury, but not death. In *Novak v. State of New Jersey et al.,* No. BUR–L–10003–03 2006, Jury Verdicts and Settlements (Mealey) 2424, (N.J.Super., Burlington Co. Dec. 19, 2006), the Plaintiff, Taylor Novak, was seriously injured from being aggressively shaken while in foster care. Novak suffered brain damage, and as a result was rendered blind, was unable to walk or speak, suffered periodic seizures, and suffered severe cognitive impairment. *Id.* He was awarded $21 million as a result. *Id.* Finally, in a case different from this one in claims and facts, but similar in theme and outrage, Abner

Louima received an $8.75 million settlement after being brutalized by police officers. *See Louima v. City of New York,* 2004 WL 2359943, 2004 U.S. Dist. LEXIS 13707 (E.D.N.Y., 2004) (Louima originally sought $50 million in compensatory damages for his own injuries and $5 million in loss of services to his wife).

**204.** *See* Exh. 2133 (Feb. 6, 1972 letter from Tameleo to the Department of Corrections, noting that his five year sentences had not been "activated" and requesting that be corrected).

**205.** I understand that—particularly at a time when sentences were indeterminate, and parole and good time were readily available—terms of five years and seven years did not necessarily equate with imprisonment for that period of time. Nevertheless, nothing in the record suggests what the actual term consisted of, as opposed to the formal sentence.

damages. The First Circuit agreed. *See Olsen* 189 F.3d at 55. The Court reasoned that both the limits of § 1983 [206] and the law of proximate cause (the valid plea was the cause of his sentence) barred Olsen's damages claim entirely. *See Olsen,* 189 F.3d at 67–68.

While it is true that had Tameleo and Limone not been serving time for the Deegan murder, they still would have been imprisoned at least for some period of time due to valid sentences on these other offenses—imprisonment not due to any FBI misconduct [207]—there are significant differences between the instant case and Olsen. The time Olsen wrongly served on his murder conviction was specifically attributed to his manslaughter conviction—which was a lesser included offense to murder. Moreover, by his plea, Olsen did not contest the term of years on the manslaughter, and the suspended sentence thereafter.

In the instant case, Tameleo's and Limone's sentences derived from unrelated convictions, not inextricably intertwined with the wrongful one. They have not only contested the validity of the Deegan sentence; their challenge has been accepted by the state courts. The wrongful conviction is responsible for the overwhelming majority of Tameleo's and Limone's terms of imprisonment, and the conditions under which they were served. Removing the unconstitutional sentences from their punishment dramatically changes the picture. While I can make an adjustment to the damages for these concurrent sentences, they should not significantly affect the to-

tals. Death row is death row; Tameleo and Limone served time there under far harsher conditions than they would have for unlawful gambling or interstate transport of stolen goods. Moreover, life imprisonment is life imprisonment—not a term of years. Tameleo and Limone were subject to all the restrictions that applied to "lifers." Despite being model prisoners, they were constantly returned to maximum security prisons. They lived every day of their sentences under the mental and emotional anguish of believing that their imprisonment would never end, that they would die without ever knowing freedom again.

Even with this adjustment, the instant case stands out from the field of malicious prosecution and wrongful imprisonment cases in the extremity of its suffering; few cases are directly comparable. In fact, this Court surmises that Greco and Tameleo's lives could have been significantly prolonged had they not been made to suffer their wrongful imprisonment. Nevertheless, I will accept the $1 million dollar per year award subject to the adjustments noted above. Accordingly, I award: $26 million for Peter Limone, $29 million for Joseph Salvati, $28 million for the estate of Louis Greco, and $13 million for the estate of Henry Tameleo.[208]

## 2. *Damages for Family Members*

### a. *Loss of Consortium*

Loss of consortium refers to both intangibles—companionship, love and society—and more measurable valuables—fi-

---

**206.** *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) imposed, a limit on the availability of 1983 actions by adopting a favorable termination requirement similar to that found in the malicious prosecution context.

**207.** To be sure, whatever sentences they received may well have been more harsh because of their conviction in the Deegan case.

**208.** This award serves to compensate Limone, Salvati, Greco, and Tameleo for their intentional infliction of emotional distress damages as well.

nancial support, household and childcare services. Massachusetts does not limit loss of consortium claims to predicate torts involving physical injury. *See Agis v. Howard Johnson Company,* 371 Mass. 140, 355 N.E.2d 315, 319–320 (1976) (holding that a loss of consortium claim can arise from a claim of intentional or reckless infliction of emotional distress). The Supreme Judicial Court in *Agis* reasoned that "the underlying purpose of such an action is to compensate for the loss of the companionship, affection and sexual enjoyment of one's spouse, and it is clear that these can be lost as a result of psychological or emotional injury as well as from actual physical harm." *Agis,* 355 N.E.2d at 320.

Further, Massachusetts recognizes loss of consortium both between spouses and between a parent and a dependent minor child. *See Limone II,* 336 F.Supp.2d at 49–50; *Agis,* 355 N.E.2d at 320; *Ferriter v. O'Connell's Sons, Inc.,* 381 Mass. 507, 413 N.E.2d 690, 696 (1980), superseded on other grounds as stated in *Lijoi v. Massachusetts Bay. Transp. Authority,* 28 Mass.App.Ct. 926, 548 N.E.2d 893 (1990). But because the child's claim "is based upon dependence on the injured parent for management of the child's needs and for emotional guidance and support" a plaintiff cannot recover for loss of consortium in a parent that occurred while the plaintiff was an independent adult. *See Barbosa v. Hopper Feeds, Inc.,* 404 Mass. 610, 537 N.E.2d 99, 104 (1989).

The spouses of the Deegan defendants are entitled to compensation by the government for the loss of their husbands' society, companionship, love and support which I find to have been proximately caused by the acts of the defendant which violate the FTCA. *See Norman v. Massachusetts Bay Transp. Auth.,* 403 Mass. 303, 529 N.E.2d 139, 140 (1988). This includes the loss of sexual relations. *See Diaz v. Eli Lilly & Co.,* 364 Mass. 153, 302 N.E.2d 555, 560 (1973). It also includes the value of household services that would have been performed by their husbands. *See, e.g., Wood v. Mobil Chem. Co.,* 50 Ill.App.3d 465, 8 Ill.Dec. 701, 365 N.E.2d 1087, 1097 (1977).

The children are entitled to compensation for loss of their fathers' society, affection, guidance and support, and impairment of the fathers' ability to manage their needs, all of which likewise was proximately caused by defendant's tortious conduct. *See Glicklich v. Spievack,* 16 Mass.App.Ct. 488, 452 N.E.2d 287, 292, *rev. den.,* 390 Mass. 1103, 454 N.E.2d 1276 (1983). "The loss of a parent's love, care, companionship, and guidance can severely impact a child's development and have a major influence on a child's welfare and personality throughout life." *Villareal v. Department of Transp.,* 160 Ariz. 474, 774 P.2d 213, 217 (1989).

In determining the value of the intangibles that make up loss of consortium, the Court must rely on its own discretion. The prior independent existence of marital discord or separation short of divorce are important considerations, since they qualify the nature of the society that has been lost. *See, e.g., Planned Parenthood of Northwest Ind., Inc. v. Vines,* 543 N.E.2d 654, 657–658 (Ind.Ct.App.1989). Compensation for intangible harm is separate and cumulative for each plaintiff who suffers a loss; even though they suffer the loss of the same person, each plaintiff's loss is their own.

### (1) *Spouses*

The loss to Olympia Limone, Marie Salvati, and Jeannette Tameleo could not have been more devastating. The marital relationships they described were loving,

supportive, and invaluable.[209] Their husbands are their partners—in intimate moments, in raising their children, in weathering life's hardships and experiencing its joys. The strength of those bonds is further evidenced by the extraordinary lengths Olympia and Marie went to in order to keep their families together, to ensure that their husbands remained a part of their lives to the greatest extent possible.

■ Roberta Werner's relationship with her ex-husband, however, was different in kind from the others. One of the factors I must consider in a loss of consortium claims is the quality of the relationship lost. To say that the Grecos had troubles would be an understatement. Roberta Werner conceded that Louis tried to kill her. Whereas Olympia Limone and Marie Salvati visited their husbands regularly for thirty odd years, Roberta Werner ceased her visits by the summer of 1969— a year after Louis Greco was convicted. She abandoned her sons, causing them and Greco much anguish. Moreover, by 1970 Louis and Roberta were no longer married. I find against Roberta Werner on her loss of consortium claim and therefore award her no damages on this score.

Most wrongful imprisonment cases in which damages are awarded for loss of consortium concern imprisonment for hours or days. In addition to the consortium lost due to the imprisonment itself, these awards often include loss of consortium due to the effect of the victim's emotional anguish on the marital relationship long after release. *See, e.g., Pitt v. District of Columbia,* 404 F.Supp.2d 351, 353 (D.D.C.2005), reviewed on other grounds, 491 F.3d 494 (D.C.Cir.) ($50,000 for loss of consortium to wife of plaintiff wrongfully imprisoned for six days); *Arch v. Schnur,*

No. 91–8091–CIV–Moreno (S.D.Fla. Oct. 20, 1992) ($200,000 to common-law wife of plaintiff under house-arrest for 6 months); *Forrest v. Northwest Airlines,* MICV1995–01524 (Mass. Sup.Ct. April 7, 2000) ($10,-000 to wife of plaintiff imprisoned for 3 hours); *Baeza v. Johnson,* No. 89–CI–16815 (73rd Dist. Ct., Bexar County, Tex. Feb. 18, 1991) ($34,000 to wife of plaintiff imprisoned for unspecified period of time); *Peaks v. Drug Emporium, Inc.,* No. E41490, 1996 WL 33100369 (Ga. Sup.Ct. June 14, 1996) ($7500 to husband of plaintiff imprisoned for 14 hours); *Sheets v. Reynolds,* No. 97CV–05450, 1999 WL 33228726 (Ga. Cty. Ct. Fulton Cty. March 1, 1999) ($5,000 to spouse for 8–10 hours' incarceration and 45 days' pending prosecution).

■ Larger loss of consortium awards are common for the wrongful death of a spouse, parent, or child. *See, e.g., Frazier et al. v. Honeywell International Inc.,* No. 05–cv–00548, 6–12 Prod. Liab. and Risk (Mealey) 6, (E.D.Tex. Feb. 15, 2007) (parents together awarded $24 million in mental anguish and loss of consortium (undifferentiated) after seat belt failure contributed to daughter's death in a car accident), reported in *Dominguez et al. v. City and County of San Francisco,* (Super.Ct. San Francisco County, 2005, No. 422963) (Calif. Super., San Francisco Co. Sept. 2, 2005) ($5.5 million to father and $15,033,546 to mother for mental anguish and loss of consortium (undifferentiated) after daughter killed in car accident); *Thompson, et al. v. Alza Corp., et al.,* No.2005–11685 (113th Dist.Ct., Harris County, Tex. July 7, 2006) ($772,500 to minor child for loss of consortium for death of mother due to defective medication).

---

**209.** In the case of Jeannette Tameleo the power of their relationship is inferred.

The loss in this case is greater than in the usual wrongful imprisonment case. Plaintiffs were not deprived of their husbands for hours or days. They lost a lifetime's companionship; Jeannette Tameleo never saw her husband as a free man again. Given all the above considerations I award: One Million And 00/100 ($1,000,000.) Dollars each to the spouses of Limone, Salvati and Tameleo for their loss of consortium.

### (2) *Children*

■ The Limone, Salvati, and Greco children were deprived of the love, care, nurture, guidance, society, affection, and companionship of their fathers. The Limone and Salvati children managed to maintain relationships with their fathers to a degree, but were robbed of the day to day nurturing of a parent. Eddie and Louis Greco Jr. were never able to recover from their loss. They never stopped loving their father, hoping he would come home to them. But that never happened, and their lives were destroyed by his absence.[210]

As no court has awarded damages to a child for loss of consortium based on the wrongful imprisonment of a parent, it is instructive to look at cases in which children were awarded damages for the wrongful death or injury of a parent. This case law is limited since, unlike Massachusetts, many states do not recognize a child's claim for the loss of a parent's consortium.

In cases in which damages were awarded for loss of parental consortium, courts have carefully considered the circumstances of each parent-child relationship. For example, in *Reeder v. Allport*, 218 S.W.3d 817, 822 (Tex.App.2007), the Court

of Appeals upheld a jury award of $125,000 for loss of consortium for the seventeen year old daughter of a man who was accidentally shot and killed, and $175,000 for loss of consortium for the man's ninth-grade son. In assessing the damages, the court considered "the severity of the injury to the parents and its actual effect upon the parent-child relationship ... the nature of the child's relationship with the parent, the child's emotional and physical characteristics, and whether other consortium-giving relationships are available to the child." *Reeder*, 218 S.W.3d at 819 (quoting *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex.1990)).

A similar assessment of damages was reached in *Marin v. U.S.*, 814 F.Supp. 1468 (E.D.Wash.1992), in which the court acknowledged that the parental loss suffered by the plaintiffs was greater than average. There, a woman was murdered by an indicted federal felon who was released from prison by the INS to serve as an informant. *See Marin*, 814 F.Supp. at 1476. The court awarded $200,000 to each of a decedent's three children (ages nine, eleven, and fourteen)—not including loss of the mother's future income. *Id.*

Significant damages have also been awarded to children in cases of a parents' serious injury. For example, in *Oberson v. U.S.*, 311 F.Supp.2d 917 (D.Mont.2004) the court awarded $600,000 to the daughter of a snowmobiler who was brain-damaged after being struck by another snowmobiler on a trail maintained by the U.S. Forest Service. Similarly, in *General Motors Corp. v. Burry*, 203 S.W.3d 514, 550–51 (Tex.App.2006) a Texas appeals court upheld a jury award of $1,010,000 each, for loss of parental consortium to a woman's

---

**210.** Because Saverio Tameleo was already living independently as an adult when he lost his father, Massachusetts law does not allow

him to recover for loss of consortium. *See Barbosa*, 537 N.E.2d at 104.

two daughters who were eleven and nine when their mother suffered permanent brain damage in a car accident.

As in the above cases, where juries and judges have struggled to quantify the unquantifiable, the loss suffered by the Limone, Salvati and Greco children is immeasurable. The children here were deprived of their fathers' love and support at a very early age and some of them were never able to recover. In keeping with the holdings of the other cases, I believe that a damage award of $200,000 per child is warranted on these facts.

### b. *Bystander Intentional Infliction of Emotional Distress*

▪▪▪▪▪ The plaintiffs claiming bystander intentional infliction of emotional distress fall roughly into two categories: (1) family members who experienced the trauma of the conviction and its aftermath, and (2) children who were very young at the time of the conviction.

### (1) *The General Case*

These family members knew immediately of every proceeding from the arrests through the indictments, trial, convictions, sentencings, and denial of the appeals. Many were physically present as events unfolded. Eddie Greco was present when the police came to arrest his father at dinnertime. The entire Limone family was present when the police surrounded their house looking for Peter Limone. Olympia was a defense witness at the trial, and was there at the moment when the

verdict was handed down, at which point she screamed and fainted. Saverio Tameleo was in the courtroom when the verdict and sentence were pronounced.[211]

Moreover, I find that it is reasonable to infer from the evidence that even those who were not physically present at the proceedings, with the exception of the youngest children, who are discussed below, had contemporaneous knowledge of every subsequent development. The trial was heavily reported on television and in the newspapers. And family members and neighbors communicated amongst themselves. For example, Maria Salvati Sidman was told by a friend just as her father was arrested. On the day of his conviction, her whole family was together and her mother told her of the conviction and that her father was innocent. Olympia Limone found out from her brother-in-law as Peter was being arrested. She told Peter Jr. the verdict as soon as she returned home from court after its pronouncement. Eddie Greco was told by his mother as soon as the verdict and sentence were handed down, and was inconsolable.

The severity of their emotional distress as they watched events unfold is discussed at length above,[212] and need not be repeated here, except to note how it was renewed with each agonizing step: arrest, indictment, trial, conviction, sentencing, denial of appeal, commutation, etc.

### (2) *Young Children*

Not all of the plaintiffs' children were fully aware of what was happening when their fathers were convicted. Neither Gail

211. This litany is not meant to be an exhaustive list of who was where when; it is merely a sampling.

212. Roberta Werner testified that when she heard the guilty verdict, she felt "[l]ike my heart was ripped out of my body, I was in some kind of hole and I couldn't get out. It

was horrible." Tr. vol. 11, 47. The measure of her emotional response is best captured by her conduct after the conviction—resorting to drinking, abandoning her children, and cutting off contact with Greco. Accordingly, on this issue her damages are comparable to those of other wives.

nor Anthony Salvati knew that Salvati was in prison at first—Gail was too young to be told, and Anthony was younger still. Carolyn Limone was told that her father was in the hospital, and Janine Limone was just a baby.

But this is not a case of a car accident or a shouting match; the outrageous conduct here did not occur at only one hour of one day. When the children eventually did learn the truth about where their fathers were, they were not hearing about a long-past horrifying event; they were being introduced to an ongoing saga that would be a daily fact of their lives for decades. Nor was this fact merely a lasting consequence of the FBI's outrageous conduct in the late 1960s. Four commutation petitions brought by Salvati from 1986 through 1991 were rejected because the FBI concealed evidence. Each time, Salvati's hopes, and those of his family, for commutation were dashed. The FBI did the same for Limone three times. Each time their fathers' commutation petitions were denied, it spurred a fresh round of despair, horror and humiliation for the by-then fully aware and involved younger children. Therefore, I award them damages for bystander intentional infliction of emotional distress on the same terms as their siblings.

Even in the case of death, bystander intentional infliction of emotional distress awards tend to be smaller than awards for wrongful imprisonment or loss of consortium. *See, e.g., Blinzler v. Marriott International, Inc.*, 81 F.3d 1148, 1150 (1st Cir.1996) ($200,000 to wife who watched husband die of a heart attack while waiting for an ambulance that took 30 minutes to arrive; negligent, not intentional, infliction of emotional distress); *Stabenow v. Jacobsen*, 610 N.W.2d 512, 2000 WL 157483 (Wis.App.2000) ($24,000 to two parents together who witnessed son's death at hands of drunk driver); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993) ($6,200 to mother who learned that defendant killed daughter in car accident and hid the body).

I award $50,000 to each family member whose trauma was proximately caused by the defendant's intentional infliction of emotional distress.

## VI. *CONCLUSION*

On one of the plaques in this building is a portion of a quote from Justice Brandeis' dissent in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). It is fitting to quote it here more completely:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

*Olmstead v. United States*, 277 U.S. at 485, 48 S.Ct. 564.

Judgment for the plaintiff; damages as follows:

I **AWARD** damages in the amounts of **Twenty–Eight Million And 00/100 ($28,-000,000.00) Dollars** to the estate of Louis

Greco, Sr., **Twenty–Six Million And 00/100 ($26,000,000.00) Dollars** to Peter Limone, Sr., **Twenty–Nine Million And 00/100 ($29,000,000.00) Dollars** to Joseph Salvati, and **Thirteen Million And 00/100 ($13,000,000.00) Dollars** to the estate of Enrico (Henry) Tameleo.

To Olympia Limone, Marie Salvati, and the estate of Giovannina (Jeannete) Tameleo, I **AWARD** damages in the amount of **One Million And 00/100 ($1,000,000.00) Dollars** for loss of consortium and **Fifty Thousand And 00/100 ($50,000.00) Dollars** for intentional infliction of emotional distress, for a total award of **One Million, Fifty Thousand And 00/100 ($1,050,000.00) Dollars** to each of these plaintiffs separately.

To EACH of Peter Limone, Jr., Paul Limone, Carolyn Limone Zenga, Janine Limone Arria, Maria Sidman, Sharon Salvati, Gail Orenberg, Anthony Salvati, Edward Greco, and the estate of Louis Greco, Jr., separately, I **AWARD** damages in the amount of **Two Hundred Thousand And 00/100 ($200,000.00) Dollars** for loss of consortium and **Fifty Thousand And 00/100 ($50,000.00) Dollars** for intentional infliction of emotional distress, for a total of **Two Hundred, Fifty Thousand And 00/100 ($250,000.00) Dollars** to each of these plaintiffs separately.

To EACH of Roberta Werner and Saverio Tameleo separately, I **AWARD** damages in the amount of **Fifty Thousand And 00/100 ($50,000.00) Dollars** for intentional infliction of emotional distress.

**SO ORDERED.**